TRINA A. HIGGINS, United States Attorney (#7349)
TODD C. BOUTON, Assistant United States Attorney (#17800)
JACOB J. STRAIN, Assistant United States Attorney (#12680)
SACHIKO JEPSON, Special Assistant United States Attorney (#17077)
Attorneys for the United States of America
111 South Main Street, Ste. 1800, Salt Lake City, Utah 84111
Telephone: (801) 524-5682

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-cr-00010-HCN |
| Plaintiff, | UNITED STATES'MOTION IN LIMINE TO PRECLUDE DEFENDANTS FROM RAISING A NECESSITY DEFENSE AND ANY VARIANTS THEREOF |
| vs. | |
| PLASTIC SURGERY INSTITUTE OF · UTAH, INC.; MICHAEL KIRK MOORE JR.; KARI DEE BURGOYNE; KRISTIN JACKSON ANDERSEN; AND SANDRA FLORES, | Judge Howard C. Nielson Jr. |
| Defendants. | |

*To raise a necessity defense, a defendant must establish that he faced "an unlawful and present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury."[1]*

*The defense of necessity is "based on a real emergency" and "may be asserted only by a defendant who was confronted with a crisis as a personal danger."[2]*

*Even in the face of a real emergency, "if there was a reasonable, legal alternative to violating the law . . . the [necessity] defense[ ] will fail."[3]*

---

[1] *United States v. Vigil,* 743 F.2d 751, 756 (10th Cir.1984).
[2] *United States v. Al-Rekabi,* 454 F.3d 1113, 1121–22 (10th Cir. 2006) (citing *United States v. Lewis,* 628 F.2d 1276, 1279 (10th Cir.1980)).
[3] *United States v. Bailey,* 444 U.S. 394, 409-10 (1980).

1.    **INTRODUCTION**

This is the kind of case where the Court's decision on a key motion in limine—this motion—is likely to definitively shape, if not outright decide, the case.[4]

The defendants are charged with (1) Conspiracy to defraud the United States in violation of 18 U.S.C. § 371; (2) Conspiracy to Convert, Sell, Convey, and Dispose of Government Property in violation of 18 U.S.C. §§ 371 and 641; and (3) Conversion, Sale, Conveyance, and Disposal of Government Property in violation of 18 U.S.C. §§ 641 and 2. These charges are based largely on the defendants' scheme to destroy COVID-19 vaccines and to unlawfully distribute COVID-19 vaccination record cards to at least 1,000 persons who never received a COVID-19 vaccine. They did this so that the card recipients could pass themselves off as having been vaccinated in order to avoid having to comply with then-current health-and-safety restrictions for the unvaccinated.

Based on multiple public statements and admissions made by Defendant Dr. Michael Kirk Moore, Jr. ("Dr. Moore") and on statements made by his current counsel, Dr. Moore (and/or his codefendants) intend(s) to assert a bastardized version of the "necessity defense" at trial. In essence, they intend to argue that Dr. Moore and his codefendants were justified in breaking the law to protect others from having to either (a) be vaccinated for COVID-19, or (b) suffer the consequences and temporary restrictions attendant to their choice not to be vaccinated.

This pseudo-"necessity defense" cannot, however, meet the required elements of a true necessity defense. A true necessity defense requires the defendant to show (1) that the defendant

---

[4] *See, e.g.*, *Copar Pumice Co. v. Morris*, No. CIV 07-0079 JB/ACT, 2009 WL 2424567, at *1 (D.N.M. July 6, 2009) (district courts may entertain motions in limine to exclude evidence "at the heart of th[e] case"); *see also United States v. O'Dowd*, Case No. 2:20-cr-00332, 2022 2022 WL 4448309 at *3-5 (D. Utah Sep. 23, 2022) (Mag. J. Oberg) (unpublished) (granting in part motion in limine and precluding defendants from raising a necessity defense at trial).

was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) that the defendant had no reasonable, legal alternative to violating the law—that is, a chance both to refuse to do the criminal act and also to avoid the threatened harm; and (3) that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm.[5] The defendants' quasi-"necessity defense" cannot meet these elements.

Because defendants cannot meet the standard for a true and legally recognized necessity defense, the Court should preclude the defendants from wasting the jury's time and confusing the jury with this legally unrecognized and politically charged defense. FRE 401-403 (precluding irrelevant evidence and even relevant evidence whose probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time). Equally important, the defendants should be precluded from introducing such an improper defense or argument—with no legal basis—to invite jury nullification over a politically charged issue. *Id.* Simply put, defendants should not be allowed to taint the jury with a pseudo "necessity defense".[6]

/ / /

/ / /

/ / /

/ / /

---

[5] *Vigil*, 743 F.2d at 755. There is a fourth element for the legally recognized necessity defense that sometimes applies in other cases—namely, that the defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct. *Id.* This element appears to be inapplicable here.
[6] *See United States v. Patton*, 451 F.3d 615, 619-20, 638 (10th Cir. 2006) (district court did not abuse its discretion in granting government's motion in limine to preclude defendant from asserting a "modified necessity defense"); *United States v. Seward*, 687 F.2d 1270, 1271, 1273-1275, 1277-78 (10th Cir. 1982) (en banc), cert. denied, 459 U.S. 1147 (1983) (trial court did not abuse its discretion in granting motion in limine to preclude necessity defense to defendants who criminally trespassed on federal land to protest at a nuclear plant site); *United States v. Aguirre-Torres*, 3 Fed. Appx. 852, 853-854 (10th Cir. 2001) (unpublished) (trial court did not err in granting government's motion in limine to preclude defendant from raising necessity defense based on his subjective belief that he needed to illegally reenter the United States in order to assist his ailing, wheelchair-bound mother who was on dialysis).

## 2.    FACTUAL BACKGROUND

### 2.1.    There appears to be little, if any, dispute as to the key facts that will establish whether the defendants committed the crimes charged in this case.

The evidence will establish that the defendants conspired to obstruct a lawful government function of the Centers for Disease Control and Prevention ("CDC") in violation of 18 U.S.C. § 371. More specifically, the evidence will show (a) that they did so by knowingly distributing fraudulently completed COVID-19 vaccination record cards to unvaccinated persons, and (b) that they did so with the intent to obstruct the CDC's efforts to provide a reliable means of verifying vaccination status through the controlled distribution of COVID-19 vaccination record cards to only those persons who had actually been vaccinated. Among other things, text messages between the defendants and others will establish this. The testimony of Defendant Sandra Flores (Dr. Moore's former receptionist) and others will establish this. The testimony of two separate undercover agents will establish this. And, perhaps, most damning, Dr. Moore seems to have essentially admitted as much in his post-arraignment public pronouncements. (*See infra* § 2.2).

The evidence will also establish that the defendants conspired to convert, sell, convey, and dispose of government property  in violation of 18 U.S.C. §§ 371 and 641, and did, in fact, convert, sell, convey, and dispose of government property in violation of 18 U.S.C. §§ 641 and 2. Among other things, the relevant evidence will show that:

(1) Dr. Moore signed a CDC COVID-19 Vaccination Program Provider agreement so that his medical practice Plastic Surgery Institute of Utah, Inc. ("PSI") could receive COVID-19 vaccines;

/ / /

/ / /

(2) Approximately 2,200 doses of the vaccine were received by the defendants and then destroyed or otherwise discarded;[7]

(3) The defendants knowingly worked together to provide fraudulently completed COVID-19 vaccination record cards to individuals who had not received a COVID-19 vaccine ("unvaccinated card recipients");

(4) At some point, these unvaccinated card recipients were generally directed to donate and show they had donated $50 to a specified "charitable organization" before scheduling an appointment to come to PSI to receive a fraudulently completed COVID-19 vaccination record card without first (or ever) being vaccinated;

(5) In some cases, minor children were injected with saline shots so that they would think they were receiving a COVID-19 vaccine or so they could technically claim they had been "vaccinated" with something;

(6) Although the COVID-19 vaccinations never took place, the defendants worked together to report false vaccinations to the Utah Statewide Immunization Information System.

Admittedly, as a whole, the defendants have neither stipulated to nor admitted all the key facts in the foregoing paragraphs. But documentary evidence, witness testimony, and other evidence will establish as much. And, equally if not more important, in public statements, the main defendant, Dr. Moore, has, at least on his own behalf, essentially owned many if not all of these facts—at least in general terms.

/ / /

---

[7] Depending on which version of the COVID-19 vaccine a recipient received, they needed to receive either one or two doses of the vaccine to be considered fully vaccinated. This suggests that at least approximately 1,000 persons, if not more, received fraudulent COVID-19 vaccination record cards from the defendants.

But regardless of whether and to what extent any substantive factual dispute(s) need be and remain to be tried to a jury in this case, Dr. Moore has made it clear that he intends to present (either directly or through his counsel) a pseudo "necessity defense" at trial. The United States maintains that Dr. Moore's variant of a necessity defense is flawed and inadmissible.

### 2.2. Despite appearing to admit he committed the charged crimes, Dr. Moore has indicated that he intends to assert a pseudo-"necessity defense" based on his perceived obligation as a doctor to resist COVID-19 vaccinations and mandates.

Defendants seek a jury trial[8] because according to Dr. Moore, "I've been indicted for not murdering and not maiming people."[9] Dr. Moore's assessment is inapt. The defendants actually have been indicted for deception, conversion and destruction of government property, and for purposeful efforts to defraud and impede a lawful government function. But Dr. Moore's statement, and many others like it, are de facto admissions of his guilt for the indicted conduct and reveal his intention to present—or have his counsel present—a pseudo-"necessity defense" at trial.

Indeed, after being indicted, Dr. Moore took to social media to argue his case in the public square.[10] He has spoken at length about his criminal case, about his conduct, as well as the conduct of his staff, and about his anticipated defense(s).

On February 15, 2023, defendant Dr. Moore posted to his X account "Stand_For_Moore" the following: "After he stood by his Hippocratic Oath to 'first, do no harm' helping thousands of

---

[8] With the exception of defendant Sandra Flores who is now cooperating against her co-defendants.
[9] Social media post on April 21, 2023 (*available at* https://x.com/Stand_for_Moore/status/1649459127725465601).
[10]  Post-indictment, Dr. Moore has posted to a Twitter account called "Stand_For_Moore" https://twitter.com/Stand_for_Moore.
He has appeared on Rumble.com (https://rumble.com/v2k8lkg-blood-money-episodes-79-and-80-with-domenico-cocchella-and-dr-kirk-moore.html) (https://rumble.com/v29molo-february-15-2023.html).
He has appeared on Facebook live (https://fb.watch/rg5dROdZzh/).
He has been interviewed on YouTube (https://www.youtube.com/watch?v=6OW3_7DG_W8).

individuals being forced to get the experimental Covid vaccine, Dr. Kirk Moore and his staff now face federal charges. @elonmusk #standformoore https://tinyurl.com/MooreGiveSendGo."[11]

On April 26, 2023, defendant Dr. Moore appeared on a YouTube video interview through the channel MSCS MEDIA. The video is entitled, "Dr. Kirk Moore Indicted on Covid Mandate, Breast Augmentation Plastic Surgeon | Mscs Media *299"[12] In that interview, Dr. Moore made the following admissions:

- "I was told this by a friend um and he said uh you know 'Kirk you got to realize that um you are actually being indicted for not murdering people and not maiming people.' That's, that's really what it comes down to…"

- "I think that if we lose this fight, if we lose the medical Freedom fight, um, we've lost it. I mean, that's the, that's the next domino in this whole, you know, in this whole sphere and this whole scheme."

- "I'm gonna go down kicking and screaming um, and make sure that my message is out there."

- "I want the government out of our medical system . . . medical care is supposed to be between a doctor and a patient."

- "They have no right to mandate anything. They have no right to tell you that you need to have a treatment that can participate in society, and they have no right to tell a doctor that he needs to provide this particular treatment for this patient."

- "[T]hey couldn't have a kidney transplant unless they had a vaccine. Wow, um, and you know, military, you know, military personnel people that, whose job depended on them traveling, I mean, even somebody who worked in Salt Lake City that was traveling back and forth to Seattle, you know, um, they couldn't keep that job. ***So, uh, you know, that was that was where we kind of, you know, we stepped in we, you know, provided vaccines [sic] for those people that, you know, were going on***." (emphasis added).

- "My requirement as a physician is the first 'do no harm' um, and so I'm, I, you know, that's a higher calling, a higher, you know, a higher objective than, you know, abiding by, by, you know, some legal, whether it's lawful or unlawful, um let some, you know, quote unquote legal requirements."

---

[11] available at https://twitter.com/Stand_for_Moore.
[12] available at https://www.youtube.com/watch?v=6OW3_7DG_W8.

- "There is absolutely zero reason why everybody on this planet needs to have a needle in their arm."

- "Thousands upon thousands the hundreds of upon hundreds of thousands of people that are vaccine injured that are coming out in the public."

- "If they get to this point where they can demand and mandate that we have a medical procedure and injection, take a pill, take a tablet, um, you know, get this spray, go through, you know, this medical intervention, whatever it is; if they have the ability to do that, we've lost any other level of freedom that we could ever possibly think of having. So, you know, this is kind of the, the, the end, uh, the beginning of the end."

- "We just we need all the support we can get, um, and, uh, try to, you know, try to just fight and, and stand up against our federal government, um, and their ability to tell people what they need to have done in order to be contributors to society."

- "If we can't keep a needle out of everybody's arms now, we're not gonna be able to keep, you know, any other intervention that our government says is going to be required in order to be, you know, like I said, contributors to society."

On May 2, 2023, Defendant Dr. Moore was interviewed in a Facebook video on the

"Crashing Justice Show" and also made the following admissions:

- "It's a lot of really smart doctors and a lot of really smart scientists and everybody else that bought this whole thing, hook line and sinker, how they can say that, you know, they're reading the science or reading the data, when there is no science, and there is no data, and then the only stuff that is out there is all bad: myocarditis, strokes, um, cardiovascular disease, uh, people dying from aortic aneurisms . . . all the vaccines . . . all of them . . . not one of them is better than the other. It's just, they're all bad."

- "We're looking to get as much information and data as we can . . . trying to put together an exhaustive list of discovery questions and data that we want to get out of the federal government. You guys know enough about what's going on with Sasha Latypova and some of the information she's put out with the Department of Defense. . . ."

- "They have to prove to me that I committed fraud and so ***one of my arguments*** potentially is that, you know, I didn't commit fraud because the fraud was started with this vaccine. So, I'm going to request all the science and all the data and everything behind all the contracts and everything they've had with the Department of Defense and that they've had with any third party" (emphasis added).

/ / /

/ / /

/ / /

**2.3.    Dr. Moore's defense counsel has also specifically indicated that they intend to present a "necessity defense" on his behalf.**

In conversations with the United States' counsel, Dr. Moore's defense counsel has indicated that they believe Dr. Moore (and by extension, his codefendants) may have a viable "necessity defense" to the crimes with which they are charged. The United States apprised Dr. Moore's counsel that it intended to file this motion in limine to preclude such a defense. Dr. Moore's counsel indicated that they would oppose the motion.

In a recent status conference on April 18, 2024, Dr. Moore's counsel also indicated on the record that they intended to call "many witnesses" at trial. The United States anticipates that defense counsel may thus intend to call numerous unvaccinated card recipients who were, to a lesser degree, complicit with the defendants in their efforts. The United States posits that this testimony would focus on personal, medical, or other perceived challenges or inconveniences that these as-yet-unidentified unvaccinated individuals faced and the introduction of justifications as to why these persons "needed" the defendants' help to obtain fraudulent vaccination record cards.

## 3.    LEGAL ARGUMENT

Simply put, the defendants did not agree with a government program, so they engaged in criminal conduct designed to undermine, defraud, and impede it. The defendants are, in essence, impassioned protesters who chose to commit federal crimes instead of seeking lawful recourse through the political process. Instead of contenting themselves with publicly expressing their opinions, exploring legal remedies, writing their representatives, running for office, or contributing to political affiliates with whom they were aligned, they chose to break the law. They anointed themselves as defenders of medical freedom and saviors of common, but, in their view, deluded Americans—and determined, wrongly, that they could declare themselves to be above the law.

The defendants are entitled to their opinions and to express them. Indeed, the First Amendment protects the fundamental and cherished value of freedom of speech.

> The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests.[13]

However, the defendants cannot raise a quasi-"necessity defense" in a protest case like this one. Nor can they raise a "necessity defense" because (1) they cannot show they acted under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) they cannot show they had no reasonable, legal alternative to violating the law; and (3) they cannot show that there was a direct causal relationship between their criminal actions and the avoidance of any imminent bodily harm.

Moreover, a federal criminal trial is not the venue to protest or to debate the efficacy or wisdom of a lawful government function such as the CDC's vaccination program and attendant, controlled distribution of COVID-19 vaccination record cards to only vaccinated persons. Rather, a federal criminal trial is a highly regulated environment where the primary focus is to establish relevant—and only relevant—facts so that a jury can determine whether the elements of specific, charged crimes have been committed. To maintain order and respect for the process, the courtroom operates under strict procedural rules; and therefore, it must necessarily limit certain freedoms including aspects of free speech.[14] While the defendants have a right to resolve disputed factual

---

[13] *Cohen v. California*, 403 U.S. 15, 24 (1971).
[14] *See Mezibov v. Allen*, 411 F.3d 712, 719 (6th Cir. 2005) ("[A]n attorney's job in the courtroom, although it necessarily includes speech, is fundamentally inconsistent with the basic concept of 'free' speech.").

issues before a jury,[15] if a proffered legal defense fails to establish the elements of an actual defense, the Court need not, and should not, submit it to a jury.[16]

### 3.1 The necessity defense is legally unavailable in protest cases like this one.

The necessity defense is a concept from common law that is, in essence, an appeal to utilitarianism—meaning, the social benefits of the crime outweigh the costs of failing to commit the crime. The Supreme Court has assumed, without deciding, that a common law defense of necessity is available in relation to a federal statutory crime.[17] So has the Tenth Circuit.[18]

The Tenth Circuit has explained that "[t]he defense of necessity does not arise from a 'choice' of several courses of action. . . . It can be asserted only by a defendant who was confronted with . . . a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts."[19] Most important, in cases similar in context to this one, the Tenth Circuit has specifically excluded protests from the necessity defense, noting: "It is obviously not a defense to charges arising from a typical protest."[20] This protest-exclusion standard has been adopted by at least four other circuit courts.[21] This makes sense, of course. "The necessity defense

---

[15] *See Sandstrom v. Montana*, 442 U.S. 510, 523 (1979).

[16] *See United States v. Bailey*, 444 U.S. 394, 416-17 (1980) (holding—in a case concerning prisoners who escape or attempt to escape custody under 18 U.S.C. § 751(a)—that the trial court and jury "need not be burdened" with testimony concerning elements of an affirmative defense that is insufficient to sustain that defense, because "[w]ere we to hold . . . that the jury should be subjected to this potpourri even though a critical element of the proffered defenses was concededly absent, we undoubtedly would convert every trial under § 751(a) into a hearing on the current state of the federal penal system").

[17] *Dixon v. United States*, 126 S.Ct. 2437, 2445 (2006).

[18] *See United States v. Patton*, 451 F.3d 615, 638 (10th Cir. 2006) ("the district court did not abuse its discretion by granting the government's motion in limine to exclude Mr. Patton's modified necessity defense.").

[19] *United States v. Seward*, 687 F.2d 1270, 1276 (10th Cir.1982) (en banc), cert. denied, 459 U.S. 1147 (1983); *see also United States v. Schoon*, 971 F.2d 193, 196 (9th Cir. 1991), as amended (Aug. 4, 1992) ("the necessity defense is inapplicable to cases involving indirect civil disobedience").

[20] *Seward,* 687 F.2d at 1276.

[21] *United States v. Maxwell*, 254 F.3d 21, 26-29 (1st Cir. 2001) (necessity defense barred in prosecution of offenses originating in naval base protest); *United States v. Cassidy*, 616 F.2d 101, 101-102 (4th Cir. 1979) (anti-nuclear war protest offenses at Pentagon not justified by necessity defense); *United States v. Quilty*, 741 F.2d 1031, 1032-1034 (7th Cir. 1984) (anti-nuclear war protest offenders not allowed to present necessity defense at trial); *United States v. Schoon*, 971 F.2d 193, 195-200 (9th Cir. 1992) (obstructive protestors at IRS office could not, by law, avail themselves of necessity defense; *United States v. Dorrell*, 758 F.2d 427, 430-434 (9th Cir. 1985) (necessity defense disallowed in prosecution stemming from MX missile protest); *United States v. Lowe*, 654 F.2d 562, 564-567 (9th Cir. 1981) (no

was never intended to excuse criminal activity by those who disagree with the decisions and policies of the lawmaking branches of government."[22] And if the law allowed protesters to commit crimes based on ethical, moral, or religious beliefs, no matter how sincerely held, it "would not only lead to chaos but would be tantamount to sanctioning anarchy."[23] For example, the defendants in this case might arguably hold anti-vaccine beliefs just as fervently as anti-pollution protesters who destroy and deface priceless works of art by da Vinci, Monet, and van Gogh. But just as case law would not support making the necessity defense available to anti-pollution protestors who engaged in such behavior, it does not support making the necessity defense available to the defendants in this case.

In *Seward*, the defendants were protestors who were arrested and charged as trespassers at the Rocky Flats nuclear facility in Colorado where they sat down or laid across the roadway in protest of the facility.[24] The prosecution filed a motion in limine seeking to bar the defendants from presenting necessity defenses at trial. The trial court ordered the defendants to provide offers of proof in advance of trial regarding their proposed necessity defenses. The defendants' offers of proof proposed that "various witnesses would have testified to the effects of radiation, risks of accidental leakage, soil contamination in the land surrounding Rocky Flats, and lack of viable political alternatives."[25] The trial court ruled that their offers of proof fell short of the necessity defense requirements, and all necessity-related evidence and arguments were barred from trial. The Tenth Circuit ruled the trial court did not abuse its discretion in the pretrial consideration and

---

necessity defense available in prosecution of protestors of nuclear submarine base); *United States v. May*, 622 F.2d 1000, 1002-1004, 1008-1010 (9th Cir. 1980) (Trident missile protestors at naval installation failed to satisfy requirements of necessity defense).

[22] *United States v. Kabat*, 797 F.2d 580, 591-592 (8th Cir. 1986).

[23] *United States v. Turner*, 44 F.3d 900, 903 (10th Cir. 1995) (citations omitted).

[24] *Seward,* 687 F.2d at 1271-72.

[25] *Id*. at 1273.

bar of the defense, as "the defendants failed in their offer of proof to meet several of the requirements necessary to permit the trial court to submit the necessity defense to the jury,"[26]

As outlined in Dr. Moore's commentary on various social media platforms, this case involves a form of civil disobedience in protest of a government program that the defendants sought to frustrate through criminal activity. Notably, the Defendants' protest-crimes carried less moral authority than more traditional forms of civil disobedience, because the Defendants' crimes were done in secret—without daring to openly defy or protest the CDC's vaccination and vaccination-card-distribution program, which Dr. Moore now claims was unlawful. Indeed, it can be argued that "[t]he political power of civil disobedience stems in part from the fact that those who engage in it are willing to face being punished for their actions. John Rawls, for example, claimed that civil disobedience could be accepted as a source of change within a democratic legal system because 'fidelity to law is expressed by the public and nonviolent nature of the act, by the willingness to accept the legal consequences of one's conduct.'"[27]

Even though the defendants may have sincerely believed they were saving lives by destroying over 2,000 doses of the COVID-19 vaccine and distributing fraudulently completed vaccination record cards to the unvaccinated, necessity can never be a defense to the type of protest-driven crimes that the defendants have committed. Accordingly, as a matter of law under Tenth Circuit precedent, the necessity defense is legally unavailable to them.

**3.2 The defendants cannot meet the elements of a necessity defense.**

Even if the necessity defense were not precedentially unavailable to the defendants, the defense would still fail because the defendants cannot meet the elements of a bona fide necessity

---

[26] *Id*. at 1273-76.
[27] Nick Robinson, Elly Page, Protecting Dissent: The Freedom of Peaceful Assembly, Civil Disobedience, and Partial First Amendment Protection, 107 Cornell L. Rev. 229, 281–82 (2021) (citing JOHN RAWLS, A THEORY OF JUSTICE 320, 322 (rev. ed. 1999)).

defense. In cases where a defendant seeks to raise a necessity defense, a pre-trial offer of proof is required as to each element, so that the trial court may duly consider whether the defense should reach the jury before exposing the jury to it. To prevail on a necessity defense, the defendants must prove that: "(1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship is reasonably anticipated to exist between the defendant's action and the avoidance of harm."[28] This Court need only find that the defendant fails to meet just one of the elements to bar the necessity defense from finding its way to the jury. Nevertheless, given the nature of the case, the defendants cannot meet any of the elements.

### 3.2.1 The Defendants cannot show that they had no available legal alternative(s) to violating the laws they are charged with violating.

"The sine qua non of [the necessity] defense is a lack of a reasonable, lawful alternative."[29] Even in a true crisis, there are almost always legal alternatives that do not involve criminal conduct. In *Turner*,[30] a "sidewalk counselor" scaled a fence surrounding an abortion clinic and "entered the clinic in order to pray and place her body in front of a woman who was attempting to enter the clinic."[31] Turner was arrested and subsequently convicted of obstructing a federal court order not to trespass. Following a successful appeal, Turner was retried and again convicted. Turner appealed again claiming that the trial court erred in refusing to instruct the jury on the necessity defense. The Tenth Circuit determined that the district court properly refused to instruct the jury

---

[28] *United States v. Patton*, 451 F.3d 615, 638 (10th Cir. 2006); *United States v. Al-Rekabi*, 454 F.3d 1113, 1121 (10th Cir. 2006); *United States v. Unser*, 165 F.3d 755, 764 (10th Cir. 1999) ("[T]he defendant at least must bear the initial burden of producing evidence which could support a finding in his favor on each element of the defense.").
*see also United States v. Turner*, 44 F.3d 900, 902 (10th Cir. 1995) (citing *United States v. Schoon*, 955 F.2d 1238, 1239–40 (9th Cir.1991)).
[29] *United States v. Dixon*, 901 F.3d 1170, 1179 (10th Cir. 2018).
[30] *United States v. Turner*, 44 F.3d 900 (10th Cir. 1995).
[31] *Id*. at 901.

on the necessity defense because, among other things, there were legal alternative means available to the defendant to accomplish her objectives.[32]

In *DeChristopher*,[33] the defendant protested an auction by the Bureau of Land Management for oil and gas leases on parcels of public land in Utah. He did this by bidding on the leases that he did not have the means or intention of purchasing. He was indicted and ultimately convicted at trial for violating the Federal Onshore Oil and Gas Leasing Reform Act and for providing false statement(s). The trial court (Judge Dee Benson) granted the United States' motion in limine to prevent the defendant from raising a necessity defense. The Tenth Circuit found no abuse of discretion in the conclusion that the evidence was insufficient to allow a necessity defense to be raised to the jury because it determined, among other things, that there were legal alternative means available to the defendant to accomplish his objectives.[34]

Here, as in *Turner* and *DeChristopher*, there were legal alternative means available to the defendants to accomplish their objectives—to help many individuals avoid the restrictions associated with choosing not to be vaccinated. As mentioned above, the defendants had several lawful means to respond to the CDC's COVID-19 vaccination and vaccination-record-card-distribution program: The defendants could have filed a civil lawsuit requesting that a court enjoin vaccine mandates, requirements, or restrictions; they could have contacted their elected representatives; they could have organized or participated in rallies, parades, and the like; they could have engaged the print and broadcast media to cast their message to the masses; they could have enlisted celebrities to champion their cause; they could have recruited prominent members of the legal community to act as spokespersons; and so on. "There are thousands of opportunities

---

[32] *Id*. at 903.
[33] *United States v. DeChristopher*, 695 F.3d 1082 (10th Cir. 2012).
[34] *Id.* at 1096 ("Here, the district court did not abuse its discretion in concluding the evidence was insufficient to support a necessity defense. We need go no further than the first prong—the absence of a legal alternative.")

for the propagation of [a] message: in the nation's electoral process; by speech on public streets, in parks, in auditoriums, in churches and lecture halls; and by the release of information to the media, to name only a few."[35]

Perhaps, most important, here, where the unvaccinated persons that the defendants sought to help were in no imminent danger of seriously bodily harm or death, the defendants could have simply allowed the unvaccinated card-seekers to continue to remain unvaccinated and to comply with the temporary health-and-safety restrictions placed on them based on their voluntary choice to remain unvaccinated. Or, had they desired, the unvaccinated card-seekers could have complied under protest or waited to comply until they had exhausted all legal remedies. But in any event, the defendants always had the legal alternative not to distribute fraudulently completed vaccination record cards and to allow others to comply with the law. Had they done so, neither the defendants nor the unvaccinated card-seekers would have faced any real emergency or imminent threat of serious bodily injury or death that required them to break the law. (*See infra* § 3.2.2). Because the defendants faced no imminent threat to themselves or others, the defendants could have simply not responded to the CDC's COVID-19 vaccination- and vaccination-record-card-distribution program. In the absence of an emergency, doing nothing was always a viable legal alternative.[36]

But despite having many legal alternatives, the defendants chose to do what they were not at liberty to do—to break the law. And they did it in secret, without any of the moral authority that generally attends an honest, sincere, and public act of civil disobedience.[37] Instead, the defendants in this case chose the less patient and knowingly criminal route to protest the government program. As the Ninth Circuit has recognized, "[t]hose who wish to protest in an unlawful manner frequently

---

[35] *United States v. Quilty*, 741 F.2d 1031, 1033 (7th Cir. 1984).
[36] *See Vigil*, 743 F.2d at 755 (A reasonable legal alternative can include "a chance both to refuse to do the criminal act and also to avoid the threatened [imminent] harm.")
[37] *Supra* n. 27.

are impatient with less visible and more time-consuming alternatives."[38] However, "[t]heir impatience does not constitute the necessity that the defense of necessity requires."[39] Moreover, a defendant's subjective belief as to available legal alternatives should not be determinative.[40] Rather, the defendant's belief that there were no other legal alternatives must be reasonable.[41] Accordingly, the defendants cannot bring a necessity defense, here, because they had several objectively reasonable, legal alternatives open to them.

### 3.2.2 The Defendants cannot show they reasonably acted to avoid an imminent threat of bodily harm or injury to themselves or others.

To avail themselves of the necessity defense, the defendants must establish that "the harm to be avoided [was] so imminent that, absent the [] criminal acts, the harm [was] *certain* to occur."[42] "Although some leeway needs be given to individuals responding to an emergency, they must still act in the most responsible manner available under the circumstances."[43] The term "imminent harm" connotes a real emergency or crisis.[44] Therefore, to raise a necessity defense, a defendant must establish that he faced "an unlawful and present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury."[45]

Here, the defendants cannot make the required showing needed to support a "necessity defense"—namely, that they reasonably acted to avoid a well-grounded apprehension of an

---

[38] *United States v. Dorrell*, 758 F.2d 427, 431 (9th Cir. 1985).

[39] *Id*.

[40] *United States v. Dixon*, 901 F.3d 1170, 1181 (10th Cir. 2018); *United States v. Saldivar-Munoz*, 439 F. App'x 730, 735 (10th Cir. 2011) (unpublished) ("[A] defendant's subjective belief that he has no available legal alternatives is insufficient to submit the question to a jury.") (citing *U.S. v. Meraz*-Valeta, 26 F.3d 992, 995 (10th Cir. 1994) overruled on other grounds by *U.S. v. Aguirre-Tello*, 353 F.3d 1199, 1207-1208 (10th Cir. 2004)). *United States v. Aguirre-Torres*, 3 F. App'x 852, 854 (10th Cir. 2001) (unpublished) (citations omitted)

[41] *See id.*

[42] *United States v. Kabat*, 797 F.2d 580, 591 (8th Cir. 1986) (*citing Bailey*, 444 U.S. at 410) (emphasis added).

[43] United States v. Al-Rekabi, 454 F.3d 1113, 1123 (10th Cir. 2006); *see also United States v. Dixon*, 901 F.3d 1170, 1179 (10th Cir. 2018).

[44] *See Seward*, 687 F.2d at 1276.

[45] *United States v. Vigil*, 743 F.2d 751, 756 (10th Cir.1984).

imminent and impending threat of death or serious bodily injury to themselves or other persons. In Dr. Moore's words, the defendants were purportedly acting to avoid "murdering and [] maiming people" by helping unvaccinated persons, who did not want to comply with then-current health-and-safety restrictions for the unvaccinated, receive fraudulent vaccination record cards.[46] However, the defendants had no reasonable basis to conclude that these other unvaccinated persons, to whose aid they purportedly came, were, in fact, facing an imminent and impending threat of death or serious bodily injury to themselves. These persons may have been facing employment, educational, or other consequences based on their decision not to be vaccinated. In some cases, they could have been facing termination from their employment, work and schooling restrictions, travel restrictions, restrictions on entering public and private venues, and even delays in receiving some medical procedures. But these persons were not facing an imminent and impending threat of death or serious bodily injury.

Even if the Court were to determine that the defendants reasonably and sincerely believed that the administration of a COVID-19 vaccine could have caused an unvaccinated card-seeker to die or to suffer serious bodily injury, the unvaccinated card-seekers never had to take the vaccine.[47] Nor were the defendants saving any unvaccinated card-seekers from being potentially injured by the vaccine. No one was standing next to the unvaccinated card-seekers ready to imminently and forcibly inject them with a COVID-19 vaccine against their will. Defendants were not swooping in at the last minute or second to swat an arsenic-filled syringe out of the hand of a government agent attempting to forcibly inject an unwilling and helpless unvaccinated card-seeker. By definition and inclination, these unvaccinated card-seekers never intended to be vaccinated. And no one was forcing them to be. The unvaccinated did face some restrictions consistent with public-

---

[46] *Supra* nn. 9 and  12 and page 7.

[47] By raising this argument, the United States by no means concedes that such a belief would have been reasonable.

health-and-safety measures enforced by democratically elected leaders. But no one was imminently threatening them with death or bodily injury from compelled vaccination. Therefore, the defendants cannot show that they acted in response to a well-grounded apprehension of an imminent and impending threat of serious bodily harm or death to themselves or others.

Because the defendants cannot establish that they violated the law in response to a "real emergency" that threatened "imminent" serious bodily harm or death to themselves or others, the Court should preclude them from raising a "necessity defense" at trial. Fed. R. Evid. 401-403.

### 3.2.3 The defendants cannot show that there was a direct causal relationship between their actions and their stated goals to protect persons from being forcibly vaccinated or to stop the CDC's vaccination program.

"A defendant must demonstrate cause and effect between an act of protest and the achievement of the goal of the protest by competent evidence. He cannot will a causal relationship into being simply by the fervor of his convictions (no matter how sincerely held)."[48]

The goals outlined by Dr. Moore in his public statements were to get "the government out of our medical system"; to "keep a needle out of everybody's arms"; and to stop the federal government from telling "people what they need to have done."[49] In essence, the defendants sought to avoid COVID-19 vaccination and to stop the CDC's COVID-19 vaccination program. But the defendants cannot show that they reasonably anticipated that their criminal actions would directly bring about the ends they claim to have sought, much less to avoid a bona fide, imminent and impending threat of death or serious bodily injury.[50]

In fact, the opposite is true. The defendants cannot show that by distributing fraudulently completed COVID-19 vaccination record cards, administering saline shots to minors, and

---

[48] *United States v. Maxwell*, 254 F.3d 21, 28 (1st Cir. 2001).

[49] *See supra* section 2.2.

[50] *Vigil*, 743 F.2d at 755 (noting this required element to support a necessity defense).

fraudulently uploading the names of unvaccinated persons to the Utah Statewide Immunization Information System, they reasonably anticipated that they could stop "compulsory vaccination" and the CDC's COVID-19 vaccination program or avoid an imminent threat of bodily injury or death. Rather, by secretly and fraudulently distributing COVID-19 vaccination record cards to unvaccinated persons and allowing them to pass themselves off as vaccinated, the defendants were only fostering the policies that existed to encourage and incentivize COVID-19 vaccination.

In reality, their paradoxical clandestine civil disobedience created the impression that unvaccinated persons were, in fact, vaccinated and that the CDC's vaccination program was legitimate. By fostering the appearance that more persons were being vaccinated and by tricking minor children into thinking they had been vaccinated, the defendants were not calling attention to their issues with what they deemed to be "compulsory vaccination" and the CDC's COVID-19 vaccination program. All they were doing was facilitating the evasion of public health-and-safety measures imposed by democratically elected government officers.

As for the unvaccinated card-recipients, they were likely never going to be vaccinated in the first place. So, the defendants cannot even take credit for saving them from "compulsory vaccination." Nor could the defendants have reasonably anticipated that distributing fraudulently completed and illegally issued COVID-19 vaccination record cards would stop the CDC's vaccination program. If anything, distributing these additional, fraudulently completed vaccination record cards only fostered a public sense that the CDC's COVID-19 vaccination program was legitimate. Therefore, the defendants' criminal actions actually undermined their stated goals.

Perhaps most important, as noted above in Section 3.2.2, the defendants cannot show, in the first place, that they were responding to a legitimate, well-apprehended, imminent and impending threat of serious bodily harm or death to themselves or other persons. Therefore, as a

matter of law, they cannot show that they reasonably anticipated a direct causal relationship between their criminal actions and the avoidance of a cognizable threatened harm.[51]

Because the defendants also cannot show that they could reasonably anticipate a direct causal relationship between (a) their criminal actions, and (b) the avoidance of an imminent threat of serious bodily injury or death to themselves or others, the Court should preclude the defendants from raising a necessity defense. Their pseudo "necessity defense" is invalid.

## 4.    CONCLUSION

Defendants' pseudo-"necessity defense" should never be presented to the jury. The necessity defense is legally unavailable to these protest-type defendants, and they cannot satisfy the elements of that defense. For the reasons above, the United States asks the Court to rule on this motion in limine far in advance of trial and to preclude the defendants from raising an improper and invalid "necessity defense." The Court should also specifically exclude any proposed defense witnesses who are expected to testify that they "needed" the help of the defendants for medical or other reasons. For the same reasons, the Court should likewise exclude any defense witness who would testify to "vaccine injury" or "vaccine harm." Such a ruling would streamline the jury trial, filter out the defendants' improper "necessity defense," and avoid wasting the jury's time, misleading the jury, or confusing them with an irrelevant, unavailable defense.

Respectfully submitted,

TRINA A. HIGGINS
United States Attorney

*/s/ Todd C. Bouton*
TODD C. BOUTON
Assistant United States Attorney

---

[51] *See Vigil*, 743 F.2d at 755.