JEFFREY A. BRONSTER, ESQ. (#JB/2620)
17 Wendell Place
Fairview, New Jersey 07022
(201) 945-2566

DAVID O. DRAKE, ESQ. (#0911)
6905 South 1300 East, #248
Midvale, UT 84047
(801) 601-9049

*Attorneys for Defendant Michael
Kirk Moore Jr.*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>vs.<br><br>PLASTIC SURGERY INSTITUTE<br>OF UTAH INC, et al.,<br><br>       Defendants. | Case No. 2:23-cr-00010-HCN-JCB<br><br>DEFENDANT MICHAEL KIRK MOORE'S MOTION TO VACATE THE PRETRIAL DETENTION ORDER OF NOVEMBER 12, 2024 ENTERED BY MAGISTRATE JUDGE JARED C. BENNETT, AND FOR A CONTINUANCE OF HIS TRIAL DATE<br><br>Honorable Howard C. Nielson, Jr. |

*A defendant who has been found to have violated a condition of his pretrial release can only be subject to pretrial detention under 18 U.S.C. § 3142 if the violation, or the threat of a repeated such violation, creates a risk of flight or a danger to a person or the community as required by 18 U.S.C. § 3148*

*The Magistrate Judge, either as a matter of law or as a matter of his judicial discretion, should not have entered an Order for the pretrial detention of Dr. Moore*

## STATEMENT OF FACTS

Dr. Michael Kirk Moore is charged, along with others, with fraud on the government and theft of government property. The Indictment (ECF 1) alleges that he registered as an approved Covid vaccine provider, and thus obtained both the vaccine and blank vaccination cards. He allegedly, at the request of patients, fraudulently entered vaccine cards into the vaccination database without actually administering the vaccine.

On January 26, 2023, Magistrate Judge Jared C. Bennett entered an Order Setting Conditions of Release (ECF 26-1). One of the conditions checked off on the Order was Paragraph 6(c), which consisted of the following pre-printed statement:

> (6) The defendant must . . . (c) avoid all contact, directly or indirectly, with any person who is or may be an alleged victim, potential witness and/or codefendant in the investigation or prosecution. List of persons to be provided to the defendant by the Government within 48 hours.

After that pre-printed language, the following statement was inserted: "Defendants will not talk about this case amongst themselves."

In May 2023, Dr. Moore made what he has long-since acknowledged to be a mistake, challenging the jurisdiction of the Court under what is known as the "Sovereign Citizen" doctrine. He had never before been a part of, had any connection with, or known anything about the Sovereign Citizen movement. Ironically, he was pressured into filing his motion by codefendant Kari Burgoyne (who did the same),

who recently, in an effort to obtain a better deal for herself from the Government, provided the information that led to Dr. Moore's present detention (*infra*).

Dr. Moore admittedly failed to comply with two conditions of release: surrendering his passport and providing banking records. The magistrate revoked his release and on May 30, 2023 entered a Detention Order (ECF 89). The magistrate noted that the violations had been cured prior to the hearing, and were merely "technical violations." However, he found that Dr. Moore's motion repudiating the Court's authority "demonstrates that he will not abide by conditions of release . . ."

The motion that Dr. Moore filed, which the magistrate accurately described as "legal gibberish," had not been authored by Dr. Moore; it was essentially a form motion provided by members of an extremist group that Burgoyne had pressured him to listen to. After consulting with counsel, Dr. Moore realized that Burgoyne had pushed him down a path in which he had no belief or interest, and he thereafter withdrew his challenge to the Court's jurisdiction and his motion (ECF 92). The magistrate entered a new Order Setting Conditions of Release (ECF 104) in which Paragraph 6(c) was again checked off, and in which the words "Defendants will not talk about this case amongst themselves" had again been added.[1]

---

[1] A change in the pre-printed form had apparently been made. While Paragraph 6(c) still stated "List of persons to be provided to the defendant by the Government", this was no longer followed by the words, "within 48 hours."

The magistrate's purpose in imposing the codefendant prohibition is important in analyzing whether the violation alleged would merit Defendant's detention. As a general proposition, communication between codefendants awaiting trial is not, and never has been held to be, an evil in and of itself. The magistrate had one specific concern, as he explained at the November 8, 2024 detention hearing:

> What I didn't want to have happen was collusion, and that was crystal clear.
> I mean, that's why we have that provision, and it includes co-defendants.

(Tr. 20:17-19). As will be discussed herein, the totally innocuous nature of the texts between Dr. Moore and his codefendants demonstrates that even if a technical violation occurred, it in no way undermined the magistrate's purpose.

On October 18, 2024, the Honorable Howard C. Nielson, Jr. conducted a hearing on the Government's motion to bar a "necessity defense", which the Court granted, and on the defendant's motion to dismiss the Indictment, which it denied. The significance of that hearing to this motion will be discussed shortly.

In the first week of November 2024, the Government arrested Dr. Moore for an alleged violation of his release conditions. His counsel filed a request for an emergent hearing (ECF 182), and a virtual hearing was conducted on November 11, 2024. The hearing resulted in the revocation of Dr. Moore's release order, and the entry of a new Detention Order. (ECF 191).

-4-

According to the Government (ECF 185), on October 31, 2024 it met with defendant Burgoyne, who provided certain information.[2] The first piece was that early on in the prosecution, Burgoyne supposedly had weekly meetings with Dr. Moore and defendant Kristin Anderson to discuss the case. The second piece of information was that the defendants were communicating on an application known as "Signal" (which has more than 70 million users worldwide).

The Government alleged that the defendant had violated Paragraph 6(c) of the release order, and arrested Dr. Moore and his codefendant Anderson. To the best of the defendant's knowledge the Government took no action whatsoever against Burgoyne, despite her admission to participating in the very same acts being alleged against Dr. Moore.

The nature of the texts upon which the Government relied in ECF 185 is noteworthy. On October 17, 2024, the day before the motion hearing  before Judge Nielson referred to above, Dr. Moore sent a text to Burgoyne and Anderson that began, "As you both know we have a hearing tomorrow about our motion to dismiss (MTD). It would be beneficial if you and your attorneys would be there."[3]

---

[2] Aside from Burgoyne being a codefendant, she and Dr. Moore are adversaries in a civil lawsuit over tens of thousands of dollars worth of medical equipment. Both the criminal and civil benefits to Burgoyne of "turning in" Dr. Moore are self-evident.

[3] For ease of reading, the quotation of texts here will not incorporate the abbreviation of certain words used in the original.

That not-very-sinister opening statement was followed by this:

> Kari, can you speak to my attorneys and answer some of their questions regarding how we obtained the vials and cards, who we contacted, who delivered them etc? That's a part of the process I was not really involved in.  Kris, do you know of any of our patients that would be willing to testify as to the necessity of them getting a card that permitted them to stay employed, get medical procedures, travel for work, care for a family member, etc? We may need some if we lose the MTD and prevail in the motion to allow a necessity defense. Thank you

The rest of the text chain consisted of Anderson responding "Yes I will work on it," Burgoyne responding "Bethany last person kidney transplant," and Dr. Moore concluding the discussion by stating "I will have Jeff reach out to you."[4] The Government apparently considered that chain to be a violation of the prohibition against "talking about the case amongst themselves," despite the fact that on its face it is nothing more than a coordination of court appearances and providing witness information to counsel.

The only other text message provided by the Government was a "pep talk" sent by Dr. Moore to his codefendants on the morning of the hearing itself, with what turned out to be the overly-optimistic message, "Let's do this One and Done today!!" Above that was a link to a popular song that had been No. 1 on the alternative music chart, "Take it All Back" by Tauren Wells.

---

[4] The name "Jeff" was Dr. Moore's reference to one of his attorneys.

At the detention hearing, the magistrate inquired as to the defendant's position on the allegations.[5] To avoid burdening the Court with needless testimony, Dr. Moore stipulated to the sending of the texts quoted above, without conceding that they constituted a violation of his release conditions. However, as to the supposed meetings that Burgoyne told the Government about, he stipulated to nothing, and in fact demanded a hearing.

The magistrate agreed that if anything other than the texts was to be considered, the Government would have to put Burgoyne on the witness stand and allow her to be subjected to cross-examination. He ultimately went on to hold that the stipulated texts in and of themselves were clear and convincing evidence of a violation of the release conditions, and the findings of fact in the Detention Order do not refer to any other information from Burgoyne. However, it is unclear to what extent the magistrate considered the Government's proffer about meetings, not to find the violation *per se*, but to assess the likelihood of Dr. Moore complying with his release conditions in the future. If that was considered even to the slightest degree, Dr. Moore was denied his right to compel Burgoyne's testimony.

---

[5] The hearing transcript is submitted herewith. Please note that it contains the following error: on Page 30, the excerpt starting "It came from Ms. Burgoyne" should be attributed to Mr. Strain, not to Mr. Bronster.

## POINT I

## AS A MATTER OF LAW, BASED ON THE FINDINGS MADE BY THE MAGISTRATE, THE COURT DID NOT HAVE LEGAL AUTHORITY TO ORDER DR. MOORE'S PRETRIAL DETENTION

The magistrate who presided over Dr. Moore's revocation hearing made two findings of fact that are dispositive of this motion:

(1) that Dr. Moore does <u>not</u> pose a significant risk of flight; and

(2) that he does <u>not</u> present a danger to any person or the community.

Although this Court's review of the matter is *de novo*, the defendant respectfully contends that there is nothing in the evidence that would warrant overturning either of those two findings. That being the case, Defendant contends that he must now be released as a matter of law.

Any analysis of detention must begin with 18 U.S.C. § 3142(b), which states in mandatory terms that the Court "shall" order a defendant's pretrial release unless one of two specific conditions exist:

(1) That there is no reasonable assurance that the defendant will appear in court when required ("risk of flight"); or

(2) The defendant's release would "endanger the safety of any other person or the community."

If the judicial officer believes that a defendant's release would pose a risk of flight or would endanger the safety of others, subsection (c)(1)(B) still requires the Court to order the defendant's release, subject to "the least restrictive further condition, or combination of conditions" that would eliminate the risk of flight or the danger to others.

18 U.S.C. § 3142(c) then goes on to address the situation where the Court finds that there is no set of conditions that can reasonably eliminate the risk of flight or the danger to others. Such a finding may only be made "after a hearing pursuant to subsection (f)." However, there are certain pre-conditions for even holding such a hearing. It can only be held under subsection (f)(1) when the defendant is charged with "a crime of violence," or if one of several other factors indicating dangerousness exists. None of the conditions of subsection (f)(1) even arguably apply to this case.

Two alternative grounds upon which a detention hearing may be held are set out in § 3142(f)(2), and they are similar, albeit not identical to the two criteria of 18 U.S.C. § 3142(b):

(1) There is "a serious risk that such person will flee";[6] or

---

[6] Although there is case law to the effect that finding a serious risk that a defendant will flee imposes a heavier burden of proof on the Government than finding that he will simply not appear in court when required. However, that distinction is not relevant to this motion.

(2) There is a serious risk that a defendant "will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."

To summarize, when a defendant is not charged with a crime of violence, the Court cannot even hold a detention hearing unless it appears the there is a risk that the defendant will flee, or will obstruct justice by tampering with a witness or juror. If either condition appears to potentially exist the Court may hold a hearing, but may not impose detention unless the Government proves at that hearing that the defendant is a risk of flight, or that his release would endanger another or the community.

The order Dr. Moore was accused of violating was the release order of June 6, 2023 (*supra*). As discussed, the order has the pre-printed Paragraph 6(c) checked off, followed by the words"Defendants will not talk about this case amongst themselves."

The only evidence submitted by the Government at Dr. Moore's revocation hearing to prove a violation of Paragraph 6(c) consisted of the innocuous texts quoted above.[7] As noted,Dr. Moore stipulated that the texts had been sent, and the magistrate then went on to find by clear and convincing evidence the he had violated Paragraph 6(c), and ordered his detention.

---

[7] The magistrate presumably did not consider any of Burgoyne's information about meetings, since he had acknowledged that the defendant would be entitled to have her testify at the hearing before it could be considered.

It bears repetition that even after hearing the evidence, the magistrate stated that he did not find Dr. Moore to be a flight risk, or that his release would endanger another or the community. He went on to hold, however, that pursuant to 18 U.S.C. § 3148, he still had authority to detain Dr. Moore based on the fact that he had violated a condition of release. But in that respect, the magistrate erred.

18 U.S.C. § 3148(a) lists the available remedies for a violation of a release condition: (1) revocation of release; (2) an order of detention; and (3) a prosecution for contempt. To impose detention, the Government must meet a two-prong test:

1. The Government must show that there is either probable cause to believe that while on release the defendant committed a crime; or clear and convincing evidence that the person has violated "any other condition of release"; and

2. The Government must show either that there are no conditions of release that will eliminate the risk of flight or danger to another; or that the defendant "is unlikely to abide by any condition or combination of conditions of release."

Applying the test to Dr. Moore's particular set of circumstances, the magistrate found that Dr. Moore violated Paragraph 6(c) and that he was unlikely to abide by it in the future if he was not detained, thereby justifying a detention order. In so doing, however, he misinterpreted § 3148, and failed to abide by the relevant portion of subsection (b):

-11-

> If the judicial officer finds that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, and that the person will abide by such conditions, <u>the judicial officer shall treat the person in accordance with the provisions of section 3142 of this title</u> and may amend the conditions of release accordingly.

[Emphasis added].

This language reinforces the most fundamental concept of the Bail Reform Act ("the Act"): **A defendant may not be detained unless he is a risk of flight or a danger to the community**. Despite the magistrate's ultimate decision to detain Dr. Moore, he did not find that either of these conditions applied. For example, the magistrate stated the following:

> First, I have to consider whether there is a risk of - - an unmanageable risk of nonappearance of Dr. Moore. I have to also consider whether he poses an unmanageable risk of danger to the community. And, again, danger does not mean that he poses as a risk of physical violence. It means that he poses a risk of committing crime if released. And finally, under 18 U.S.C. 3148, I also have to consider whether he is likely to abide by any condition of the Court.
>
> I suspect from our last hearing as well as what I've read thus far in the papers submitted by the parties, the real issue here is not the risk of non-appearance nor that of danger but so much that as whether Dr. Moore is willing to - - is going to abide by Court conditions. And so I suspect that will be our debate today.

(Tr. 27:23 - 28:13).

If a court follows the dictates of a U.S.C. § 3142, any conditions of release will be designed to *counteract* either the risk of flight or the danger to another. Therefore, a violation of such a condition will demonstrate that there actually is a risk of flight

or danger to another, potentially justifying detention. For the purposes of this particular revocation proceeding, the question becomes: **What happens if the court finds that a defendant will not abide by a condition of release that was not intended to reduce the risk of flight or danger to a person or the community?** Although such a situation may not be the norm, it is exactly the situation that the Court is confronted with here.[8]

The magistrate incorrectly answered the question by assuming that he could impose detention if he simply made the finding that there was no assurance that Dr. Moore would abide by the codefendant release provision and not violate it again. But subsection 3148(b) shows this conclusion to be wrong. It states that if the judicial officer so finds, he "shall treat the person in accordance with the provisions of § 3142 of this title and may amend the conditions of release accordingly." **In other words, § 3142 still controls the issue, and pursuant to that section a defendant may not be detained unless the court finds a risk of flight or danger to a person or the community.**

---

[8] The defendant contends that it was improper for the magistrate to impose the codefendant communication restriction in the first place, since it did nothing to impact any potential risk of flight or danger to another or the community (*infra*). However, this is not intended as an argument that he can violate even an improper restriction with impunity. His argument is simply one of statutory construction.

The magistrate acknowledged that § 3148 "kind of refers me back to 3142," but rejected the defendant's interpretation of the import of that cross-referencing. (Tr. 42:14-16]. In so doing, he incorrectly failed to interpret the two relevant sections of the Bail Reform Act *in pari materia*. This created a paradox: § 3142 clearly sets out the legislative goal that a defendant cannot, and will not be detained pretrial absent a showing of either a risk of flight or danger to the community. Yet the magistrate's interpretation of § 3148 would allow a defendant who violates *any* release condition to be detained pretrial, even though the violation does not implicate either a risk of flight or a danger to another or the community.

The Government may argue that Dr. Moore's interpretation would give a defendant the unfettered ability to violate at least *certain* conditions of release with impunity; but that is not so. Section 3148 provides an alternate remedy: a prosecution for contempt of court.[9] That powerful tool is both punitive for a violation that has already occurred and a deterrent against any future violation.

Almost forty years ago the United States Supreme Court stated that "in our society liberty is the norm, and detention prior to trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The exception is to

---

[9] This observation is by no means a concession by the defendant that the facts of the alleged violation would either warrant or support such a prosecution.

be found "only for the strongest of reasons." *Sellers v. United States*, 89 S.Ct. 36.

Pretrial release should only be denied "in rare circumstances." *United States v.*

*Motamedi*, 767 F.2d 1403, 1404 (9th Cir. 1985).

The are multiple reasons why a defendant should only rarely be subjected to

pretrial detention, including one that very much applies to this case - - the effect on

preparation for trial:

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the
> present Federal Rules of Criminal Procedure, Rule 46(a)(1), federal
> law has unequivocally provided that a person arrested for a
> non-capital offense shall be admitted to bail. This traditional right to
> freedom before conviction permits the unhampered preparation of a
> defense, and serves to prevent the infliction of punishment prior to
> conviction . . . . Unless this right to bail before trial is preserved, the
> presumption of innocence, secured only after centuries of struggle,
> would lose its meaning.

*United States v. Bigelow*, 544 F.2d 904, 908 (1976) [citations omitted], *quoting Stack*

*v. Boyle*, 342 U.S. 1 (1951). *See also, Barker v. Wingo*, 407 U.S. 514, 533 (1972)

[pretrial detention may hinder a defendant's ability "to gather evidence, contact

witnesses, or otherwise prepare for his defense"].

While there is little case law directly on point in the Tenth Circuit, a

noteworthy case is *United States v. Brannon*, 2000 U.S. App. LEXIS 3234 (10th Cir.

2000), where the defendant had actually threatened a federal judge. Nevertheless, the

Court of Appeals upheld the decision of the magistrate that the defendant's release

did not represent a danger to another or the community, and denied pretrial detention.

In the present case, the texts offered by the Government show that Dr. Moore was doing nothing more than communicating with his codefendants for the specific purpose of preparing for an upcoming hearing and for trial.

Finally, on the interplay between § 3142 and § 3148, defendant reiterates that they cannot be considered independently in a vacuum. An attempt to revoke a release under § 3148 must necessarily relate to the criteria in § 3142:

> . . . . Nonetheless, we discern basic similarities in the defendant's interests in both the § 3148 and the § 3142 contexts that argue in favor of similar procedural protections in both settings. Whether an individual is detained without bail pursuant to § 3142 or § 3148, the result is the same. Congress recognized that, given the individual's strong interest in liberty, pretrial detention may be constitutionally defective if the statute fails to provide adequate procedural safeguards . . . . In view of the defendant's similar interests in both the § 3142 and § 3148 contexts and Congress's concern with procedural safeguards, we conclude that it is appropriate to look to the requirements of § 3142 for guidance as to the nature of the hearing under § 3148.

*United States v. Davis*, 845 F.2d 412, 414 (2d Cir. 1988) [citations omitted].

In summary, the Bail Reform Act does not allow a judicial officer to order pretrial detention on the basis of a violation of his conditions of release unless that violation, and the potential for a repeat of that violation, would make the defendant a risk of flight or would endanger another person or the community. As the magistrate did not make any such finding (and in fact found to the contrary), the Order detaining Dr. Moore must be vacated.

-16-

## POINT II

## THE MAGISTRATE MISINTERPRETED THE PRE-PRINTED LANGUAGE OF PARAGRAPH 6(c) OF THE RELEASE ORDER

Paragraph 6(c) of the release order contains standard pre-printed language, followed by an inserted notation that the defendants are not to talk about the case (*supra*). As discussed above, Defendant contends that the texts relied on by the Government did not violate the prohibition against talking "about the case." They were nothing more than a request for the codefendants to come to court, and an effort to obtain information needed by counsel to prepare for trial. But that still leaves the pre-printed language, which reads:

> (6) The defendant must . . . (c) avoid all contact, directly or indirectly, with any person who is or may be an alleged victim, potential witness and/or codefendant in the investigation or prosecution. List of persons to be provided to the defendant by the Government.

Contrary to the magistrate's reading of that provision, the defendant contends that it is not a blanket prohibition against Dr. Moore communicating with his codefendants.

As discussed above, the Bail Reform Act only allows pretrial detention in two limited circumstances: if there is a substantial risk of flight, or if the defendant's release would endanger others. Absent those factors, the Court is *required* to release a defendant "subject to the least restrictive" conditions that would reasonably ensure the defendant's appearance and the safety of others. 18 U.S.C. § 3142(c)(1)(B). The

statute provides a list of conditions that may be imposed for that purpose, including subsection (v), which authorizes a provision that the defendant "avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense."

The pre-printed Paragraph 6(c) goes beyond the statutory authorization by adding the "and/or codefendant" language. But a pre-printed form, which is nothing more than an administratively-created convenience, cannot override statutory language. This leads to the conclusion that there must be some interpretation of Paragraph 6(c) that is *consistent* with the statute, and indeed such an interpretation does exist.

Paragraph 6(c) prohibits contact with "an alleged victim, potential witness and/or codefendant in the investigation or prosecution." The grammatically correct reading is that contact is prohibited with: (1) a victim; (2) a potential witness; and (3) a *potential* codefendant. In other words, the term "potential" modifies both words that come after it, "witness" and "codefendant."

Contrary to what the magistrate held, this interpretation is consistent with the overall intent of both the statute and Paragraph 6(c), which is clearly designed to prevent witness tampering. Actual codefendants are people already charged, with interests that are generally aligned with each other. "Potential codefendants," on the

-18-

other hand, are people not yet charged, people whom a hypothetical defendant might very well want to tamper with for his own benefit.

In rejecting the defendant's interpretation, the magistrate opined that it was not logical, "because after all how in the world would he even know that, nor is the Government going to divulge that." (Tr. 26:22-24). But the magistrate overlooked the obvious: a person charged with a crime is *uniquely* qualified to know whom he acted with. Even if a defendant maintains his innocence, he knows who acted with him in doing what the Government characterizes as illegal. Such persons are "potential codefendants", and it is understandable why a standard release provision would treat them the same as "witnesses" by prohibiting contact, which might lead to tampering.

It is natural, typical, and to be expected that defendants will plan their defense with some amount of cooperation and joint effort. It is inconceivable that the Government could have any legitimate interest in preventing them from doing so, at least in the absence of any evidence that codefendants are colluding to tamper with a witness. As a pre-printed form, the Release Order is intended to fit *all* cases, which would go far beyond any reasonably necessary measure to prevent tampering. Accordingly, the defendant maintains that the magistrate erred in determining that his contact with codefendants violated Paragraph 6(c).

-19-

## POINT III

## THE MAGISTRATE FAILED TO CONSIDER LESS RESTRICTIVE ALTERNATIVES TO DETENTION

Assuming *arguendo* that despite the defendant's arguments in Points I and II above the Court finds that the magistrate had the right under the statutory scheme to impose detention, the defendant contends that it was still error for the magistrate to do so because other, less restrictive conditions could have been imposed. The following are examples:

Rather than the somewhat ambiguous inserted clause in Paragraph 6(c) of the release barring codefendants from talking amongst themselves about "the case," the magistrate could have imposed a new and more readily-understandable condition of no communication *at all* between codefendants;[10]

Given the fact that Dr. Moore's electronic devices are already being monitored and the magistrate found that his use of the Signal application had the effect of circumventing that monitoring, the defendant could be barred from using Signal or any similar application during his pretrial release.

---

[10] As discussed earlier, this would not automatically give Dr. Moore a "free pass" on the violation that allegedly occurred. The magistrate still had available to him the very serious punitive and deterrent measure of initiating a contempt proceeding.

There are numerous other alternatives that could have been considered but were not. Instead, the magistrate figuratively threw up his hands and decided that there were no conditions he could impose that the defendant would abide by, and imposed the last-resort remedy of pretrial incarceration. The defendant submits that this was a violation of his rights under the Act, and asks that the Court consider the issue of alternative remedies *de novo*.

## POINT V

### IN THE EXERCISE OF HIS DISCRETION, THE MAGISTRATE SHOULD HAVE DECLINED TO IMPOSE PRETRIAL DETENTION

Assuming *arguendo* that the Court finds that the magistrate had the legal authority to issue a detention order, the question still remains as whether he *should* have done so. As this afforded the magistrate the opportunity to exercise his discretion, there are numerous factors that merit discussion to determine whether or not that discretion was exercised in a manner consistent with the objectives of the Bail Reform Act and the interests of justice.

#### A. The Detriments of Detention

The harms that Dr. Moore is suffering from his present incarceration are to a large extent self-evident. Aside from the obvious loss of his personal freedom, his ability to prepare for trial, (which if this motion is denied will be taking place in two

months), has been significantly impaired, and he is being denied the "traditional right to freedom before conviction [which] permits the unhampered preparation of a defense." *United States v. Bigelow*, 544 F.2d 904, 908 (1976) [citations omitted].

There are also personal considerations of significance. Dr. Moore's 17-year-old son lives with him under his supervision, and his elderly mother also lives with him part-time. Both need his care and assistance. With regard to his son in particular, five years ago Dr. Moore's wife committed suicide, and it was her then-twelve-year-old son who discovered her body. The trauma of the loss of his other parent, however temporary, and the separation from the adult who is his sole emotional and financial support will have a devastating effect that the Court can surely appreciate.

### B. The Nature of the Violation

The Government is likely to argue that the harms to Dr. Moore and his family discussed above are ultimately his "fault," and therefore do not justify his release. The argument is a fairly standard one, and is not without at least some merit. But the other side of the coin is that the harshness of the results of his incarceration far outweighs the seriousness of the violation that he is charged with.

The Court can see for itself how innocuous the texts between the codefendants were. On the eve of a crucial court hearing, Dr. Moore encouraged his codefendants to appear in court and to have their attorneys do so as well. Then, he asked them to

provide information on potential trial witnesses, to be given to his attorney. There was not even the remotest hint of the "collusion" that the magistrate himself acknowledged was the rationale behind the restriction (*supra*).

Furthermore, the magistrate relied on certain assumptions that were outside the scope of the evidence and are completely unsupported in the record; assumptions that on their face were a major factor in the decision to detain Dr. Moore.

Perhaps the most serious such assumption was the dubious proposition that because these particular texts between the codefendants existed, there must have been many others, making the defendant's conduct more egregious:

> And although these are the communications that we have in front of us, and there's reasonable inference where you have a group on Signal called "Defense," indicates this is something far more than just a one-time deal.
>
> Now, I understand that that's not - - there is an allegation of October 17th, but the reasonable inferences from this history would show otherwise, would show that it's broader than that, and that Dr. Moore, instead of just simply responding to someone else, is the one leading the charge.
>
> For those reasons I find that Dr. Moore is unlikely to abide by the Court's conditions. And I find, as I have before, and after stern warnings and all of this, it just doesn't seem to matter. And at some point in time the Court has to uphold its orders if they're going to mean anything at all.

(Tr. 45:18 - 46:7).[11]

---

[11] The group text was actually titled "Legal Defense." And while the magistrate apparently interpreted this as something sinister, nothing could be a greater demonstration that the intent of the texts was not to collude, not to violate the law, not to obstruct, but simply to prepare for trial.

The Government offered no evidence of any texts except the ones that have been discussed in this brief, and the magistrate had no basis to assume that others existed or what their content might have been. Also, given that Burgoyne herself brought the evidence of the texts to the Government, it is inconceivable that she would not have provided *all* of them.

**C. <u>The Enduring Impact of the "Sovereign Citizen" Argument</u>**

There is something of a history in this case of Dr. Moore being treated more harshly than other defendants. For example, both he and codefendant Burgoyne had previously asserted a "sovereign citizen" position (*supra*); yet Dr. Moore ended up being detained, while Burgoyne was not. In the present situation Burgoyne has not even been arrested, although she clearly participated in the same alleged violation. And although codefendant Anderson was also arrested she was released by the magistrate, whereas Dr. Moore was detained.[12]

The magistrate made it very clear that a major factor in his detention decision was Dr. Moore's earlier adoption of the sovereign citizen position, even though he has long-since denounced it:

---

[12] Nothing in this argument is intended to even suggest that Anderson should have been detained; Dr. Moore is simply pointing out the differences in the way that he has been treated.

The Court notes that at the very outset of the case, and I want to be really clear here, because there has been a lot of discussion about what the First Amendment allows. And I agree, if people want to believe in whatever movement they want, flat earth, sovereign citizen, it's great. This is America. God bless you all. The question I have to ask myself is the reason why the sovereign citizen issue was an issue to me not because it's a sovereign citizen issue but two things: Number one, Dr. Moore said, "I don't recognize the jurisdiction of the Court." That's a problem in terms of abiding by conditions. Number two, he also said he was not going to follow court orders, and he proved it because we had a violation hearing. He didn't participate but was simply repeating some stuff that I told him had no legal impact, and every court in the country has so said.

As I indicated, Dr. Moore is a very sophisticated, very smart guy. I mean, to be a plastic surgeon, that's an unbelievable amount of training and education. It's something far beyond my capacity to do, so I had to recognize that. This isn't somebody who got duped by someone smarter than them into believing this stuff. This was - - by choosing to file something with the federal court saying, "I don't recognize your jurisdiction. I'm not going to abide by your conditions," not abiding by conditions, and then not really participating in the hearing in any meaningful way except in repeating some gibberish. That's the concern of the Court. Regardless of what he believes, I don't care. But it's how he's going to interface, how those beliefs are going to fuel the interfacing with the law is what I care about. So we had that issue.

(Tr. 43:11 - 44:16).

The magistrate's interpretation of Dr. Moore's level of "sophistication" has no basis in fact. He agrees that no one who can complete medical school can be stupid. But that fact does not meaningfully support the conclusion that he could not have been "duped" into temporarily adopting the sovereign citizen rhetoric. Indeed, that is exactly what happened - - Dr. Moore was pressured into adopting it by someone he knew and trusted, codefendant Kari Burgoyne.

-25-

Suddenly faced with the prospect of many years in prison for conduct that he himself, rightly or wrongly, did not believe to be criminal, and panicked about the future of his family, Dr. Moore was a ripe target for the seductiveness of a theory that could free him entirely from the threat that he was under; there was nothing about his IQ level that would shield him from that temptation.

Indeed, the fact that Dr. Moore even tried the sovereign citizen approach at all is proof positive of his *lack* of sophistication; no "sophisticated" defendant would ever believe, even in the moment, that the sovereign citizen arguments could prevail. The magistrate was justified in characterizing the arguments as being "nonsense" and "gibberish." No one with any degree of sophistication or experience in the law could have ever believed that it could be successful, given that it would undermine the entire justice system of the United States.

Many of the radicals who espouse the sovereign citizen doctrine, and who actually authored the motion that Dr. Moore was persuaded to file, undoubtedly believe that the justice system *should* be undermined. Dr. Moore does not share, and has never shared, that belief. He naively accepted the statements of others, including Kari Burgoyne, that he had a right to assert the position, and a reasonable expectation of doing so successfully. Dr. Moore paid a heavy price for his naiveté, but it is time for him to *stop* paying it.

If Dr. Moore has violated his release order at all, he has done so only in the most trivial way under the most strenuous circumstances for reasons that are easily understood just by reading the texts. It is inconceivable that any judicial officer would order him detained on that basis *but for* the prism of the sovereign citizen issue through which the magistrate viewed him.

It bears repeating that codefendant Burgoyne made the very same sovereign citizen arguments that Dr. Moore did, and engaged in the exact same violation regarding codefendant texts that Dr. Moore did. Yet the Government has not even *asked* to have her detained, nor has the magistrate taken any action *sua sponte* to have her brought before the Court to be held accountable or to initiate the contempt proceeding authorized by the Bail Reform Act. Dr. Moore alone is being subjected to the loss of his freedom, and it is occurring only because in his darkest hour he was persuaded for a brief moment to employ a strategy that he was too unsophisticated to realize had *absolutely* no chance of being successful.

All that Dr. Moore is asking is for the Court to evaluate his sending the texts in its proper perspective, free from the burden of a bizarre philosophy that he essentially espoused for ten minutes. Viewed in the proper context, he respectfully submits that the magistrate should not have issued an order for his pretrial detention.

## POINT VI

## IN ADDITION TO REVOKING THE DETENTION ORDER, DEFENDANT ASKS THE COURT TO STRIKE THE CODEFENDANT PROVISION

It is arguable whether or not an absolute prohibition against speaking to codefendants can withstand a constitutional challenge in view of the defendant's Sixth Amendment right to a fair trial. Certainly the Bail Reform Act itself does not support it. The Act focuses throughout on two specific concerns: the risk of a defendant's flight, and the danger to others or the community. Neither of those concerns is implicated by two or more codefendants working together to prepare to defend themselves at trial.

It is obvious that despite any constitutional issues, codefendants cannot conspire to obstruct justice or tamper with witnesses; this is not only a violation of release conditions, it constitutes a serious crime. When the Court has a reasonable basis to believe that such a conspiracy will occur, the codefendant communication prohibition may be a reasonable prophylactic measure. However, there has never been any evidence presented of such a danger in this case. Therefore, in order to facilitate trial preparation by removing an artificial barrier to free and full cooperation between the defendants, Dr. Moore respectfully requests that the prohibition be stricken from his release order.

-28-

## POINT VII

### IN THE EVENT THAT THE COURT DOES REVOKE THE DETENTION ORDER, PLAINTIFF SEEKS A CONTINUANCE OF TRIAL FOR REASONS THAT THE COURT HAS ALREADY ADDRESSED

At the October 18, 2024 motion hearing (*supra*), the Court discussed the scheduling of the trial. Although it had been set to begin in January 2025, the defense moved to adjourn it for several reasons, most notably the need to reset the defense strategy in light of the necessity defense ruling, and certain health issues involving one of Dr. Moore's attorneys.

After coordinating its own calendar with that of counsel, the Court agreed to continue the trial until July of 2025. However, following the hearing date, Dr. Moore was incarcerated. Unwilling to spend eight months in jail awaiting trial, he invoked his speedy trial right and objected to the continuance; as a result, no written order was ever entered, and the trial remains scheduled for January.

If the Court should deny this motion to revoke the magistrate's detention order, Dr. Moore still intends to go forward with the January trial; the alternative of sitting in jail for many months, with only limited access to counsel to prepare for trial, is simply not tenable. However, should the motion be granted and Dr. Moore is released, he renews his request for a continuance until the July date.

Dr. Moore will not burden the Court here with a repetition of the factors that the Court found would justify the continuance. It is not that Dr. Moore *cannot* go to trial in January; indeed, if this motion is denied he will have no choice but to do so. But as discussed at the appearance on the motions, the continuance would assist Dr. Moore and his counsel in being *better* prepared for the trial, and the reasons for the request are legally adequate to support the granting of a continuance.

## **CONCLUSION**

For all of the foregoing reasons, the defendant respectfully requests that the Court revoke the magistrate's detention order, that the trial of the Indictment be continued until July of 2025, and that the Court order such other relief as has been requested herein.

/s/ Jeffrey A. Bronster
JEFFREY A. BRONSTER, ESQ.
17 Wendell Place
Fairview, New Jersey 07022
(201) 945-2566

DAVID O. DRAKE, ESQ. (#0911)
6905 South 1300 East, #248
Midvale, UT 84047
(801) 601-9049

*Attorneys for Defendant Michael Kirk Moore Jr.*

Dated:   November 20, 2024

-30-