IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

```
_____ )
                                 )
United States of America,        )
                                 )
      Plaintiff,                 )
                                 )   Case No: 2:23-cr-00010-HCN
vs.                              )
                                 )
Plastic Surgery Institute        )
of Utah, et al.,                 )
                                 )
      Defendants.                )
_____ )
```

**MOTION HEARING/RULING BEFORE THE
HONORABLE HOWARD C. NIELSON, JR.**

Date:  Friday, October 18, 2024

Time:  1:30 p.m. to 5:15 p.m.

Reported by Teena Green, RPR, CRR, CBC

Orrin G. Hatch United States Courthouse
351 South West Temple, 7.430
Salt Lake City, Utah  84101
(801) 910-4092
teena_green@utd.uscourts.gov

1                          **APPEARANCES**

2    FOR THE PLAINTIFF:

3    TODD CHRISTOPHER BOUTON
     SACHIKO JEPSON
4    US ATTORNEY'S OFFICE
     111 South Main Street, Suite 1800
5    Salt Lake City, UT    84111-2176
     (801) 524-5682
6    (801) 524-3399
     todd.bouton@usdoj.gov
7    sachiko.jepson@usdoj.gov

8
     FOR DEFENDANT PLASTIC SURGERY INSTITUTE OF UTAH:
9
     BRIAN R. BARNHILL
10   OSBORNE & BARNHILL
     11576 South State Bldg., Suite 204
11   Draper, UT    84020
     (801) 571-2555
12   brian@oblawpc.com

13   FOR DEFENDANT MICHAEL KIRK MOORE, JR.:
     DAVID O. DRAKE
14   DAVID DRAKE PC
     6905 South 1300 East, Suite 248
15   MIDVALE, UT    84047
     (801) 205-9049
16   sirdrake2033@gmail.com

17   JEFFERY A. BRONSTON
     17 Wendall Pl.
18   Fairview, NJ    07022
     (201) 945-2688
19   jbronster@Bronsterlaw.com

20   FOR DEFENDANT KARI DEE BURGOYNE:

21   MICHAEL J. LANGFORD
     LANGFORD | RAMOS PLLC
22   43 East 400 South
     Salt Lake City, UT    84111
23   (801) 328-4090
     mjl@langfordramos.com

24

25

1    FOR DEFENDANT KRISTIN JACKSON ANDERSEN:

2    EDWARD K. BRASS
     BRASS & CORDOVA
3    560 South 300 East, Suite 105
     Salt Lake City, UT   84111
4    (801) 322-5678
     ed@edbrasslaw.com
5

```
 1   October 18, 2024                                    1:30 p.m.
 2                        P R O C E E D I N G S
 3            THE COURT:  All right.  Good afternoon.  We're here
 4   for a hearing in United States versus Plastic Surgery Institute
 5   of Utah, et al., that's Case No. 2:23-cr-10.
 6            The purpose of this hearing is for me to hear
 7   argument and possibly rule on the following motions:
 8   Docket No. 148, the Government's motion in limine, and
 9   Docket No. 166, Defendant Dr. Michael Kirk Moore's motion to
10   dismiss the indictment.
11            In addition to those motions, we may need to discuss
12   trial logistics and scheduling.  But let's start with
13   appearances of counsel.
14            First, counsel for the United States.
15            MR. BOUTON:  Good afternoon, Your Honor.  Todd Bouton
16   and Sachiko Jepson for the United States of America.
17            THE COURT:  All right.  Welcome, Mr. Bouton.
18   Welcome, Ms. Jepson.
19            All right.  Counsel for Plastic Surgery Institute.
20            MR. BARNHILL:  Brian Barnhill.
21            THE COURT:  Welcome, Mr. Barnhill.
22            Counsel for Dr. Moore?
23            MR. DRAKE:  Your Honor, David Drake appearing for
24   Dr. Moore as co-counsel.  If I may just say one thing, I
25   graduated a year after Judge Benson and a year before Judge
```

1    Nuffer, so I knew both of them well.  And I know my co-counsel

2    here, Jeff Bronster, he's too humble to say this, but his boss

3    was Samuel Alito years ago.  But I just thought you wanted to

4    know that.

5              **THE COURT:**  All right.  Okay.  Thank you.

6              So Mr. Drake, you represent Dr. Moore.

7              Anyone else for Dr. Moore?

8              **MR. BRONSTER:**  Yes, Jeffrey A. Bronster.  Good

9    afternoon, Your Honor.

10             **THE COURT:**  All right.  Welcome, both of you,

11   Mr. Drake and Mr. Bronster.

12             Counsel for Ms. Burgoyne.

13             **MR. LANGFORD:**  Good afternoon, Judge.  Michael

14   Langford on behalf of Ms. Burgoyne.  And Ms. Keri Burgoyne is

15   also present for today's hearing.

16             **THE COURT:**  All right.  Well, she's certainly

17   welcome, as are you, Mr. Langford.  Thank you.

18             Counsel for Ms. Andersen.

19             **MR. BRASS:**  Ed Brass for Ms. Andersen.  She's present

20   as well.

21             **THE COURT:**  All right.  Welcome, Mr. Brass.  And,

22   welcome, Ms. Andersen.

23             **MR. BRASS:**  Thank you.

24             **MR. DRAKE:**  Judge, if I might add, my client is also

25   present, sitting in the front row, Michael Moore, Dr. Moore.

1      **THE COURT:**  All right.  Dr. Moore, welcome.

2      Do we have counsel for Ms. Flores?  I think they

3      indicated -- she indicated they might not come.

4      **MR. BOUTON:**  Yes, Your Honor, counsel for Ms. Flores

5      is Kris Angelos from the Federal Public Defenders Office, and

6      she indicated they would not have someone here since Ms. Flores

7      has already entered into a cooperation agreement.

8      **THE COURT:**  Okay.  And has she pleaded as well or

9      just -- has she actually entered the change of plea?

10     **MR. BOUTON:**  I'm sorry, it's a diversion agreement,

11     Your Honor.

12     **THE COURT:**  Oh, so, no.  She's entered a diversion

13     agreement, okay.  Understood.

14     Okay.  Very good.  All right.  Anyone else that needs

15     to enter an appearance?

16     Okay.  All right.  I want to move to argument on

17     these motions.  Now, I gather that the motion to dismiss was

18     filed by Dr. Moore alone and Mr. Moore is the only defendant to

19     file an opposition to the Government's motion in limine.

20     Let me ask, do any of the other defendants join the

21     motion to dismiss or oppose the motion in limine?

22     **MR. BARNHILL:**  Your Honor, the Plastic Surgery

23     Institute also joins in the motion to dismiss.

24     **MR. LANGFORD:**  Judge, Keri Burgoyne would also join

25     in the motion to dismiss.

1      **MR. BRASS:**  As does Ms. Andersen.

2      **THE COURT:**  Okay.  So the motion to dismiss.

3      None of you mentioned the motion in limine.

4      Okay.  And do any of you wish to be heard on that

5  motion?  Not counting counsel for Dr. Moore, but Mr. Barnhill,

6  Mr. Langford, Mr. Brass, do any of you want to be heard?

7      **MR. LANGFORD:**  Not for Ms. Burgoyne, Judge.

8      **MR. BARNHILL:**  Not for Plastic Surgery either.

9      **MR. BRASS:**  No.

10      **THE COURT:**  All right.  Very well.  Okay.  It sounds

11  like then it will be just counsel for Dr. Moore arguing the

12  motions on the defendant's side.  And then whoever -- I don't

13  know on the Government's side whether Mr. Bouton, Ms. Jepson,

14  you're dividing labor or whether one of you is going to do both

15  motions.

16      **MR. BOUTON:**  It will be me, Your Honor, in a bit of a

17  marathon.

18      **THE COURT:**  Okay.  Well, I probably won't let it

19  become a marathon, but I understand.

20      And what about on Dr. Moore's side?  Is one of you

21  arguing or are you splitting, dividing?

22      **MR. BRONSTER:**  I'll be arguing both motions, Your

23  Honor.

24      **THE COURT:**  Okay.  Very good.  All right.  In that

25  case, I think we'll just do them together.  I was planning to

1    give about 15 minutes per motion, so a total of about 30

2    minutes.  If there was a division, I was going to do it

3    seriatim, but I think I could just give each of you 30 minutes

4    and you can allocate that as you see fit between the two

5    motions.

6         And, you know, one of the motions was filed by the

7    Government, so if we were just hearing argument on that I'd

8    have the Government go first.  One of them was filed by

9    Mr. Moore, so if that was the only motion we'd have Dr. Moore

10   go first.  Since that's a tie, I'll just have the Government go

11   first since the Government filed the case, or the prosecution.

12        So Mr. Bouton, I'm going to give you about 30 minutes

13   to address both motions in just a minute.  I've read your

14   briefs so there's no need to belabor everything you said.

15   Rather, please focus on what you think is most important.

16        After that, we'll have Mr. Bronster argue about 30

17   minutes on behalf of Dr. Moore.

18        I guess I had just a few questions before we get

19   right into the meat of it.  And these, I guess, are primarily

20   related to the motion in limine.  And I guess I'd like --

21   they're for you, I guess, Mr. Bronster.

22        First of all, I am not aware that any K through 12

23   public school in Utah required students to receive the COVID-19

24   vaccine to attend school in person.

25        Am I wrong about that?

1          **MR. BRONSTER:**  Not that I'm aware of, Your Honor.

2          **THE COURT:**  Okay.  I know some of the state

3    universities did for a while.

4          **MR. BRONSTER:**  Yes.

5          **THE COURT:**  Okay.  All right.  Second of all, I want

6    to give you a hypothetical.

7          When children turn 26, and I say "children" because I

8    think of them that way, they can no longer remain on their

9    parents' health insurance plans, and most universities require

10   their students like to have health insurance.

11         Suppose that a university student is about to turn

12   26, will no longer have health insurance, doesn't want to pay

13   for health insurance, doesn't think he needs it, but his

14   university requires health insurance to remain enrolled as a

15   student.

16         A third party creates fraudulent insurance documents

17   for the student, documents that falsely indicate the student is

18   enrolled in a health insurance plan, and the student uses that

19   documentation to remain enrolled at his university.

20         Would the third party have a necessity defense if the

21   Government prosecuted him for creating the fraudulent insurance

22   documents?

23         **MR. BRONSTER:**  No, Your Honor.

24         **THE COURT:**  And that is different here because of the

25   harms of the vaccine; right?

1          **MR. BRONSTER:**  Well, if I may, Your Honor.

2          **THE COURT:**  Yeah, you may.

3          **MR. BRONSTER:**  It's not just different because of the

4    harms of the vaccine, it's different because the student has a

5    very simple legal choice.  It may not be on his list for that

6    week to buy health insurance, but all he has to do is buy it

7    like everybody else and then there's no problem.

8          There is a simple legal alternative that he has no

9    good reason not to follow; contrasted, of course, with patients

10   here who are terrified of getting the COVID vaccine because

11   they fear for their life.

12         **THE COURT:**  What if he can't afford insurance?

13         **MR. BRONSTER:**  Well, I would submit, Your Honor, that

14   there are other ways that he can go about it.  I don't pretend

15   to be fluent in the administrative regulations regarding that

16   in the state of Utah, but I know that there are programs such

17   as Medicaid that provide for insurance.  There is what is known

18   still as ObamaCare --

19         **THE COURT:**  Sure.

20         **MR. BRONSTER:**  -- whereby people who don't have money

21   have access to get it.

22         So the Government has worked very hard to get to the

23   point where there is no one in our society who has a legitimate

24   way of saying, "Well, I can't afford it."

25         **THE COURT:**  Okay.

1          **MR. BRONSTER:** So the student always has the

2   alternative.

3          **THE COURT:** All right. So in that case -- stay here

4   for just a minute -- you're focusing on the other alternative

5   and not the -- I understand.

6          So let me try again with another hypothetical.

7          Suppose the Federal Government strengthens its

8   EAGER 5 program for monitoring whether employers are employing

9   individuals who are not in the country legally, and suppose

10  under the modified program employers actually face strict

11  penalties for employing such individuals and that some

12  employers that do not currently do so, say construction

13  companies, to take an obvious example, begin verifying their

14  employees' immigration statuses carefully.

15         Suppose that a third party creates fraudulent

16  documents such as fake green cards, birth certificates or

17  passports, so that individuals who lack legal status in the

18  United States can retain their employment.

19         Would that third party have a necessity defense if

20  the Government prosecuted him for creating the fraudulent

21  immigration documents or the birth certificates or --

22         **MR. BRONSTER:** I would say not, Your Honor, because

23  the immigrant has a host of other options. There are many

24  other types of employment he can seek. He can seek employment

25  in his own country. It may be somewhat difficult, but

1    difficult is not the threshold.  Difficult is an imminent risk.

2         **THE COURT:**  Okay.  But isn't that true of anyone

3    whose employer had a vaccination mandate, that they could seek

4    other employment?

5         **MR. BRONSTER:**  I would respectfully submit not,

6    Your Honor.  Because there's a difference between someone who

7    doesn't have a job and is now coming to seek one.

8         **THE COURT:**  Well, I said they had a job.  My

9    hypothetical is they were working and their employer all of a

10   sudden started verifying documents.  So it's a matter of

11   retaining employment.

12        **MR. BRONSTER:**  I would say, Your Honor, that there

13   are significant distinctions between that and the case that we

14   have here.

15        The primary reason that the patients of Dr. Moore did

16   not get inoculation -- in the job context -- there were a

17   variety of reasons, but one of them that Your Honor I think is

18   focusing on is the possible loss of a job.

19        **THE COURT:**  Well, I'm focusing on it because -- I

20   mean I'm going to bracket the vaccine, and for purposes of

21   these motions I'm going to assume that, you know, Dr. Moore is

22   either correct that, you know, the vaccine was harmful, or at

23   least he honestly believed that.

24        So I'm focusing on the other alternative, because no

25   one was forced to be vaccinated, they were put to a choice.

1    And it may have been a difficult choice, but it was a choice

2    between two options.  And one of the options, probably the

3    worst of the options that you identified, the most difficult

4    option, as opposed to receiving the vaccine, was either losing

5    employment or not being able to attend college in person.

6    Those were the -- am I wrong about that?  I mean those are the

7    most severe consequences of remaining unvaccinated that I'm

8    aware of that you identified.

9            **MR. BRONSTER:**  Yes, but that's only half the

10   equation.  What you have that you don't have, I think, in the

11   immigration situation, is you're focusing on some of the

12   reasons that they had to get the vaccination card but not

13   focusing on the reason that they didn't simply take the legal

14   alternative of getting the vaccine.

15           **THE COURT:**  Well, see, in my hypothetical, the

16   legal -- the person without documentation doesn't even have

17   another option.  They cannot change their place of birth and,

18   you know, they cannot become a U.S. citizen overnight.  Your

19   client's patients could have received the vaccine.  So I don't

20   think that side of the equation helps you.

21           **MR. BRONSTER:**  Well, but I do think, Your Honor,

22   there's a distinction there.

23           The immigrants do have a legal alternative.

24           **THE COURT:**  To go home.

25           **MR. BRONSTER:**  Don't break the law and set up the

1    situation in the first place where you have to get the false

2    documentation.  Stay in your country and do the best that you

3    can do there.  That is a viable legal alternative.

4              And if the Court were to say, "Well, maybe it's not

5    viable given the circumstances," then the Court would

6    theoretically be opening the door for every immigrant from a

7    poor country to come illegally and have a valid excuse to do

8    it.

9         **THE COURT:**  Well, that's the issue, is I'm not sure

10   who's opening the door here.  I mean I just -- it seems like if

11   we're going to have a necessity defense just because someone's

12   going to lose their job, that is opening the door quite a bit.

13        **MR. BRONSTER:**  I think that there are many people out

14   there who would take exception to characterizing it as just

15   losing their job.

16        **THE COURT:**  Okay.

17        **MR. BRONSTER:**  There is a great deal more at stake.

18   Losing their jobs --

19        **THE COURT:**  What?

20        **MR. BRONSTER:**  Well, losing their jobs has a far

21   greater impact than --

22        **THE COURT:**  On a federal employee than on an illegal

23   immigrant?

24        **MR. BRONSTER:**  I'm sorry, Your Honor?

25        **THE COURT:**  So losing a job is a bigger deal for a

1    federal employee than for an illegal immigrant?  Is that your

2    point?

3          **MR. BRONSTER:**  There's a difference.  The federal

4    employee is legally in his job and has a right to stay there

5    and support his family.  The illegal immigrant is trying to

6    protect a right that he doesn't have in the first place.  He's

7    not supposed to be in that job.  And if he follows the law,

8    he's not going to be in that job.

9          So the two situations are in no way analogous.  And

10   where I think my perspective on it may be somewhat different

11   from the Court's is that I think that the loss of a job, short

12   of an actual physical harm, which, by the way, all of these

13   patients feared, which is what brought them there, the loss of

14   the job is one of the greatest detriments that a person can

15   face out there in the world.

16         **THE COURT:**  Okay.  Let me --

17         **MR. BRONSTER:**  Aside from the fact that they have a

18   constitutional right to work.

19         **THE COURT:**  Let me -- let's rewind a little bit.

20   Let's say that -- I mean it's not -- I'm trying to think of the

21   best way to tee it up.  I mean it was a very real issue, you

22   know, decades ago when employers would fire someone who was

23   affiliated with like certain political parties.

24         Would -- you know, if somebody were called in to

25   court or to Congress and asked, you know, whether they were a

1    member of a certain party, and if by saying yes they knew they

2    would lose their job, would they have a necessity defense to a

3    prosecution for perjury if they lied and said that they're not?

4         **MR. BRONSTER:**  It's an interesting hypothetical.  And

5    I don't think there is an easy answer to it.

6         What came to be considered as the persecution of many

7    individuals in the McCarthy era may or may not have been legal.

8    It's an interesting hypothetical but I think --

9         **THE COURT:**  I think you'd say that the mandates may

10   or may not have been legal, too; right?

11        **MR. BRONSTER:**  Well, we say that they're not, but --

12   we say at the very least they're not.

13        **THE COURT:**  At the very least, they may or may not be

14   legal.  In your position, at the very least, they're of

15   questionable legality; right?

16        **MR. BRONSTER:**  Absolutely.

17        **THE COURT:**  I mean -- and that's surely the same as

18   the McCarthy era stuff I was alluding to?

19        **MR. BRONSTER:**  Yes.  And that plays into our argument

20   that it gave rise to the necessity defense also.  They're not

21   just fighting against something that's going to harm them,

22   they're fighting against something that's going to harm them

23   that shouldn't be the law in the first place which, of course,

24   is a separate aspect of the argument.

25        **THE COURT:**  So necessity defense to perjury if you

1  lie to Congress and say "I'm not a member of the communist

2  party"?

3          **MR. BRONSTER:**  I would say, Your Honor, that it is

4  too difficult a question for me to answer without access to at

5  least a little bit of legal research.  I will say that there

6  are certainly some parallels that I see in the example.  I'm

7  not sure, though, that they lead to the exact same resolution.

8          **THE COURT:**  Okay.  All right.  Anyway, I just wanted

9  to press you on that a little bit.  Because I'm trying to

10  understand the scope of the argument you're making and how far

11  it extends.

12          **MR. BRONSTER:**  The argument does not extend really

13  any further than I think are the necessary parameters of it.

14  We have people who, for religious or other legitimate reasons,

15  believe that this vaccine is something they and their children

16  should not take because it risks putting their lives at risk.

17  And so they --

18          **THE COURT:**  Sorry.  I'm going to interrupt.

19          **MR. BRONSTER:**  Oh, I apologize.

20          **THE COURT:**  No one was required to take the vaccine.

21          **MR. BRONSTER:**  That is true.

22          **THE COURT:**  And that's what I was getting at with

23  these examples.  What you have to say is the thing that

24  justified the necessity defense here was not to prevent the

25  vaccine but to prevent the very difficult choice that they were

1    put to, to prevent having them put to that choice?

2         **MR. BRONSTER:**  It is true that if Dr. Moore had not

3    done what he did, that the Government would not have sent the

4    military into these people's homes to forcibly vaccinate them

5    the next day.  But we do not believe that that is by any means

6    the standard that has to be met.

7         The ramification of not getting the vaccine could be

8    fairly draconian.  One of which is -- and I'll argue later that

9    this was completely unconstitutional -- but one of them is that

10   the people who don't get the vaccine are now, by default, part

11   of a government database of those people who, for religious

12   reasons or other similar reasons, chose not to be vaccinated.

13        And when I say that they're essentially in that

14   database, I'm sure Your Honor understands they're there by

15   reverse effect.  Everyone who's vaccinated has to be in the

16   database, so everyone who's not is on that societal black list.

17        And part of the reason is that a lot of those people

18   are there are for religious reasons, and that database -- for

19   that database to even exist is a threat to the constitutional

20   rights of those people.

21        **THE COURT:**  I mean at this point -- at this point do

22   you think there is a serious stigma associated with not having

23   received the COVID vaccine, at this point, as opposed to three

24   years ago?

25        **MR. BRONSTER:**  I would say, Your Honor, that it

1    depends who you talk to, what part of the country you're in,

2    and what the political leanings are of the people who you're

3    discussing it with.

4              **THE COURT:**  We're in Utah and that's where Dr. Moore

5    lives and practices.

6              **MR. BRONSTER:**  Yes, Your Honor.

7              **THE COURT:**  And I mean --

8              **MR. BRONSTER:**  I think that in every state -- well,

9    there are what we traditionally these days call blue states and

10   red states, but there are in every state people who believe

11   both ways.  And there are undoubtedly, in my view, people in

12   Utah who stigmatize those who do not get the vaccine, just as I

13   believe that there are people in Utah who stigmatize those who

14   got the vaccine and who believe that the vaccine is something

15   that should be implemented.

16             As I indicated in my brief, it's an incredibly

17   divisive issue.  And knowing that doesn't help decide the

18   issue, but it should indicate the fear that these patients were

19   under that motivated them to do this.

20             **THE COURT:**  Understood.  All right.  Those are the

21   questions I had.  I'll let you reserve the rest of the things

22   you want to say for just your argument.

23             **MR. BRONSTER:**  Thank you.  I appreciate it.

24             **THE COURT:**  Okay.  With that, though, Mr. Bouton,

25   I'll give you about a half hour to argue whatever you'd like to

1    argue on these two motions.

2        **MR. BOUTON:**  Thank you, Your Honor.  Given the

3    discussion you've just had, I think I'll start with the motion

4    in limine and try to focus my remarks to some of the questions

5    you've raised.

6        I think Your Honor understands that this motion in

7    limine will definitively shape, if not outright decide, this

8    case.

9        The defense of Dr. Moore and, as far as I understand

10   it, his co-defendants, is essentially one of -- I'll call it

11   pseudo-necessity, because I don't believe it actually qualifies

12   as a legally valid necessity defense, even though they try to

13   characterize it that way.

14       The standard in the Tenth Circuit for applying a

15   necessity defense, to the extent it can even be asserted

16   against a criminal statute, is clear.  And here I think the

17   real -- well, the standard is clear.

18       **THE COURT:**  Well, I mean just -- I mean of course it

19   can be asserted by a criminal defendant.  That's about the only

20   context the necessity defense arises in.  Right?

21       **MR. BOUTON:**  Well, in some of the cases they did

22   raise an open question as to whether this common law defense is

23   in fact applicable to federal statute, is my point.

24       **THE COURT:**  Understood.  Okay.  I understand what

25   you're alluding to.

1    **MR. BOUTON:**  But assuming it is, the elements have

2    been clearly articulated in the Tenth Circuit.  And they are

3    that the defendant would have to show that they were under an

4    unlawful and present imminent and impending threat of such a

5    nature as to induce a well-grounded apprehension of death or

6    serious bodily injury; two, that they had no reasonable legal

7    alternative.  Not inconvenient or unfortunate or difficult or

8    hard alternatives, but no reasonable legal alternative to

9    violating the law, meaning a chance both not to do the criminal

10   act and also avoid the threatened imminent harm of serious

11   bodily injury or death, not job loss or canceling a vacation or

12   changing educational, recreational or other plans.

13         And three, there has to be a direct causal

14   relationship between the criminal action taken and the

15   avoidance of the threatened harm.  It can't be some tenuous

16   indirect thing, for example, like creating a mechanism to

17   provide counterfeit COVID-19 vaccination record cards.

18         They perhaps indirectly alleviated pressures to be

19   vaccinated, but there was no elementary, foundational, imminent

20   threat of serious bodily harm or injury.  There was no threat,

21   defendants acknowledge, of compulsory vaccination, there was no

22   agent of the government or military force kicking down doors

23   holding people down and forcibly injecting them with something

24   they may have reasonably or unreasonably believed could be

25   harmful.  That was not happening.

1          The very existence of this case, the very market that

2     Dr. Moore exploited, or appetite, desire that he fulfilled by

3     providing these shots, these people did not -- the card

4     recipients did not intend on being vaccinated.

5          This was not about avoiding a vaccination, it was

6     about avoiding the consequences of choosing not to be

7     vaccinated, which included temporary restrictions on liberty

8     that were put in place by democratically-elected and appointed

9     government agents, representatives who made a choice, difficult

10    choices, a number of them, some of which remain controversial,

11    some of which may be debated for decades, but acting in the

12    middle of a national pandemic that, by estimates, killed

13    15 million people, that they didn't know everything about, they

14    made their decisions.

15         Democratically-elected and appointed officials made

16    their decisions.  That's called the rule of law.  And that's

17    what's at the heart of this case, whether someone, if they have

18    philosophical or political or other objections to a law or

19    government regulation, can take the law into their own hands

20    and break it and claim they are cloaked by a shadow of

21    necessity even though there was no danger.

22         The necessity defense is, by definition and practice

23    and precedent, limited to the very narrow situation where there

24    is a real imminent emergency.  The child has to be on the train

25    track about to get hit.  And even then, if there is a

1    reasonable lawful alternative, pull the child off, stop the

2    train, get in the way, call it.  You don't get to blow up the

3    train.  You don't get to blow up the train.  You don't need to.

4          And here they had legal alternatives.  They could

5    have not been vaccinated.  Twenty-four percent of Utahans

6    weren't ever.  Thirty-four percent were never fully vaccinated.

7    Their lives were not destroyed.  They were not sent to Q-lock.

8    Most of them kept their jobs.  And to the Court's -- the heart

9    of what I think was the Court's question is, does the necessity

10   defense apply to save your job?

11         And the answer is no, it doesn't.

12         It is limited to the very narrow situation where

13   there is an imminent threat of serious bodily injury or death

14   to yourself or someone else and you don't have time to do what

15   you should normally do if you disagree with the law; to lobby,

16   to call your representatives, to go to court and challenge the

17   law if you disagree with it, to challenge the restrictions if

18   you disagree with them, to ask for changes, to protest.  That

19   is how, in a society governed by the rule of law, people

20   exercise their reasonable legal alternatives.

21         They could have waited out the pandemic, they could

22   have changed jobs, they could have filed appeals in work or

23   elsewhere.  They could have made other temporary travel

24   arrangements.  Maybe they didn't get to go to Hawaii in 2020 or

25   2021.  That doesn't authorize them to take the law into their

1    own hands and break it and then say, "There will be no

2    consequence because I didn't like the law, I disagreed with the

3    law. I thought it was unwise. I thought it was dangerous. I

4    thought it was anything." It doesn't matter. We don't resolve

5    it by breaking it. Necessity defense does not immunize people

6    who do.

7            And that's what happened here. Direct causal

8    relationship? Not in this case. Maybe they saved jobs.

9    Maybe. Maybe they saved vacations or athletic events or

10   entertainment. Maybe they saved people from inconvenience.

11   That's not enough to justify criminal activity.

12           **THE COURT:** Job loss is a little more than an

13   inconvenience, Mr. Bouton.

14           **MR. BOUTON:** Well, it's a significant one, but people

15   do find other jobs. And it's not significant enough to allow

16   someone to break the law and commit crimes when they have

17   plenty of time and other options. If they were that worried

18   about their job, they could have come to court and filed suit

19   and said, "My employer is threatening to terminate me unless I

20   get this vaccine. I believe it's dangerous," or "I have

21   religious objections," or whatever objection, even personal

22   autonomy, whatever it is, that's how you resolve it.

23           You don't do this. You're not authorized to do this.

24   And if you do, the necessity defense does not protect you. It

25   doesn't apply to a job. It's got to be an imminent threat of

1    serious bodily injury or death.  Not job loss, not anything

2    else, because that is the only narrow situation that would

3    philosophically and legally justify a temporary exemption from

4    having to comply with the law and the rule of law, because

5    there's no time.  But when there is time, when there are other

6    alternatives, any -- any reasonable legal alternative, it does

7    not apply.  It is a hard, fast, line, Your Honor.  That would

8    be my answer.

9          To your hypothetical about McCarthy-ism, I think the

10   answer is no, necessity defense would not apply.  Unless they

11   were about to be hanged or beaten, no.  They would have to do

12   what people who objected to the COVID vaccine program should

13   have done, go to court.

14         **THE COURT:**  Mr. Bouton, let me ask you this one.  I

15   mean one of the very -- probably colloquial examples that many

16   people are familiar with that at least seems somewhat akin to

17   the necessity defense, what about the person who speeds to get

18   his wife to the hospital when she's going into labor?

19         **MR. BOUTON:**  I've raised that in my brief,

20   Your Honor.

21         **THE COURT:**  Does necessity defense apply or not?

22         **MR. BOUTON:**  Only if there was no reasonable legal

23   alternative.  If there was an ambulance, someone else could get

24   there, they could have left earlier, no.  If there wasn't time

25   to get somebody else, there was a serious threat that she was

1    going to die or she's bleeding, if you waited, then, no.

2            Would a police officer maybe let you off?  Different

3    question.  But technically, the necessity defense would turn.

4    Its application in that scenario would turn on whether it was

5    actually an imminent threat of serious bodily injury or death,

6    reasonably apprehended.  You really thought your wife might die

7    if you don't go 100 miles an hour and get there immediately,

8    maybe, and you have no other way to get her there, yes, it

9    could.  But you would have to meet all those elements.

10           If -- we'll turn it around and say if your boss told

11   you -- you've been late before -- "I know you love this job,

12   you're good at your job.  You're late one more time, you're

13   fired.  There will be no appeal.  That's it."  And you're late.

14           You can't -- the necessity defense won't allow you to

15   drive 100 miles an hour, break the speed limit just to keep

16   your job, it would not.  It would be unfortunate, it would be

17   difficult, you know.

18           Was the situation that people who had objections --

19   were put into, who had objections to the COVID vaccine, easy?

20   No.  But in a democratic society where the rule of law governs,

21   we don't resolve the disputes by committing crimes, secret

22   ones.

23           This wasn't a national protest.  This wasn't Gandhi

24   or Martin Luther King going to jail for their beliefs.  This

25   was setting up a system, cloaking himself from responsibility

1    by putting it on lower-level employees to handle the screening

2    and delivery of the vaccines.  And then he wants to say it was

3    about his beliefs?

4            To some extent, I'm sure it was.  Right?  I

5    anticipate it was.  But at the end of the day, it doesn't

6    matter.

7            To start with a quote in the reply brief, *United*

8    *States v. Turner*, Tenth Circuit, "To allow the personal,

9    ethical, moral or religious beliefs of a person, no matter how

10   sincere or well-intended, as a justification for criminal

11   activity, would not only lead to chaos, but would be tantamount

12   to sanctioning anarchy."

13           And I would submit, hopefully respectfully, that if

14   the Court were to rule otherwise and not grant this motion to

15   dismiss, it would be sanctioning anarchy.  He would be opening

16   up a necessity defense to apply to whoever thinks, based on

17   their own personal analysis and feelings, they're justified in

18   committing a crime and breaking the criminal law in their

19   moment.  Even without an imminent threat of serious bodily

20   injury or death, you would be blessing that application.  And

21   I -- I think it's clear, I think that would be unwise in the

22   view of the United States of America.

23           **THE COURT:**  All right.

24           **MR. BOUTON:**  How much time do I have?  Anything --

25   five minutes?  You did give a little extra time to

1    Mr. Bronster, Your Honor.

2              **THE COURT:**  I gave you 30 minutes, you've used about

3    half of it.  You're fine.

4              **MR. BOUTON:**  Okay.  So unless you have more questions

5    about the motion in limine, I'll turn to the motion to dismiss.

6              **THE COURT:**  All right.  That's fine.

7              **MR. BOUTON:**  Anything else that's raised a question

8    or a concern?

9              **THE COURT:**  Not right now.  I may have something

10   later, we'll see, but for right now you can move on.

11             **MR. BOUTON:**  For the motion to dismiss -- I don't

12   need to reiterate that this is a consequential case.

13             This is basically a motion to dismiss based on

14   failure to state a defense, as I interpret it, under

15   12(b)(3)(B)(5), saying the allegations of the indictment are

16   insufficient to state the essential facts constituting the

17   three charges.  Right?

18             The standard for the defense is a very high one.  All

19   the United States must do is provide reasonable notice.  We set

20   forth the elements of the offenses charged.  We've done that.

21   We put defendants on fair notices of the charges to defend.

22   They know what this case is about.  They know what they're

23   charged with doing.

24             We have an 18-page speaking indictment that is

25   detailed.  There's no question about "What are you saying we

1    did wrong?"  They're just trying to say, "Even if I did it,

2    it's okay because I was philosophically or medically or

3    politically driven, and so I get to break the law as I choose

4    whenever I want, even without a real emergency."

5              We've got to show it enables the defendants to assert

6    a double jeopardy defense.  That's not a question here.  All

7    we'd have to do is quote the statutory language of the offense,

8    include the date, time and place, and the nature of the illegal

9    activity.  That's not an issue.

10             So what does it leave us with?  It's not about

11   notice.  It leaves us with what they could potentially

12   characterize as legal challenges.  They can't.  You're stuck

13   with the alleged facts.  The Court has to take them as true.

14             So what are their legal challenges?

15             As to Count 1, conspiracy to defraud the United

16   States by obstructing a lawful government function of the CDC,

17   which was responding to the COVID-19 pandemic, trying to

18   mitigate it and providing, in a controlled manner, COVID-19

19   vaccines and vaccination record cards that could be used to

20   reliably verify vaccination status.

21             As I understand it, they are charging the lawfulness

22   saying this wasn't -- they're not saying it wasn't a government

23   function, they're saying it wasn't lawful because the CDC, in

24   their view, did not have the power to respond to the COVID-19

25   pandemic, they were not authorized.  That's just not true.

1          There are a multitude of statutes that authorize the

2     CDC to provide vaccines and vaccination record cards.

3          42 USC 264(a) addressed in *Alabama Association of*

4     *Realtors*, allows them, in times of this kind of emergency where

5     there is a risk of the interstate spread of a communicable

6     disease, to impose measures that directly relate to preventing

7     the interstate spread of disease by identifying, isolating and

8     destroying the disease itself.

9          The Supreme Court relatively recently, when

10    addressing the eviction moratorium, clarified -- right? -- that

11    the second sentence in this statute informed the first, and

12    that these examples of fumigation were just illustrative and

13    that they could perform other measures reasonably necessary.

14         This was a measure that is reasonably necessary to

15    address the pandemic.  To suggest that they had no authority

16    for this ignores even the name of the agency, the Center for

17    Disease Control and Prevention, whose mission it is to mitigate

18    and address disease in the United States.

19         42 USC 247d, specifically in the context of public

20    health emergencies, if the Secretary of the Health and Human

21    Services, of which CDC is a component or division, determines

22    disease presents a public health emergency they can respond by

23    entering into contracts.

24         Well, they did.  As they had done with other vaccines

25    in situations where certain demographics or persons maybe don't

1    have access to vaccines, they entered into voluntary --

2    voluntary vaccination provider agreements to allow medical

3    providers like Dr. Moore to voluntarily enroll in the program

4    and agree to distribute it.

5            He didn't have to sign it.  He didn't have to do it.

6    He didn't have to encourage it.  He didn't have to endorse it.

7    He never had to give anyone a vaccine.  And as far as I know,

8    he didn't.  But he could not lie, sign up for the program,

9    agree that he would, in exchange for receiving vaccines that

10   were only available from the Federal Government and bona fide

11   vaccination record cards to identify recipients of the

12   vaccines, get them, lie and say he would administer the vaccine

13   appropriately.

14           He would record the administrations, he would update

15   it, and he would give the cards only to recipients, get them

16   and then do exactly the opposite, dump the vaccines down the

17   drain or squirt them, dispose of them, fraudulently fill out

18   these cards and hand them to people.

19           That gets to the other legal question, but let's

20   finish with the statute.  42 USC 247d-6b, the health -- they

21   could maintain -- CDC can maintain and distribute a vaccine

22   stockpile for the health and security of the U.S.  This was a

23   vaccine stockpile distributed just for that reason.

24           Congress, in fact, required the CDC to maintain --

25   "the CDC shall maintain the stockpile."  That is a direct

1    mandate.

2          42 USC 247d-6-(B)(a)(3)(G), I think, deploy the

3    stockpile as appropriate.  They did that.

4          42 USC 247d-6(B)(a)(3)(J), provide assistance to

5    state and public health departments to disburse materials from

6    the stockpile, the vaccines and the vaccination record cards,

7    among other things.  They were doing that.

8          These provider agreements they entered into whose

9    enrollment was facilitated by the Utah Department of Health is

10   exactly an example of providing assistance to state and local

11   public health departments.

12         42 USC 247d-1, they could track the initial

13   distribution of federally purchased influenza vaccine in an

14   influenza pandemic.

15         Now, the other side may say, "Well, it didn't say

16   'COVID'".  Yes, because it was passed before COVID, and

17   Congress was not required to legislatively divine.

18         In early 2000, there will be a global pandemic coming

19   from China, or wherever, and it will threaten the lives of the

20   whole world.  And so that includes COVID-19, which we don't

21   even know about yet.  It is analogous.  And in fact, a few

22   years later, they updated the statute to say, "or other

23   pandemic or other vaccine."

24         **THE COURT:**  Is that a very good statutory argument,

25   Mr. Bouton, do you think?

1          **MR. BOUTON:**  What is your concern, Your Honor?

2          **THE COURT:**  Well, we don't usually say that a law is

3    in effect just because Congress didn't have a chance to enact

4    it yet but they would have if they had have foreseen.

5          **MR. BOUTON:**  I think I would characterize the

6    argument more this way --

7          **THE COURT:**  It says "influenza."

8          **MR. BOUTON:**  That the definition of influenza should

9    be broadly interpreted to apply to similar diseases, and that

10   Congress's intent was that it would allow the CDC to respond to

11   influenza or influenza-like pandemics, without having them

12   predict beforehand exactly what the disease would be called and

13   whether or not you could technically say, oh, it does fall in

14   the influenza family, or it doesn't, that this would be within

15   the ambit of the language or the intent of Congress, when they

16   talked about influenza, they would mean something like COVID,

17   too.

18          **THE COURT:**  Could it be something like Monkeypox?

19          **MR. BOUTON:**  Yes, it could be.

20          **THE COURT:**  Okay, so influenza just means disease?

21          **MR. BOUTON:**  It means a flu-like disease, is what I

22   would say is the intent.  I don't think they had to list out

23   every single type of disease to suggest that tracking was

24   permissible.

25          **THE COURT:**  Yeah, they could have used a different

1  word from "influenza," though.  They could have said "a

2  disease."

3        **MR. BOUTON:**  Broader language would be better.  This

4  is the language there.  And I think the fact that they went

5  back and clarified it shows that was consistent with the intent

6  that --

7        **THE COURT:**  Well, I mean it also may show that they

8  thought they needed to.

9        **MR. BOUTON:**  Or that someone could criticize it and

10  they wanted to make clear that that was the intent not to

11  change it and say, oh, now we're going to add something.  You

12  could read it both ways, I'll concede that.

13        **THE COURT:**  All right.  Well, anyway, you've

14  mentioned a lot of other statutes, too.  I was just

15  specifically talking about the tracking influenza statute.  But

16  in any event, you can continue.

17        **MR. BOUTON:**  So putting those all together, and I

18  think reading even the influenza tracking statute in context of

19  the other statutes they should be read together as a canon of

20  construction, suggests it's not unreasonable to interpret that

21  as also provising authorization for what the CDC did even if

22  that is not ultimately compelling for Your Honor.

23        *Lopez* and *Chevron* I think can easily be addressed.

24  *Lopez* says, "When a particular statute delegates authority to

25  an agency consistent within constitutional limits, courts must

1    respect the delegation, while ensuring that the agency acts

2    within it."

3              The CDC acted within their delegation, it should be

4    respected.

5              The PRA, I think they've abandoned the argument to

6    the PRA, I didn't see it in their reply, but I will just note

7    the four or five reasons it doesn't apply.

8              One, it doesn't apply to criminal prosecutions, just

9    administrative agency processes and related judicial actions.

10   This is not that.

11             Two, it doesn't prevent persons who provide false

12   information to the Federal Government, *US v. Chism*, Tenth

13   Circuit.

14             Three, more specific statutes authorize the CDC to

15   distribute the vaccines and arguably track them, and they trump

16   the PRA's general regulation of information collection.

17             Four, nothing in the PRA prohibits the voluntary

18   contracts for disclosures to vaccine recipients.  In fact, they

19   are authorized to do that.

20             And, in the reply brief, we noted there was an

21   exception made, and specifically an exemption made from the PRA

22   for purposes of the COVID-19 vaccine program by the secretary.

23   I don't know that there's any point in talking more about the

24   PRA.

25             That leaves us with counts -- unless you have a

1    question, Your Honor.

2         Counts 2 and 3, the only elements they charge are the

3    first and third.  They say the vaccines, or least the

4    vaccination record cards did not belong to the U.S., they're

5    not property.  And they argue the value didn't exceed $1,000 or

6    the United States' valuation is somehow improper, insufficient.

7         They're wrong on both counts.

8         Even if the Court is not compelled to accept the

9    allegations of who owned the property, if it is viewed as some

10   kind of legal question based on the alleged facts, it still

11   fails.  We have demonstrated and will show that the vaccination

12   record cards and the vaccines belong to the United States of

13   America.  They were distributed to people who enrolled, and

14   only the medical providers who enrolled in the CDC's

15   vaccination program, and agreed to distribute and administer

16   and track them and report them, report the vaccinations in

17   certain ways; otherwise, they did not have it.

18        This is not a vaccination record card, it's about two

19   business cards I stapled together, but this is about the size.

20        When those cards came into the hands of Dr. Moore or

21   his Plastic Surgery Institute, they still belonged to the

22   United States.  He was not authorized to tear them up, to burn

23   them, to hand them out to whoever he wanted.  All he could do,

24   in terms of a license, right, was distribute them, and was

25   required to do, and had agreed to do, and lied and said he

1    would do, was hand them out, complete them to people who --

2    after they had been vaccinated, and accurately document what

3    vaccination they had received, and then report that within 24

4    hours.

5            If he didn't want to do that, he should not have

6    signed up.  They were not his cards to do with whatever he

7    wanted.  They said "HHS" and "CDC" on them.  Everyone knew what

8    they were about and who they belonged to.  And, in fact, the

9    property -- the United States continued to own them unless and

10   until they were received by the intended recipient.  That is

11   the law.

12           It's analogous in Social Security and other cases.

13   Where property of the United States is in transit, the

14   possession or property interest of the United States remains

15   until it reaches an intended recipient.  Even if it lands in a

16   joint bank account and someone else grabs it, not okay, it

17   still belongs to the United States.

18           If it's intercepted, still belongs to the United

19   States, until it gets to the intended recipient.  And in this

20   case, the intended recipient of the cards was a vaccinated

21   individual.

22           An unvaccinated person, they don't even own the card.

23   They might possess it; they don't own it.  And it was never

24   their property.  It was fraudulently obtained, fraudulently

25   distributed.  It belongs to the United States of America.  They

1    contracted for it, they printed it, they controlled the

2    distribution with these voluntary agreements, with these

3    restrictions.  If and only if you received the evacuation do

4    you get the card with the notation from an authorized provider.

5    That is property of the United States.  No different than --

6    similar to a driver's license or a passport.

7             I don't know that United States is arguing or needs

8    to argue that it could be revoked.  Right?  Perhaps if it was

9    demonstrated that it was fraudulently obtained, it could be

10   revoked.  But up until the point at least that the card was

11   given to a vaccinated recipient, a vaccinated individual, the

12   intended recipient, it remained the property of the United

13   States.  And Dr. Moore was not free to intercept it through

14   fraud and distribute it through fraud and then lie about it

15   through fraud to the state-wide immunization database.

16            As to the value, a general theory, right, the

17   overarching theory for creating the value, which is a

18   conservative estimate, given what these cards were going for in

19   other cases, were basing it on market value.  Right?

20            Under the jury instruction, Tenth Circuit jury

21   instructions for Section 641, "value" means face, par, or

22   market value or cost price, whichever is greater.  You can use

23   market value.  I don't have to say, "well, it only cost two

24   cents to print this," or whatever, it's what was the market

25   value.

1          Well, you determine market value by what someone is

2     willing to pay.

3          And in this case, throughout the indictment, you'll

4     see, and it happened with the two undercovers, they were

5     directed by Kristin Andersen, the co-defendant, to submit $50

6     donations to a specific organization, put an orange emoticon in

7     it, "Send me the snapshot proving you paid.  Then and only then

8     will I give you additional documents to sign, allow you to set

9     up an appointment with the Plastic Surgery Institute so you can

10    walk in and receive the card.  You have to pay first."  The

11    fact that someone was willing to pay for a dose, per notation,

12    per dose, shows it had a market value of $50 per dose.  That's

13    not, I think, reasonably disputable.

14         Anything else as to the indictment you'd like the

15    United States to address in particular?

16         **THE COURT:**  Not at this time.  I think you've pretty

17    much used the 30 minutes I anticipated.  Especially since I had

18    a discussion with Mr. Bronster and the questions, I'll give you

19    a few minutes to reply after we hear from Mr. Bronster.

20         **MR. BOUTON:**  Thank you, Your Honor.

21         **THE COURT:**  All right.  Mr. Bronster, I'll give you

22    about a half hour as well to address both motions.  And, again,

23    you can do it in whatever order you see fit.

24         **MR. BRONSTER:**  Thank you, Your Honor.  I hope that

25    Your Honor will be at least a little bit lenient on the time.

1    There is such an enormous volume of material.  I do not intend

2    to repeat everything in my briefs.

3            **THE COURT:**  Yeah, please don't.  I did read them.

4            **MR. BRONSTER:**  Absolutely.  This wasn't where I

5    planned to start, but since it was the last thing the

6    Government was talking about, we have no problem if they want

7    to say that the valuation is $50 per dose.  They've actually

8    said that it's, I think, something more than that.

9            What they said that we're objecting to was that the

10   valuation was $50 per card, which escalates the total number

11   incredibly.  It was not.

12           The market value -- I'll concede for a minute, just

13   for this argument, so that I don't have to go around it, that

14   Dr. Moore stole these cards from the Government.

15           What he got was doses of a vaccine where we're not

16   challenging their valuation and blank vaccine cards.

17           What would any one of his patients have paid for that

18   blank vaccine card?  The answer is nothing.

19           **THE COURT:**  How do I know that?

20           **MR. BRONSTER:**  Excuse me, Your Honor?

21           **THE COURT:**  How do I know that?

22           **MR. BRONSTER:**  Well, the way you know that is that

23   the Government has the burden of proof, and nothing in their

24   case shows that there is any value.  I'm sure there is some

25   value.  How many hundredths of a penny the value of the printed

1    card is, is something that I can't calculate.

2         But the Government's own theory is not that these

3    people came to Dr. Moore to get a blank vaccine card.  In the

4    case that -- I don't recall the name, but it's in the brief,

5    both briefs.

6         In the case with the postage stamps that were

7    misprinted, when that was stolen, that had value, huge value,

8    exactly as it was.  The vaccine cards that Dr. Moore got from

9    the Government had a value of zero.  It was the act of -- it's

10   a strange context to use the term in, but it's the value added

11   by Dr. Moore.  It was the act of signing the card that the

12   patients -- if you take the Government's theory that there were

13   payments, that's what the patients were paying for.  And that

14   goes, theoretically, if there was an issue of measuring his

15   gain, but that's not the issue.

16        The issue is the value of the items stolen.  And the

17   value of that blank card for all intents and purposes was

18   absolutely zero.

19        **THE COURT:**  Let me just ask you about that.  Again,

20   and this may not matter all that much.  But I mean it seems

21   like at a minimum someone with a blank CDC card could forge it

22   themselves.  I mean it seems like that's got to be worth

23   something, I mean like a --

24        **MR. BRONSTER:**  I suppose in theory that's true.  I

25   don't know how effective it would have been, given whatever

1    checks are performed by the Government.  But I would suspect --

2    not suspect.  I will predict that there is not a single witness

3    the Government will ever call in this case who would say, "Oh,

4    I was willing to get a blank vaccine card and pay for it to

5    forge it."

6          **THE COURT:**  Yeah, I just am curious.  I mean it seems

7    like these cards were used in a lot of different ways, and when

8    they were used in verified ways, with like the Government,

9    yeah, probably the forged card probably wouldn't get you very

10   far.  But a lot of times restaurants would say, "If you don't

11   show your card, you can't eat dinner."  And I mean I doubt they

12   would check.

13         **MR. BRONSTER:**  That's quite possibly true,

14   Your Honor, but there's no evidence in this case that would

15   establish --

16         **THE COURT:**  Well, don't waste your time on that.

17   That was maybe a point of curiosity.

18         **MR. BRONSTER:**  I dwell on the point, Your Honor,

19   because it may not be overwhelmingly significant at this stage.

20   But if this case should ever reach the point where there's

21   going to be a sentencing of Dr. Moore, it's going to probably

22   make the difference of a decade if the Court is persuaded to

23   accept this bogus valuation for something that they would never

24   have paid for.  But if I could move on then.

25         **THE COURT:**  Yeah, but your point is that the value

1    was his signature on the card.

2            **MR. BRONSTER:**  Exactly, Your Honor.

3            **THE COURT:**  The card itself.

4            **MR. BRONSTER:**  Exactly.

5            **THE COURT:**  Okay.

6            **MR. BRONSTER:**  Another point that I won't dwell on

7    because I think Your Honor already clearly already has it, is

8    influenza is influenza.  We can't just make it up and say,

9    "Well, if they had known about it, they would have legislated

10   it, we should interpret it differently than it says."  It's

11   congressional legislation.  You interpret it the way it's

12   written.

13           And we know from the United States Supreme Court that

14   if it happens to be silent on something, you don't just

15   interpret it the way an administrative agency wants to.  You

16   can't override congressional authority.

17           And let me use that as a segue into what I consider

18   to be at least equally important to the necessity argument.

19   Because, quite frankly, Your Honor, we believe that this

20   indictment must be dismissed.  And this is -- it's a long,

21   complex argument.  I will absolutely try to minimize it as long

22   as I can.  Excuse me.  I have to cross-reference.

23           In my brief I did what I will not do here, which is

24   go through the entire history of administrative law in this

25   country.

 1              But the administrative procedure law was originally

 2     enacted as a check on administrators who might otherwise have

 3     carried -- whose zeal might otherwise have carried them to

 4     excesses not contemplated in the legislation.  They said it 80

 5     years ago, but the Supreme Court has pretty much now told us

 6     again, that's what this is all about.

 7              If we had been here a year ago, this entire argument

 8     may be different, but we weren't.  We're here today, after the

 9     *Loper* case has been decided by the United States Supreme Court,

10     and we can't just ignore it.  And the Government's attempts to

11     differentiate it are unsuccessful.

12              Now, some of what I'm about to say now is extremely

13     technical.  But as Your Honor knows, sometimes in the law, and

14     certainly in administrative law, the technicalities are

15     dispositive.  And I think I believe that's going to be the case

16     here.

17              It starts with the fact that the CDC is not a

18     regulatory agency.  It's chartered as an advisory agency only

19     which means that, to do anything, it first has to have a source

20     of authorization.

21              Now, the fact that it's called the Center for Disease

22     Control, as the Government pointed out, has absolutely no

23     significance, just as their reference to the CDC's mission

24     statement has absolutely no significance.  The only question is

25     what are they allowed to do.

1          Now, there is no legislation ever enacted -- and I

2     know we have to discuss the specific statutes -- that gave HHS,

3     let's start with that, HHS the broad authority to enact this

4     COVID scheme and to enforce the databases that would include

5     everyone who's gotten it; and, therefore, by exclusion, include

6     everyone who, for whatever reason, religious or otherwise,

7     decided not to get it.  And there is certainly no authorization

8     for the CDC to do so.

9          Now, the Government relies on CFR -- forgive me,

10    please, Your Honor.

11          **THE COURT:**  That's all right.

12          **MR. BRONSTER:**  It relies on the CFR provision that I

13    did have somewhere but cannot locate at the moment, but don't

14    want to hold it up, that authorizes the CDC, in which HHS

15    authorizes the CDC to do certain things.

16          That CFR was never passed by Congress, and there is

17    no evidence that it was ever the congressional intent when it

18    authorized HHS to do something to pass it to on to CDC.

19          Now, in the *Loper* case, we dealt with the same thing.

20    But in that case, the defense was never raised that HHS did not

21    have authority to delegate.

22          So in *Loper*, you'll see the Supreme Court talking

23    about how HHS has delegated it to the CDC, and then evaluating

24    that.  The argument was not raised there.  It is, I assume, an

25    issue of first impression.  But it is our position that, having

1    raised the issue, there is no legislative authorization for HHS

2    to take the power that was given to it and to delegate it to

3    the CDC.

4            But let's come back -- let's assume for a minute that

5    it had that authority and talk about what HHS's actual

6    authority was.

7            **THE COURT:**  I think you need to do that, because the

8    indictment, you know, it does talk about the CDC a lot, but it

9    also alleges that -- and I'm quoting here, "to facilitate the

10   proper administration of the COVID-19 vaccines, the CDC and

11   HHS" --

12           **MR. BRONSTER:**  Yes, but in language -- I'm sorry.

13           **THE COURT:**  Anyway, if I can finish, the quote is,

14   "The CDC and HHS," and then I'm eliting a bit, "developed rules

15   and protocols for the entities that would administer the

16   vaccines at locations around the United States."

17           So I do think that the indictment charges that, you

18   know, the program was adopted, promulgated, whatever, by both

19   HHS and CDC, which is a part of HHS.  So I -- I know we --

20           CDC is getting thrown around here a lot by shorthand,

21   but I don't know that -- I don't know that -- you know, given

22   the rules for a motion to dismiss, I think I probably have to

23   accept as true that it was a cooperative thing and it wasn't

24   just the CDC freelancing.

25           **MR. BRONSTER:**  Well, I would only point out that the

1   operative charging language, which there is a case that's cited

2   in my brief, has to be there for the indictment to be valid, is

3   that they interfered with a lawful operation of the CDC

4   vaccination plan.

5           **THE COURT:** Okay. So you --

6           **MR. BRONSTER:** But I do understand Your Honor's point

7   to want to talk about the broader concept of HHS doing what

8   they did.

9           The question -- and on the question of -- going back

10  to that CDC issue, I want to refer to something I quoted in my

11  brief. And I think that if Your Honor is going to take the

12  proposition that this was joint, that this quotation would have

13  to be extended jointly to both as well.

14          This is on a government website from the National

15  Institute of Health. And this is what they're saying,

16  retrospectively.

17          "The CDC exercised broad regulatory authority

18  throughout the COVID-19 pandemic with many of its actions

19  challenged in, or even blocked by the courts. The committee

20  believes that the CDC should be afforded ample legal authority

21  to carry out its mission using evidence-based measures to

22  reduce the interstate and international spreed of infectious

23  disease. This would require legal reforms," just like

24  "influenza" in the statute didn't mean anything for COVID-19,

25  it's what the law says, "This would require legal reforms,

1    including modernizing the Public Health Service Act, which was

2    enacted well before major societal changes, including

3    globalization, that can amplify the threat of rapidly moving

4    infectious diseases."

5          So what the NIH, which is the advising agency to the

6    federal government is saying is, CDC exercised a lot of these

7    broad powers, but a lot of it was challenged successfully, and

8    we need to make sure that for next time they're given the power

9    that they exercised this time without really having the

10   authority.  And I think that coming from a government source,

11   that is extremely important and influential.

12         Moving on, very major source, I think perhaps the

13   primary source of HHS/CDC authority that the Government relies

14   on is 42 USC 264, which talks about, "The Surgeon General, with

15   the approval of the Secretary."  Now, and by the way, the

16   Surgeon General, it's not clear where he got authority to

17   delegate the CDC to do anything.

18         The Surgeon General's Office is different from HHS,

19   which has its own director.  So that's another technical

20   administrative issue that at some point has to be dealt with.

21         But the language the Government predictably relies on

22   is, "The Surgeon General, with the approval of the

23   administrators authorized to make and enforce such regulations

24   as in his judgment are necessary to prevent the introduction,

25   transmission or spread of communicable disease from foreign

1   countries into states or possessions."

2          Now, that sounds pretty broad, "such regulations as

3   in his judgment are necessary."  That sounds like a very broad

4   authorization, and that's what we might have interpreted it as,

5   until the United States Supreme Court decided the *Alabama*

6   *Realtors* case, which says it was never the intention of

7   Congress to give this kind of broad authority to the HHS or to

8   the CDC.

9          And it says that the second sentence of that

10  paragraph, which gives examples, it's not just random examples,

11  it's illustrative of the extent and the scope of the authority

12  that's being given to HHS.  And it talks about things that have

13  no application here, such as fumigation, pest extermination,

14  destruction of animals; nothing about establishing a nationwide

15  database for vaccinations to track who's vaccinated and who

16  isn't and everything else that went along with that plan.

17         Now, the Government tries to differentiate between

18  our case and *Alabama Association of Realtors* by emphasizing the

19  language in the Supreme Court decision about how extreme and

20  serious the repercussions of that case were so that, for

21  example, it had economic and political consequences.  It

22  affected -- the Government notes with emphasis that it affected

23  80 percent of the population.

24         Well, the CDC regulations affected more than

25  80 percent of the population.  They affected virtually

1    100 percent of the population.  And it's an issue that the

2    economic and political ramifications of couldn't possibly be

3    greater.  And I believe that that's something that the Court is

4    in a position to take judicial notice of without argument from

5    me.

6            This case falls squarely within the *Realtors* case.

7    The Government has tried to take a general delegation of

8    authority and expand it to a point where it goes beyond

9    anything Congress ever intended.  And that's the key.

10           We're talking here about the legislative branch and

11   the executive branch.  And the executive branch only has on the

12   agency level such authority as is delegated to it by Congress.

13           And just like in the *Alabama Realtors* case, this is

14   nothing ever passed by the Congress of the United States that

15   granted HHS the kind of broad authority to do everything that

16   it did in this case.

17           Now, the Government then goes on to say something in

18   its brief that I thought at first was curious because it

19   sounded like something that would have been in my own brief,

20   which is that the Government's -- the CDC efforts of the

21   Government, the -- I'm sorry -- the pandemic efforts of the

22   Government were contractual efforts.

23           That plays right into exactly what the defendant is

24   saying, but then as I read on I saw why they were making that

25   argument.  Because we have the provision that they talked about

1    that says that the Government, in pandemic situations, can

2    enter into contracts.

3         So they're trying to say, "Oh, that's exactly what

4    happened, that's authorized by that law."  But you have the

5    same problem.  When you look at that statute, it authorizes

6    things such as economic grants and awards, conducting support

7    investigations into the cause of the disease.

8         Now, it does have a catch-all, it says that they may

9    take such action as may be appropriate, but that brings us

10   right back to the *Alabama Realtors* case.  That kind of

11   generalized language in a statute that gives examples that are

12   nothing to do with what was actually done here does not serve

13   to empower the CDC now to do whatever it wants in the name of,

14   "Well, this is what our mission is, we're entitled to do this."

15   It simply doesn't work.

16        But I do agree with the Government that this was a

17   contractual relationship.  And when Dr. Moore did what he did

18   with the vaccine, with the vaccination cards, assuming for a

19   minute that they were U.S. Government property, what he did is

20   he broke his contract.  He violated his contract that says,

21   "okay, this is what I'm going to do with it."  And if they want

22   to sue him for breach of contract, they're more than welcome.

23   That doesn't make it a criminal offense.

24        Now, moving on for a minute to the question of

25   whether this was government property, it was not.  I'm not

1   going to get into the issue now of whether or not it was the

2   property of the State of Utah because, frankly, we don't have

3   enough information because it hasn't been provided by the

4   Government.  We haven't seen the contracts and the documents

5   between the state and the government.

6          And there was an interview that they provided by a

7   Mr. Larkin, who is the immunization director of HHS, and he

8   made the following statements.  "If the provider receives the

9   vaccines through HHS, they are required to report the

10  vaccinations to the USIIS database.  It is not mandatory for a

11  provider to enter it into the database if they didn't get the

12  vaccine through DHHS," which actually physically or legally

13  wasn't possible at that time.

14         And then it also says COVID-19 was the only time that

15  DHHS has used the CDC Provider Enforcement Agreement.  So, yes,

16  there's a contract with the CDC's name on it, but the director

17  of immunization keeps talking about a provider getting vaccine

18  from the State of Utah.

19         And finally, there is one -- on this issue, there's

20  an obvious question that the agents could have and should have

21  asked Mr. Larkin when they prepared this.  Who owned the

22  vaccine?

23         We don't know.  Nobody ever asked them.

24         Maybe it was an oversight, but maybe it wasn't.  The

25  Government is incorrect in assuming that we have abandoned the

1    Paperwork Reduction Act argument.  We simply did not see the

2    value of repeating our arguments in the reply brief.  There are

3    cases that are cited in my brief where it has been used to

4    dismiss criminal charges.  And all the cases the Government

5    cites where it does not get used for that are all tax cases,

6    and there is dicta that's in my brief that differentiates tax

7    cases from all other cases.

8            **THE COURT:**  Why would that be?

9            **MR. BRONSTER:**  I'm sorry, Your Honor?

10           **THE COURT:**  Why would that be?

11           **MR. BRONSTER:**  I could probably come up with a number

12   of possibilities, but I think if it's acceptable to Your Honor,

13   I would rather just say that it doesn't matter why it would be,

14   because the Tenth Circuit has said that it is so.

15           **THE COURT:**  All right.

16           **MR. BRONSTER:**  And so it becomes only a philosophical

17   debate.

18           Before I go on to the necessity, is there anything

19   about the -- oh, I really missed the punchline on the first

20   argument, which is the *Loper* case itself.

21           The *Loper* case has made it clear that administrative

22   authority is limited, very limited.  It's limited to what

23   Congress authorizes.  And the fact that Congress may be silent

24   about something or even ambiguous about it doesn't open the

25   door for the administrative agency to say, "Hey, we can do

1     this."

2            This is clearly a new day in administrative law in

3     this country.  The Supreme Court said very clearly that it is

4     abandoning the prior case law and even saying that the prior

5     case law did not really seem to have any legitimate purpose in

6     the first place, but it is gone and it is over.  And Congress

7     never gave these administrative agencies the authority to

8     remake this country virtually for the sake of the pandemic.

9            Pandemic is a serious threat.  Government has a right

10    to deal with it.  But HHS doesn't unilaterally have the right

11    to say, "We are the Government and we're going to decide how to

12    deal with it."  It has to be authorized, and it needed

13    congressional authorization to exercise the hugely, vastly

14    broad power that it did in this case, which there is no

15    statutory authority for.

16            Before I move to the last thing, which is back to

17    necessity, does Your Honor have any questions for me on those

18    issues?

19            **THE COURT:**  No, I do not.

20            **MR. BRONSTER:**  Thank you.  Then I'll try to do

21    necessity as quickly as possible.  We have the benefit of some

22    discussion on it earlier.

23            The Government's position would virtually take us

24    from opening statements to verdict with little or nothing in

25    between.  It would take them a few hours to put on some

1    witnesses and that would be the end of the case.  And they feel

2    that that's the way it should be.

3         Dr. Moore has a defense and he has a constitutional

4    right to present it.

5         Now, there are two separate issues.  The first is,

6    should he be allowed to present his necessity defense?  And the

7    second issue is, would he have a right to have the jury charged

8    on that defense so that they could consider reaching their

9    verdict?

10        It's premature to decide the latter question.  You

11   have no way of knowing at this point what the proofs would be.

12   So the only question right now is, does this man have a right

13   to defend himself at all?

14        You've heard from the Government what this case is

15   really about.  It's not about him doing a crime for profit.

16   It's about moral, ethical, and legal opposition to the COVID

17   vaccine.  And the Government's first words out of the

18   prosecutor's mouth, which I agree with, are that this is a very

19   consequential case.

20        Well, it's consequential to the United States

21   Government because they spent $39 billion on this vaccine and

22   they don't now want to have to answer to the public.  But it's

23   consequential for Dr. Moore because if he can't present his

24   defense and at least have a chance for the jury to decide that

25   what he did was reasonable, he's going to go to jail and he's

1    going to go for a substantial period of time.

2         And it seems contrary to even the most fundamental

3    constitutional principles that he should not be able to stand

4    before a jury and explain to them, "This is why I did it, and I

5    found it to be necessary and this is why."  The jury may accept

6    it or the jury may reject it.  And whatever the outcome, so be

7    it.  But right now, the Government wants to shackle him to his

8    chair and put a gag in his mouth and force him to remain

9    silent.

10        One thing I want to mention from the Government's

11   argument, we're somewhat off track when we talk about, "Well,

12   is the loss of your job enough of an imminent threat to justify

13   a necessity defense?"

14        And two comments.  First of all, if we are talking

15   about the loss of job, I wrote down the Government's comment

16   about how the loss of a job is not significant enough.  Only a

17   person who has a job would make that statement.

18        And I think, Your Honor, from what your response to

19   what the Government said, appreciates the importance of that to

20   the lives of every human being in this country and the

21   Constitution.

22        But beyond that, that's not in itself the imminent

23   threat.  The imminent threat is that, if Dr. Moore doesn't get

24   these people the vaccination card, they're going to have no

25   choice but to cave into the governmental and systemic pressure,

1    and they're going to have to get that shot from someone else.

2    And the day they do, Dr. Moore believed they would be placed in

3    imminent harm of physical injury or even death.

4         And it doesn't have to happen ten minutes later.

5    There's case law that I cited that says that, if the event is

6    imminent, even if the repercussions are not until much later,

7    that doesn't undo the defense.  That was what Dr. Moore was

8    worried about and that's what Dr. Moore was trying to protect

9    these people against, from the oppressive pressures that were

10   being put on them where they were at risk of losing their job.

11        And I've never met these people, but I would be

12   willing to bet any amount of money that if you put every one of

13   them on the stand, not one of them is going to say this is

14   because we wanted to go to Hawaii.  That's just the Government

15   trying to minimize what is clearly an important personal and

16   societal issue.

17        People don't want to lose their jobs, people don't

18   want their children ostracized.  And in the face of those

19   pressures, these people may very well have had no choice but to

20   cave in.  And Dr. Moore tried to prevent that imminent harm.

21        **THE COURT:**  Tell me about the children being

22   ostracized.  I don't understand where you're -- that sounds

23   like you're making that up.

24        **MR. BRONSTER:**  Well, Your Honor made the point that

25   in the state of Utah children were not necessarily required to

1    have the vaccine to go to school.  But I would respectfully

2    submit that's not enough of the inquiry.  There were states

3    where it was.

4            What if some of these people decided tomorrow, you

5    know what, I want to relocate for work, I want to move, freedom

6    of movement throughout the country, one of the constitutionally

7    protected rights.  Well, now they have to worry about the fact

8    there are school systems like the one in my state that would

9    not let children into the building without a COVID card.

10           **THE COURT:**  At what point?  Because I mean kids

11   couldn't even get the vaccine for a long --

12           **MR. BRONSTER:**  I'm sorry, Your Honor?

13           **THE COURT:**  At what point?  Children couldn't even

14   get the vaccine for a long time.

15           **MR. BRONSTER:**  That's true, Your Honor.  But there

16   was a point, not just where I'm from, but in other states as

17   well -- and if I had anticipated the question I would have, of

18   course, come with more data, but if Your Honor likes I'll

19   submit something supplemental.

20           There were places where it was required for school

21   children, as well as for other things, but that's where my

22   emphasis is at the moment.  And these patients, they have the

23   right to relocate if they want, they have the right to travel

24   throughout the country.  Well, they can't if their children

25   aren't vaccinated and now their options are limited.

```
 1              There was compelling reason for these people to get

 2     the vaccine, and their only way out -- their only way to

 3     prevent what they believed and the doctor believed was a

 4     life-threatening situation, was to have him give them this

 5     card.

 6              Now, Your Honor may disagree, the Government may

 7     disagree, the jury may disagree, but they have a right to hear

 8     it and make that decision for themselves.

 9              There's no objective right or wrong here.  There's

10     the matter of what Dr. Moore believed, what he based his belief

11     on, and was it reasonable for him with that belief and what he

12     based it on to go ahead and do what he did.

13              I can't answer that.  The prosecutor can't answer

14     that.  Only a jury of Dr. Moore's peers can answer that.  But

15     the Government doesn't want to give them the opportunity to

16     even hear about it, and that's depriving him of a fair trial.

17              There is a lot more that I would like to say, but I

18     respect Your Honor's time limitations.

19              THE COURT:  I'll give you about another five minutes

20     if you have any points that you didn't get to that you feel are

21     important.

22              MR. BRONSTER:  Thank you, I appreciate it.

23              THE COURT:  You can have a moment to confer with your

24     colleague, too.

25              MR. BRONSTER:  And again, I will not be able to
```

1    provide you with the backup data today, but I am advised by my

2    co-counsel that, at one point under Utah law, school children

3    over the age of 12 were required to be vaccinated to go to

4    school.

5         THE COURT:  I guess I would need to see that to

6    believe that.

7         MR. BRONSTER:  Yeah, I understand.  And I can't tell

8    you that on my personal knowledge, Your Honor.  I would ask --

9         THE COURT:  Just let me stop you.  The idea that the

10   Utah legislature would have passed that law is unthinkable to

11   me.

12        MR. BRONSTER:  I can only check it out after today,

13   Your Honor.  I can't --

14        THE COURT:  I could be wrong, I'm not -- I didn't

15   research it, but I just -- I mean I paid attention during the

16   pandemic.  And Utah was doing things like -- the Utah

17   legislature was doing things like enacting laws barring local

18   school districts from requiring masks.

19        MR. BRONSTER:  Yes.  And Utah went so far over its

20   concerns about -- and this relates to the job issue and how

21   important a person's job is -- I believe the State of Utah

22   passed legislation making it illegal to check someone's

23   vaccination status for a job.

24        Now, this came sometime after the pandemic and after

25   the danger was over, so it was of no value to the patients that

1    Dr. Moore was seeing, but I understand what you're saying.  And

2    what I'd like to ask is your permission, if I do find something

3    that does document about the 12-year-olds, that Your Honor will

4    allow me to submit a one-page submission on it.

5         **THE COURT:**  Okay.  I'll decide on that later.

6         Go ahead.

7         **MR. BRONSTER:**  All right.  I think, Your Honor, that

8    is as deep as I need to go at this point.  I am, of course,

9    again willing to answer any questions that Your Honor may have.

10        **THE COURT:**  All right.  Thank you.

11        All right.  Mr. Bouton, I told you you could have a

12   few minutes to reply if you need to.

13        **MR. BOUTON:**  Thank you, Your Honor.  I'll be brief.

14        With respect to the motion in limine, I think the

15   argument from defense counsel proves our point.  He said

16   there's no objective right or wrong.  He's essentially arguing

17   there's no law.  He said this case would be over in a few

18   minutes, we'd go to opening and closing.  Why?  Because the

19   defendants committed the crime.  But they don't want that to be

20   what the trial is about and that's exactly what it has to be

21   about.

22        In the Tenth Circuit, jurors are not allowed to

23   consider nullification.  They don't get to ask or have a

24   referendum on COVID and say, "Were the policies appropriate or

25   wise?"  They have to ask, "Did he violate the law?"  In fact,

1    they are barred from substituting their own judgment for what

2    the law is, and required to apply the facts to the law as given

3    to them by the Court.

4          This is the kind of case that could actually test the

5    jury system. Right? If you were to allow -- the judge acts as

6    a gatekeeper. There is no constitutional right or any right to

7    present a defense that is not supported by fact or law. Many

8    of the cases -- most of the cases, if not all cited in the

9    briefs, have denied the necessity defense and/or affirmed the

10   district court's preclusion of the necessity defense.

11         To say that, "Well, it doesn't matter because if you

12   feel strongly enough about it, no matter whether you committed

13   a crime, you should be able to argue to the jury and tell them

14   the law is wrong, ignore it. If you agree with me, if you feel

15   the way I feel, ignore the law and acquit me even though I did

16   it," that's not permissible. And that's exactly the kind of

17   prejudicial and dangerous argument that they want to make.

18   It's their whole case. And it's up to the Court not to allow

19   it.

20         There was no emergency. They keep saying they had no

21   choice but to be vaccinated. That is wrong. They had plenty

22   of choices. For some persons maybe the choices were harder or

23   more difficult. Maybe it was an employment choice. Maybe it

24   wasn't. For some it was less significant inconveniences. And

25   even if it was a potential job loss, they could go to court,

1    they could find another job, they could do other things.  This

2    was not a situation where it was "get the vaccine or obtain

3    fraudulent vaccination record cards."  This was "get the

4    vaccine or comply with temporary restricted public health and

5    safety rules until I can otherwise get them changed or they are

6    removed."  There was no imminent threat of serious bodily

7    injury or death, period.  There were reasonable legal

8    alternatives.  Under both those two elements, they cannot

9    assert a legally valid necessity defense.

10            Now, as to the motion to dismiss, just brief

11   responses.

12            This notion that it was "It was just the signature on

13   the card, it wasn't the card itself," makes no sense.  One,

14   there wasn't a signature.  You would put a date and a lot

15   number and maybe a stamp, could have been a signature of where

16   it was administered.

17        **THE COURT:**  Well, let's not quibble about the

18   signature.  I think the point is, you know, was there value of

19   a card that wasn't filled out.

20        **MR. BOUTON:**  Your Honor indicated that it is the

21   value of the card, it could be filled out.  It needed

22   information, information like a lot number that could either be

23   forged or just provided by Dr. Moore or his co-defendants, who

24   had access to the lot numbers only because they had voluntarily

25   enlisted in the vaccination provider program and signed the CDC

1    vaccination provider agreements.  That's how they knew what to

2    write in.

3            No one wanted a signature or a stamp or a date on a

4    blank piece of paper from Dr. Moore.  They wanted a card.

5    Yeah, they wanted it filled out, but they weren't asking just

6    for a service.  They were asking for the card.  Notated, yes,

7    fraudulently notated, yes, but they needed the card because the

8    card was what they would show to get access to venues that they

9    wanted to attend or to avoid restrictions that barred them from

10   certain activities for a time, if they chose, which they did,

11   to be unvaccinated.  That was a choice.

12           The fact that 24 percent of Utahans were never

13   vaccinated means they had a choice.

14           **THE COURT:**  Okay.  Let me ask you a couple of

15   questions.  I mean, are you aware of K through 12 children in

16   Utah ever being required to be vaccinated during the pandemic

17   to attend school in the public schools?

18           **MR. BOUTON:**  I'm not sure, Your Honor.  I moved to

19   Utah in December of 2020 and my children were not at that age.

20           **THE COURT:**  Well, it was like May of 2021 before the

21   vaccine was even authorized for people under like 16.

22           **MR. BOUTON:**  Spring or so, yes.

23           **THE COURT:**  Yeah.  So I'm just trying to think.  I

24   mean we'd be talking about the '22/'23 school year at the

25   earliest and that's -- I don't know, I'm --

1          **MR. BOUTON:**  Well, Your Honor, even if that were the

2     case, the United States' position would be it doesn't support a

3     necessity defense.  Denying your children access to public

4     school is concededly a significant imposition and restriction,

5     but it's not an imminent threat of serious bodily injury or

6     death, and it's a restriction that should be challenged legally

7     through legal means, which were available.

8          **THE COURT:**  Right.  No, I understand your legal

9     position.  I'm just curious factually, just because I know that

10    the idea that the Utah legislature would have tolerated that at

11    that timeframe is pretty hard for me --

12         **MR. BOUTON:**  Well, I do know --

13         **THE COURT:**  -- requiring mask mandates like a year

14    before that.

15         **MR. BOUTON:**  Sorry, Your Honor, I didn't mean to

16    interrupt.

17         **THE COURT:**  Yeah, no.  I mean the state legislature

18    was barring schools from requiring masks like the school year

19    before the vaccine would have been available for 12-year-olds.

20    So just that's -- that's hard for me to believe.

21         **MR. BOUTON:**  I would agree, Your Honor, with the

22    point that, among other states, Utah was more accommodative of

23    requests.  In fact, the charitable organization we pointed out

24    to whom the donations were directed had lobbied for exemptions

25    and obtained some exemptions from the state legislature for

1    people who wanted to keep their jobs and not get vaccinated.

2         That's one of -- that demonstrates one of the

3    reasonable legal alternatives that was available, the correct

4    way a citizen should address laws or regulations that they

5    disagree with, and something that was available to people who

6    were not facing an imminent threat of serious bodily injury and

7    death.  And why does that matter?  Because that's the only time

8    you have an excuse, when you don't have time or maybe another

9    option, maybe.  Just maybe, if it's reasonable, you can break

10   the law temporarily for the greater good; otherwise, no.

11        **THE COURT:**  And what was the timeframe, as charged in

12   the indictment, that Dr. Moore and his institute were giving

13   these cards out?

14        **MR. BOUTON:**  One moment, Your Honor.  It's sometime

15   in 2021 through I believe fall of 2022, but let me look.

16        On or before May 12th, 2021, and continuing to at

17   least September 6th, 2022 are the dates charged on Count 1, and

18   probably the other counts.

19        **THE COURT:**  Okay.  Understood.

20        All right.  Then the other thing I wanted to ask you

21   about, if you don't mind, is what do I make of the fact of the

22   relationship between the secretary of the HHS and the CDC?  And

23   it is true that some of the statutes you cite give authority to

24   the secretary of HHS.

25        In the indictment, there are parts that say that the

1    HHS and CDC working together essentially but, you know,

2    Mr. Bronster does point out that, in the operative charge

3    language it says the CDC's policy.

4              I mean is it both?  Is it one or the other?  Is it

5    just the CDC?

6              **MR. BOUTON:**  No, Your Honor, my understanding is the

7    CDC is a component or a subdivision of HHS, it's not a separate

8    independent agency.  Right?  So it is both, but I don't know

9    that they are essentially different.  Right?

10             So the HHS secretary would be over the CDC,

11   essentially, would promote the regulations, and they would

12   implement them and the activity through the CDC, is my

13   understanding.

14             **THE COURT:**  Okay.

15             **MR. BOUTON:**  Does that answer your question?

16             **THE COURT:**  I guess so, yeah.  I mean your argument

17   would be something like, you know, the Attorney General -- the

18   U.S. Attorney here could exercise -- possibly exercise

19   authority from the Attorney General or the Attorney General

20   would sanction it.  I mean it's a little more complicated than

21   that usually, with the way departmental authorizations work.  I

22   mean there usually are sub-delegations and things in

23   regulation.

24             Are you aware of, like with regard to the stockpile,

25   for instance, it says -- I know that maintaining the stockpile

1    says the Secretary, you know, in consultation with the CDC.

2        **MR. BOUTON:**  My understanding is those kind of

3    stockpiles would be distributed through the CDC.  We did attach

4    some exhibits of other vaccination provider agreements, some

5    that the Utah Department of Health was using to distribute or

6    to provide other vaccines through voluntary providers who

7    signed the agreements, vaccines that were funded and paid for

8    by the Federal Government.  And my understanding is that that

9    comes through the CDC, but I'm not --

10        What exactly is the question, Your Honor?  Maybe I'm

11   not understanding.

12        **THE COURT:**  It's all right.  You don't need to worry

13   about it further.

14        **MR. BOUTON:**  But my understanding is the CDC is the

15   arm of the HHS through which vaccines are traditionally

16   distributed and those kind of policy decisions are implemented.

17        **THE COURT:**  Implemented by the CDC or made by the

18   CDC?  Or made by the CDC and approved by the Secretary?  I mean

19   does the Secretary sign off on things that the CDC does like

20   this?

21        **MR. BOUTON:**  Yes, I think they're acting under the

22   authority of HHS, if that makes sense.

23        **THE COURT:**  That's what I'm asking.  So why does the

24   indictment say the CDC policy and not the CDC and HHS policy?

25        **MR. BOUTON:**  Well, I guess it's not specifically

1    clarifying where the policy was originated or under whose

2    ultimate authority it was enacted.  Perhaps that is not as

3    precise as it could have been, looking back.

4              **THE COURT:**  Maybe you're using "CDC" as shorthand.

5              **MR. BOUTON:**  Shorthand for both, yes, because it's

6    the arm of the HHS and it's the CDC Vaccination Provider

7    Agreement, they don't call it the HHS Vaccination Provider

8    Agreement.  The CDC has more direct contact with the local,

9    state and territorial health departments that it works with.

10   So --

11             **THE COURT:**  Okay.  I understand your position.

12             Do you have any other points you want to make?

13             **MR. BOUTON:**  Just very briefly, as to *Alabama*

14   *Realtors*, it -- what the defense omits, or doesn't notice, is

15   that the Supreme Court didn't just say this was illustrative.

16   They explained in the second sentence that the second sentence

17   that demonstrated the illustrative kinds of measures that could

18   be taken authorized the CDC to take measures that directly

19   relate to preventing the interstate spread of disease by

20   identifying, isolating and destroying the disease itself.

21             And I would submit that the provision of vaccinations

22   of COVID-19 vaccines, the controlled distribution and the

23   controlled distribution of vaccination record cards allowed to

24   identify, isolate and attempt to destroy the disease.

25             There may be debates about how effective it was, you

1    can debate efficacy or danger or transmission rates, and maybe

2    we'll never know.  But you can't debate that that's what they

3    were trying to do with the information they had at the time and

4    that they were authorized to do that.

5            And that's the real question.  Was it lawful?  Yes.

6            We can debate, but we should not turn this jury trial

7    into a debate on the wisdom of whatever policies were

8    implemented.  That's the danger of a pseudo-necessity defense

9    that's not legally supported by law.  It becomes a debate or a

10   vote on particular policies with hindsight now, instead of

11   asking the real question, Did they conspire to obstruct a

12   lawful government function?  Yes.

13           Did they convert, destroy, convey, otherwise dispose

14   of, without authority, government property?  Yes.

15           Did they conspire to do that?  Yes.

16           I don't think they're even going to argue that.  They

17   just want to say, "Yeah, but so what?  I thought it was wrong

18   so I got to break the law, and I should be able to convince the

19   jury that's the case."

20           And the United States says they shouldn't, that would

21   subvert the jury system.  I don't know.  That would test -- it

22   would test the honor and medal of jurors to fulfill their own

23   oath to apply the law.  I don't think we want to do that.

24           Anything else from me, Your Honor?

25           **THE COURT:**  No.  Thank you, Mr. Bouton.

1             **MR. BOUTON:**  Thank you.

2             **THE COURT:**  Mr. Bronster -- it's Bronster, right?

3    Sorry, I can't tell if it's an L or a T the way I wrote it

4    down.

5             **MR. BRONSTER:**  Bronster.

6             **THE COURT:**  Bronster, yes.

7             You know, ordinarily, I, you know, give the moving

8    party the last word, but you both have motions here.  So I'll

9    give you five minutes and only five minutes if there's anything

10    that Mr. Bouton just said that you feel like you have to

11    respond to.

12             **MR. BRONSTER:**  Thank you, Your Honor.  That's all

13    that I would need.

14             After almost 45 years of practicing criminal law, I'm

15    not sure that an indictment is the place for the Government to

16    just say, "Oh, well, we're just talking in shorthand."

17             The fact is that it makes a very great difference

18    which agency is involved, which agencies were authorized.  And

19    I would respectfully submit to you, Your Honor, and I say it

20    even more emphatically after the questions that you posed, I

21    would say that the Court must hold a factual hearing at which

22    the Government is going to have to prove that the CDC was

23    authorized, that HHS was authorized, that whoever it is that's

24    being charged in the indictment as having this lawful scheme

25    was authorized to pass it.

1          And this is not -- and this is also addressing a

2    concern that the prosecutor expressed -- that's not a jury

3    issue.  It's not for the jury to decide if policies or laws are

4    legal or not.  That's a threshold issue for the Court.

5          And if our arguments are right about the

6    administrative issues here, the indictment has to be dismissed

7    because it has not pled the violation of a lawful governmental

8    scheme.  And that's why we raise this issue now, because only

9    the Court has the authority to decide that.

10         The jury's only going to be asked to decide whether

11   or not Dr. Moore was reasonable in his perception that an

12   immediate threat had been created.  That's a fact issue that

13   juries traditionally resolve.

14         And the prosecutor talks about testing the honor of

15   the jurors.  Well, we do that every single day.  We do it in

16   murder cases, we do it in capital cases.  We are always, in our

17   system of justice, dependent on the integrity and the strength

18   of the jurors who we choose.  That's just a part of the system.

19   And the Government's going to have to abide by it, just like

20   the defense does.  And this is not the time for the Government

21   to be proposing that the Court should be starting to be

22   questioning the ability of our sworn jurors to do the job that

23   they're sworn to do.

24         Thank you, Your Honor.

25         **THE COURT:**  All right.  Thank you.  All right.  I

1    want to take a recess for a few minutes.  I may have some more

2    things to discuss with you after that, but I'd like to take

3    about a ten-minute recess.  And so if you could -- well, let's

4    see.  It's about 25 after.  Let's say come back at 3:40, if you

5    could.

6              With that, we will take a brief recess.

7              (A recess was taken.)

8         **THE COURT:**  All right.  Thank you for your patience.

9    I appreciate your arguments today.  They were very helpful.

10   With that, I will rule on the motions.  We are on the record

11   and the transcript of my oral rulings will serve as my opinion

12   on the motions.

13             That is, although my courtroom deputy will enter a

14   minute order stating the disposition of the motions, there will

15   not be a written opinion.  I will start with Dr. Moore's motion

16   to dismiss the indictment.

17             Although Dr. Moore does not state the procedural

18   basis for his motion, he presumably brings his motion under

19   Federal Rule of Criminal Procedure 12(b)(3)(B)(v), which

20   authorizes pretrial motions to dismiss an indictment for

21   "failure to state an offense."

22             A court should dismiss an indictment under this

23   provision if, "as a matter of law, the Defendant[s] could not

24   have committed the offense for which [they] [were] indicted."

25   I am quoting there from *United States v. Todd*, 446 F.3d 1062 at

1  page 1068 from the Tenth Circuit in 2006, though I made it

2  plural to match the case.

3        The Tenth Circuit has further clarified that, in

4  nearly all circumstances, "[a]n indictment should be tested

5  solely on the basis of the allegations made on its face, and

6  such allegations are to be taken as true."  That is a quotation

7  from *United States v. Hall*, 20 F.3d 1084 at page 1087 from the

8  Tenth Circuit in 1994.

9        To be sure, the Tenth Circuit has recognized a narrow

10  exception to this rule that sometimes allows the court to also

11  consider undisputed facts outside the indictment in ruling on a

12  motion to dismiss.  And an example of that, or a case

13  discussing that exception, is *United States v. Chavez*, 29 F.4th

14  1223 at page 1226 from the Tenth Circuit in 2022.

15        But whatever the scope of that exception, the Tenth

16  Circuit has made clear that "[i]f contested facts surrounding

17  the commission of the offense would be of any assistance in

18  determining the validity of the motion, Rule 12 doesn't

19  authorize its disposition before trial."  And I am quoting

20  there from *United States v. Pope*, 613 F.3d 1255 at page 1259

21  from the Tenth Circuit in 2010.

22        I will first address Dr. Moore's interesting

23  argument -- and I mean that seriously, it is an interesting

24  argument -- that the vaccine program at issue in this case was

25  unlawful, and that Count 1 of the Indictment therefore fails as

1    a matter of law.

2            In Count 1, the Government alleges that the

3    Defendants conspired to defraud the United States in violation

4    of 18 USC Section 371.  More specifically, it alleges that the

5    Defendants conspired to impede "the lawful governmental

6    functions of the CDC in distributing and administering

7    authorized COVID-19 vaccines and COVID-19 Vaccination Record

8    Cards through approved vaccine distributing entities."

9            Dr. Moore argues that the alleged CDC functions that

10   he is charged with violating exceeded the CDC's statutory

11   authority and were therefore not lawful government functions.

12           If he is correct, the Government cannot prosecute him

13   for impeding those functions.  For as the Supreme Court has

14   recognized, the crime of conspiring to defraud the United

15   States in violation of Section 371 covers "any conspiracy for

16   the purpose of impairing...the lawful function of any

17   department of government."  And I am quoting here from *Dennis*

18   *v. United States*, 384 U.S. 855 at page 861 from 1966, which in

19   turn is quoting *Haas v. Henkel*, 216 U.S. 462 at page 479 from

20   1910.

21           In evaluating Dr. Moore's argument, it is essential

22   to cut through the rhetorical fog and identify what the

23   programs he is charged with impeding actually were.

24           First, Dr. Moore places great emphasis on various

25   vaccine mandates that required certain classes of individuals

1    to receive vaccines as a condition of employment or that

2    required students at certain universities to receive vaccines

3    as a condition of attending classes in person, or that required

4    vaccines as a condition of traveling, or that authorized

5    private employers or businesses to require their employees or

6    customers to obtain vaccines, and so forth.

7           But whatever the legality or wisdom of those

8    mandates, none of them were promulgated by the CDC.

9           Second, Dr. Moore argues that the CDC lacked

10   authority to "require [him] to vaccinate his patients, or to

11   require him to assist in the creation of a state database of

12   those who chose to remain unvaccinated."  And I'm quoting there

13   from Docket No. 166 at 19.

14          But candidly, that is hyperbolic nonsense.  The CDC

15   did not purport to require Dr. Moore to do anything.

16          Rather, the CDC simply provided COVID vaccines and

17   vaccination cards to doctors who agreed to (1) administer the

18   vaccines, (2) provide vaccination cards to individuals who

19   received the vaccines, and (3) report the vaccinations they

20   performed to state health authorities.

21          In other words, the CDC established a program for

22   (1) distributing the COVID vaccine, and (2) documenting who had

23   received the vaccine.  And this program was implemented through

24   voluntary contracts.

25          Indeed, the indictment alleges that Dr. Moore signed

1    a COVID-19 Vaccination Program Provider Agreement and willingly

2    agreed, or purported to agree, to administer and document COVID

3    vaccines.

4           I conclude that the program actually at issue in this

5    case was authorized by statute.

6           First, the vaccine program was authorized under

7    42 USC Section 264(a), which empowers the Surgeon General to:

8           "make and enforce such regulations as in his judgment

9    are necessary to prevent the introduction, transmission, or

10   spread of communicable diseases from foreign countries into the

11   States or possessions, or from one State or possession into any

12   other State or possession.  For purposes of carrying out and

13   enforcing such regulations, the Surgeon General may provide for

14   such inspection, fumigation, disinfection, sanitation, pest

15   extermination, destruction of animals or articles found to be

16   so infected or contaminated as to be sources of dangerous

17   infection to human beings, and other measures, as in his

18   judgment may be necessary."

19          This power has been sub-delegated to the CDC under

20   42 CFR Section 70.2.

21          Now, although the defendant noted that delegation,

22   that sub-delegation in his motion to dismiss, he did not at

23   that time raise any challenge to it or suggest that there was

24   anything improper about it.

25          Today he suggested that, you know, the surgeon

1    general may not have had the authority to make that delegation,

2    but I find that argument was not properly developed and I'm not

3    going to -- I will not consider it on that basis.

4           Regardless, I conclude that the vaccine program falls

5    comfortably within the scope of Section 264(a).  The program

6    was designed to increase the number of American citizens

7    vaccinated for COVID-19 in order to slow or "prevent" the

8    "transmission, or spread" of COVID-19.  It therefore can be

9    readily justified as a "measure[]" that was "necessary" in the

10    CDC's "judgment" to prevent the spread of a communicable

11    disease.

12           Now, Dr. Moore argues that the Supreme Court's

13    decision in *Alabama Association of Realtors v. Department of*

14    *Health & Human Services*, and that's 594 U.S. 758 from 2021,

15    forecloses the Government's interpretation of Section 264(a) in

16    this case.

17           There, the Court held that the CDC's eviction

18    "moratorium" in "count[ies] that [were] experiencing

19    substantial or high levels of COVID-19 transmission" probably

20    was not authorized under Section 264(a).  The Court described

21    the eviction moratorium as "markedly different from" the

22    specific measures listed in Section 264(a), such as the

23    destruction of contaminated animals.

24           But I conclude that the same reasoning does not

25    extend to the vaccine program here.  Indeed, the Court

1   contrasted the eviction moratorium, which related only

2   "indirectly" to the spread of COVID-19, with the measures

3   listed in Section 264(a), which "directly relate to preventing

4   the interstate spread of disease by identifying, isolating, and

5   destroying the disease itself."  And I am quoting here from

6   page 763 of the Supreme Court's decision.  I conclude that the

7   vaccine program is comparable to these latter measures, insofar

8   as vaccination, like "disinfection" and "sanitation," relates

9   directly to the interstate spread of a disease by targeting the

10  disease itself and is not an indirect measure comparable at all

11  to the eviction moratorium.

12          Second, even if the vaccine program were not

13  authorized under Section 264(a), I conclude that it was

14  authorized under other statutes.

15          Specifically, the HHS and CDC were separately

16  authorized to -- by statute, authorized to stockpile vaccines,

17  and I conclude vaccination cards as well.

18          Under 42 USC Section 247d-6b(a)(1), the HHS

19  Secretary, "in collaboration with the" CDC, "shall maintain a

20  stockpile or stockpiles of...vaccines and...other supplies

21  (including...ancillary medical supplies, and other applicable

22  supplies required for the administration of...vaccines[)]," to

23  the extent necessary "to provide for and optimize the emergency

24  health security of the United States...in the event of...[a]

25  public health emergency."

1    This statute expressly and indisputably authorized

2    HHS and the CDC, working together, to stockpile vaccines.

3    And I conclude that it is best read also to have

4    authorized HHS and the CDC to stockpile vaccine cards, either

5    as "ancillary medical supplies" or as "other applicable

6    supplies required for the administration of...vaccines" because

7    the cards were "necessary" for tracking when patients received

8    vaccine doses and how many doses and boosters they received in

9    providing necessary information for determining whether further

10   vaccines were indicated, and, if so, when.

11   In addition, the HHS Secretary is expressly

12   authorized to "deploy [this] stockpile at [his] discretion...to

13   respond to an actual or potential public health emergency or

14   other situation in which deployment is necessary to protect the

15   public health or safety."  And I'm quoting there from 42 USC

16   Section 247d-6b(a)(3)(G), which is a subsection of the same

17   statute that contains the stockpile provision.

18   It follows, I believe, that, in addition to

19   stockpiling vaccines and vaccination cards, HHS and the CDC

20   were authorized to deploy those materials during a public

21   health emergency like the COVID-19 pandemic.

22   Now, it is true that, unlike the stockpiles

23   subsection of the statute, the subsection about deploying the

24   stockpile says the HHS secretary does not specifically indicate

25   CDC as the stockpile provision does.  The indictment, however,

1  makes clear that HHS was involved in the decision with CDC to

2  deploy the stockpile.  As alleged in paragraph 15 of the

3  Indictment, and I'm quoting here, "[t]o facilitate the proper

4  administration of the COVID-19 vaccines, the CDC and HHS...

5  developed rules and protocols for the entities that would

6  administer the vaccines at locations around the United States.

7       Now, also, I note that the CDC is an arm of the HHS,

8  it's under the direction of the HHS.  The stockpile statute

9  clearly indicates that the CDC is involved with the vaccine

10 stockpiles.  I think it's a fair inference that it's properly

11 involved in the deployment of the stockpile as well.

12      Also, I note that the defendant -- that although the

13 Government cited this provision in its response brief, the

14 defendant did not reply to it or raise any issue relating to

15 the -- you know, to whether it provided authority to the CDC in

16 his reply brief.

17      Indeed, although the Government invoked both

18 statutes, the statutes authorizing HHS and the CDC to stockpile

19 and deploy vaccines and related supplies in its brief opposing

20 the motion to dismiss, Dr. Moore offered no response in his

21 reply brief.

22      Because HHS and the CDC were authorized by statute to

23 enter into COVID-19 Vaccination Program Provider Agreements and

24 to stockpile vaccines and vaccination cards, I conclude that

25 the vaccine program at issue here was a "lawful governmental

1    function."

2              Finally, Dr. Moore devotes a significant portion of

3    his opening brief to the Supreme Court's recent decision in

4    *Loper Bright Enterprises v. Raimondo*, 144 Supreme Court

5    Reporter 2244 from 2024, which overruled *Chevron* and its

6    progeny.  I believe my conclusions are fully consistent with

7    that decision.

8              In *Loper Bright*, the Supreme Court distinguished

9    between express delegations of authority to agencies and mere

10   statutory ambiguities.

11             As counsel is no doubt aware, under *Chevron*, courts

12   construed ambiguous language in statutes administered by

13   agencies as implicit delegations of interpretive authority to

14   the relevant agencies.

15             In overruling *Chevron*, *Loper Bright* clarified that a

16   court should not construe a statutory ambiguity as an implicit

17   delegation of interpretive authority, but should instead

18   "resolve the ambiguity" by "us[ing] every tool at [its]

19   disposal to determine the best reading of the statute,"

20   regardless of the agency's preferred interpretation.  And that

21   is a quotation from page 2266 of *Loper Bright*.

22             But *Loper Bright* does not stand for the proposition

23   that courts should disregard express delegations of authority

24   to agencies.  Instead, courts are required to "respect [such

25   express] delegations" so long as they are "consistent with

1    constitutional limits."  And I am quoting there directly from

2    page 2273 of *Loper Bright*.

3            In this case, I conclude that the vaccine program was

4    authorized by express delegations of power, not by some sort of

5    implicit delegation gleaned from statutory ambiguities.

6            The Surgeon General, and the CDC, as his delegee, was

7    expressly authorized to "[m]ake and enforce such regulations as

8    in his judgment are necessary to prevent the introduction,

9    transmission, or spread of communicable diseases," and, "[f]or

10   purposes of carrying out and enforcing such regulations" to

11   "provide for [such] measures, as in his judgment may be

12   necessary."

13           HHS, working with the CDC, was expressly authorized

14   to stockpile vaccines, "ancillary medical supplies," and "other

15   applicable supplies required for...the administration of...

16   vaccines."

17           And HHS, with which CDC, as an arm, was authorized to

18   "deploy [this] stockpile at [its] discretion...to respond to an

19   actual or potential public health emergency or other situation

20   in which deployment is necessary to protect the public health

21   or safety."

22           I conclude that I must "respect" these express

23   delegations, and I have no difficulty concluding that they

24   authorized the vaccine program at issue here.

25           To be sure, Dr. Moore suggests that I must "narrowly

1    interpret[]" these express grants of authority, and I'm quoting

2    there from Docket No. 166 at page 17, but I find no support for

3    that proposition in *Loper Bright*.

4         *Loper Bright* does not support putting a thumb on the

5    scale when interpreting express delegations, either by

6    interpreting such delegations more narrowly than warranted by

7    the statutory language or by interpreting them more broadly

8    than so warranted.

9         Rather, exercising my authority under the

10   Constitution and the Administrative Procedure Act to "say what

11   the law is," and I am quoting there from page 2257 of *Loper*

12   *Bright*, though obviously that's not the first case to use those

13   words, I must interpret express delegations fairly, as "the

14   best reading of the statute" requires.  And I believe I have

15   done so here.

16        Dr. Moore also moves to dismiss Count 1 of the

17   Indictment under the Paperwork Reduction Act, 44 USC Section

18   3501, et seq.

19        The PRA provides that federal agencies may not

20   "conduct or sponsor the collection of information" unless a

21   "control number" is "displayed upon the collection of

22   information," among other requirements.  And that's Section

23   3507(a)(3).

24        The PRA enforces this requirement by providing that

25   "no person shall be subject to any penalty for failing to

1  comply with a collection of information" that does not display

2  a control number.  It further provides that "[t]he protection

3  provided by this section may be raised in the form of a

4  complete defense, bar, or otherwise at any time during the

5  agency administrative process or judicial action applicable

6  thereto."  And that's at Section 3512(b).  The first sentence

7  was 3512(a), that's 3512(b).

8         Dr. Moore argues that the following documents are

9  "collections of information" under the PRA that lacked control

10  numbers: his Vaccine Program Provider Agreement, the forms he

11  used to report patient vaccinations to Utah's vaccine database,

12  and the vaccination cards he distributed.  He concludes that he

13  is entitled to Section 3512(b)'s protections in this "judicial

14  action," that these documents must be excluded from evidence,

15  and that without this evidence Count 1 of the Indictment fails

16  as a matter of law.

17         I conclude, however, that Section 3512(b)'s

18  protections do not apply here for two reasons.

19         First, the action before me is neither an "agency

20  administrative process" nor a "judicial action applicable

21  thereto."  By its plain terms, Section 3512(b) applies only to

22  agency proceedings and judicial review of those proceedings,

23  not criminal proceedings that originate in federal district

24  court.

25         The Tenth Circuit has adopted this interpretation of

1    the PRA in an unpublished opinion, stating that Section

2    3512(b)'s "public protection" applies only "'during [an] agency

3    administrative process' or in a 'judicial action applicable' to

4    that process."  And I am quoting here from *Springer v. IRS*

5    ex rel. U.S., 231 F. App'x 793, page 800, from the Tenth

6    Circuit in 2007.

7         The Sixth Circuit has similarly recognized "that

8    Section 3512 was [not] intended as a defense...to criminal

9    proceedings in district court."  And I am quoting there from

10   *United States v. Gross*, 626 F.3d 289 at page 296 from the Sixth

11   Circuit in 2010.  It follows that Section 3512(b) does not

12   protect Dr. Moore here.

13        Now, it is true that Dr. Moore argues that those are

14   both cases involving tax prosecutions and there's a special

15   rule in tax prosecutions and that the public protection

16   provision of the PRA should apply in other -- criminal

17   proceedings.  But I see no basis for that distinction, either

18   in the language, the operative language of the Sixth Circuit's

19   decision in *Gross*, or the Tenth Circuit's decision in *Springer*,

20   or, more importantly, in the statute itself.

21        All right.  To be sure, the Ninth Circuit has applied

22   Section 3512(b) in criminal proceedings.  But aside from the

23   fact that that's the Ninth Circuit and not the Tenth Circuit, I

24   do not see a convincing textual basis for this.  Section

25   3512(b)'s protection extends only to an agency administrative

1   process or judicial action applicable thereto.  Applying the

2   nearest-reasonable-referent canon of interpretation, I conclude

3   that the phrase "applicable thereto" modifies only the phrase

4   "judicial action," not the phrase "agency administrative

5   process."  And then applying the same canon to the phrase

6   "judicial action applicable thereto," that modifies "agency

7   administrative process."

8          It follows that Section 3512(b) applies to judicial

9   actions that are applicable to an agency administrative

10  process, not to original criminal proceedings in federal

11  district court.

12         Second, even when it applies, Section 3512(b)

13  "protects a person only 'for failing to file information.  It

14  does not protect one who files information which is false.'"

15  That is a quotation from *United States v. Chisum*, 502 F.3d 1237

16  at pages 1243 to 1244 from the Tenth Circuit in 2007.

17         More directly, the Tenth Circuit has squarely held

18  that "Section 3512 does not protect an individual against

19  prosecution for making false statements on government forms."

20  And that is a quotation from *United States v. Sasser*, 974 F.2d

21  1544 at page 1555 from the Tenth Circuit in 1992.

22         The Government is not prosecuting Dr. Moore for

23  failing to file the documents that are relevant to his PRA

24  argument:  His Vaccine Program Provider Agreement, the forms

25  that he used to report patient vaccinations to Utah's vaccine

1   database, and the vaccination cards that he distributed.

2          Instead, the Government is prosecuting Dr. Moore for

3   completing those documents with false information.  Because the

4   charges here are "predicated on the filing of false

5   information, not the failure to file," Dr. Moore "is therefore

6   not entitled to relief" under the PRA.  And I am quoting much

7   of that language there from page 1244 of *Chisum*.

8          To be sure, Dr. Moore argues that this principle does

9   not control because the Tenth Circuit's opinion in *Sasser* was

10  published before the current version of Section 3512(b) was

11  enacted.  But in *Chisum* the Tenth Circuit interpreted the

12  current version of the statute, and it reached the same

13  conclusion that it had in *Sasser*.

14         Dr. Moore's remaining arguments also fail.  For each

15  of these arguments, I conclude that "contested facts

16  surrounding the commission of the offense would be of

17  assistance in determining the[ir] validity."  It follows that

18  "Rule 12 doesn't authorize [dismissal] before trial."  And I'm

19  quoting once again from page 1259 of the Tenth Circuit's

20  decision in *Pope.*

21         First, in connection with his argument based on the

22  Paperwork Reduction Act, Dr. Moore argues "[p]arenthetically"

23  that Count 1 of the Indictment fails even if the Government's

24  evidence is admitted.  He argues that he did not interfere with

25  the vaccine program because the program's goal "was to make a

1    COVID-19 vaccine available to all authorized adults in the

2    United States who wanted to receive a vaccine," and his

3    patients did not want to receive the vaccine.

4            But the Government has plausibly alleged that the

5    vaccine program served additional goals beyond just providing

6    vaccines to those who wished to be vaccinated, including

7    "ma[king] it difficult for persons to falsely claim they had

8    been vaccinated in order to evade health-and-safety protocols,"

9    and that Dr. Moore's alleged actions interfered with those

10   goals.  I conclude that contested facts surrounding the

11   program's goals would be of assistance in determining whether

12   Dr. Moore's actions impeded the programs, and that dismissal

13   before trial is therefore inappropriate.

14           Second, Dr. Moore argues that Counts 2 and 3 of the

15   Indictment should be dismissed because the vaccines and

16   vaccination cards were not federal government property when he

17   disposed of them.

18           Here again, I conclude that contested facts would be

19   of assistance in determining whether the government had a

20   property interest in the vaccines and vaccination cards at the

21   time Dr. Moore disposed of them.

22           In Dr. Moore's opening brief, he argues that the

23   vaccines and vaccination cards were Utah property when he

24   disposed of them, not federal government property, because of

25   the CDC's agreements with Utah.

1    The Government responded that it shipped the vaccines

2    and cards directly to Dr. Moore using the government's

3    authorized shippers, without Utah ever handling or warehousing

4    the materials.

5    Dr. Moore then changed his argument in his reply

6    brief, stating that "[t]he best interpretation of the facts is

7    that Dr. Moore himself was the owner of [the] vaccine[s] and

8    cards," not Utah or the federal government.

9    Moreover, Dr. Moore described his "position" in his

10   reply brief as "that the Court should hold a hearing," with

11   witnesses and evidence, to resolve the "disputed issue as to

12   ownership."

13   Especially given that Dr. Moore himself recognizes

14   that contested facts underlie this issue, I have no difficulty

15   concluding that dismissal on the basis of this argument is not

16   appropriate before trial.

17   Finally, Dr. Moore argues that "the Government's

18   calculation of loss in the Indictment should be stricken"

19   insofar as it values each vaccination card at $50.  But here

20   again, I conclude that contested facts would be of assistance

21   in determining the "market value" of the vaccination cards.

22   For example, Dr. Moore alleges that "the defendants

23   never received $50, or any other amount, from anyone" in

24   exchange for vaccination cards.  But the Government responds

25   that it "has evidence to show that defendants received some

1    direct cash payments for the provision of the fraudulently

2    completed and distributed COVID-19 vaccination record cards."

3            Moreover, Dr. Moore alleges that his patients would

4    not have "paid one penny, much less $50, to purchase a [blank]

5    vaccine card," because the "service" that they sought was

6    Dr. Moore filling the cards with false information.  But the

7    Government responds that Dr. Moore's patients "wanted" and

8    "paid for" "the cards," not only for Dr. Moore's service in

9    completing them.  It follows, I conclude, that there are

10   disputed facts regarding the motivations of Dr. Moore's

11   patients that would be of assistance in determining the "market

12   value" of the cards.

13           Finally, the government represents that in other

14   criminal cases involving fraudulent vaccination cards,

15   defendants sold vaccine cards "for as much as $150 to $350

16   each."  This evidence further supports my conclusion that there

17   are disputed facts regarding the market value of the cards.

18           All right.  I will next address the Government's

19   motion in limine seeking to preclude the defendants from

20   pursuing a necessity defense.

21           It is well-established that the Government may file a

22   motion in limine seeking to preclude a criminal defendant from

23   pursuing an affirmative defense like duress or necessity.  For

24   example, the Tenth Circuit has affirmed a district court's

25   decision granting such a motion and precluding a criminal

1  defendant from pursuing a duress defense, and in the course of

2  doing so, the Tenth Circuit rejected the defendant's argument

3  that he had "an absolute right to have a jury consider" such a

4  defense.  And I am quoting there from *United States v.*

5  *Portillo-Vega*.  That's 478 F.3d 1194 at page 1200 from the

6  Tenth Circuit in 2007.

7          The legal standard governing the Government's motion

8  in limine is the same standard that governs whether to instruct

9  a jury on a necessity defense.  "If...an affirmative defense

10  consists of several elements," as a necessity defense does,

11  then the court must determine whether the evidence "supporting

12  [each] element is insufficient" as a matter of law "to sustain"

13  the defense "even if believed."  If, viewing the evidence in

14  the defendants' favor, even one element of the defense fails as

15  a matter of law, then "the trial court and jury need not be

16  burdened with testimony supporting other elements of the

17  defense."  And I am quoting there from *United States v. Bailey*,

18  444 U.S. 394 at page 416 from 1980.  That proposition is also

19  supported by *United States v. Dixon*, 901 F.3d 1170 from the

20  Tenth Circuit in 2018.

21          After the Government filed its motion in limine,

22  Defendants had the opportunity to proffer any testimony or

23  evidence that could have supported a necessity defense.  That's

24  what the response brief is for.

25          To the extent that Dr. Moore has proffered the

1  testimony and evidence he intends to present at trial to

2  support a necessity defense, I will construe that proposed

3  testimony and evidence in his favor.

4          The Government and Dr. Moore agree that the necessity

5  defense has at least three "requirements:" "(1) there is no

6  legal alternative to violating the law, (2) the harm to be

7  prevented is imminent, and (3) a direct, causal relationship is

8  reasonably anticipated to exist between the defendant's action

9  and the avoidance of harm."  I am quoting here from *United*

10 *States v. Patton*, 451 F.3d 615 at page 638 from the Tenth

11 Circuit in 2006.

12         It follows that I must grant the Government's motion

13 in limine if the evidence and testimony proffered thus far,

14 viewed in the light most favorable to the defendants, would not

15 permit a jury to find by a preponderance of the evidence that

16 each of the three requirements is satisfied.

17         Dr. Moore argues that his actions were necessary to

18 protect his patients from the harms posed by the COVID-19

19 vaccine.  For purposes of ruling on this motion, I will assume

20 that the COVID-19 vaccine was harmful, or at least that the

21 defendants and Dr. Moore reasonably believed it to be harmful,

22 or at least that they sincerely so believed.

23         I will begin by addressing the first requirement of

24 the necessity defense, that the defendants did not have "a

25 reasonable, legal alternative" to committing the acts alleged

 1  in the indictment, by which they could "both refuse to do the

 2  [alleged] criminal act[s] and also" prevent "the threatened

 3  harm" of vaccination.  I am quoting that discussion from page

 4  410 of the Supreme Court's decision in *Bailey*.

 5          The Tenth Circuit has stated that a necessity defense

 6  "can be asserted only by a defendant who was confronted with...

 7  a crisis which did not permit a selection from among several

 8  solutions, some of which did not involve criminal acts."  I am

 9  quoting here from *United States v. Seward*, 687 F.2d 1270 at

10  page 1276 from the Tenth Circuit in 1982.

11          The Tenth Circuit has also "noted that usually, when

12  a defendant's conduct spans a period of time, there are other

13  alternatives to the illegal conduct."  I am quoting there from

14  *United States v. Butler*, 485 F.3d 569 at page 576 from the

15  Tenth Circuit in 2007.

16          Similarly, in *United States v. Fraser*, the Tenth

17  Circuit held that the necessity defense failed where "there was

18  plenty of time" for the defendant "to try at least one more

19  (lawful) alternative."  And I am quoting here from 647 F.3d

20  1242 at page 1246 from the Tenth Circuit in 2011.

21          Finally, legal alternatives may defeat a necessity

22  defense even if they present "[d]ifficult choices" that are

23  "uncomfortable," so long as it is "not impossible" to pursue

24  the legal alternatives.  And I am quoting there from page 577

25  of the Tenth Circuit's decision in *Butler*.

1          In determining whether the defendants had legal

2    alternatives to the acts alleged in the indictment, it is

3    necessary to correctly characterize the harms that the

4    defendants sought to avert.

5          Dr. Moore describes the harm that he sought to avert

6    as the forced vaccination of his patients.

7          But I conclude that that is not an accurate

8    description of the situation the defendants faced.  No one was

9    forced to receive the COVID-19 vaccine.  Rather, Dr. Moore's

10   patients were put to a choice.  They could either (1) undergo

11   vaccination or (2) remain unvaccinated and comply with various

12   restrictions imposed on unvaccinated persons.

13         Further, I conclude that the consequences of

14   rejecting vaccination were not so unthinkable as to render

15   Dr. Moore's patients' choice illusory.  At worst, these

16   patients faced a potential loss of employment or the inability

17   to attend school in person.  But although choosing between the

18   vaccine and such consequences may have presented Dr. Moore's

19   patients with "uncomfortable" and "[d]ifficult choices," it was

20   far from "impossible" for the patients to remain unvaccinated

21   and endure those consequences.

22         Indeed, as the government points out, roughly 24

23   percent of Utahns did not receive a single COVID-19 vaccine

24   dose, and approximately -- I think it's 34 percent were never

25   fully vaccinated.

1    　　　　Fairly stated, then, the harm that Dr. Moore sought

2    to prevent was not the compelled vaccination of his patients,

3    but rather his patients being put to a genuine, though

4    sometimes difficult choice, between receiving the vaccine or

5    being subject to various restrictions.

6    　　　　Moreover, in evaluating whether legal alternatives

7    were available to the defendants to prevent this harm, it is

8    necessary to correctly characterize the illegal actions that

9    Defendants are alleged to have taken.

10    　　　　In particular, unlike the run of cases where the

11    defense of necessity or the related defense of duress have been

12    recognized, this is not a case where an individual immediately

13    reacts to a sudden and unforeseen emergency that leaves no time

14    for careful consideration.

15    　　　　To the contrary, Defendants' actions required

16    planning and significant time to bring to fruition.  And those

17    actions continued for an extended period of time.

18    　　　　The indictment alleges that Dr. Moore signed an

19    agreement with the CDC to distribute vaccines on May 12, 2021,

20    and the defendants have not identified any evidence, any

21    contrary evidence on that point regarding that date at least.

22    But the Plastic Surgery Institute did not receive vaccine doses

23    apparently until October 15, 2021, about five months later.

24    The defendants' alleged conspiracy then lasted until September

25    6, 2022, an additional eleven months.

1          Now, that constitutes a total of sixteen months, not

2     counting the time period before Dr. Moore signed the agreement

3     in May 2021, and presumably he put at least some thought into

4     that.

5          During those sixteen months, Dr. Moore and the other

6     defendants had ample time to consider and carefully choose

7     their options and to pursue available legal alternatives in

8     response to the situation that they faced.  Or as the Tenth

9     Circuit put it in *Fraser*, "there was plenty of time" for the

10    defendants "to try at least one more (lawful) alternative."

11    And again, that quote appears on page 1246 of that opinion.

12         In addition to the extended duration of the alleged

13    conspiracy, the defendants' ability to carefully respond to the

14    harm they sought to avert is evidenced by the complexity of the

15    conspiracy alleged in the Indictment, according to which

16    referrals for fraudulent vaccination cards were channeled

17    through Defendant Andersen, who allegedly screened potential

18    patients by requiring them to make a $50 donation to an

19    organization "seeking to 'liberate' the medical profession from

20    government and industry conflicts of interest."

21         To summarize, the defendants faced a situation in

22    which Dr. Moore's patients were put to a genuine if sometimes

23    difficult choice whether to remain unvaccinated.  And in

24    response to that situation, the defendants allegedly engaged in

25    a carefully planned conspiracy that took at least five months

1    to implement and then remained in effect for nearly another

2    year.

3           Especially in light of the situation the defendants

4    faced, in which Dr. Moore's patients had a genuine choice

5    whether to receive the vaccine, and the Defendants' alleged

6    response to that situation, I conclude that a jury could not

7    find by a preponderance of evidence that the defendants lacked

8    reasonable legal alternatives to committing the acts alleged in

9    the Indictment.

10          Again, the Tenth Circuit has recognized "that

11   usually, when a defendant's conduct spans a period of time,

12   there are other alternatives to the illegal conduct."  I'm

13   quoting again from page 476 of the Tenth Circuit's decision in

14   *Butler*.  And I conclude, as a matter of law, that that was

15   certainly true here.

16          Specifically, I conclude, as a matter of law, that

17   there were several obvious lawful alternatives that the

18   defendants undoubtedly could have pursued to help their

19   patients instead of the illegal means they chose.

20          First, and most obviously, Defendants could have

21   strongly advised Dr. Moore's patients to forgo vaccination

22   regardless of the consequences of doing so.  This alternative

23   cannot be dismissed as futile; after all, nearly one quarter of

24   the population of the state did just that, and presumably even

25   more might have done so if so counseled by their doctors.

1          Second, the defendants could have also advised the

2     patients regarding compliance with the regulations governing

3     unvaccinated persons, by, for example, encouraging them to

4     pursue employment opportunities that were available to

5     unvaccinated persons or to attend classes remotely.

6          Third, the defendants could have intervened on behalf

7     of the patients to mitigate the consequences they faced for

8     remaining unvaccinated.  For example, the defendants could have

9     helped the patients to seek exceptions to any vaccination

10    requirements imposed by patients' employers or schools, or

11    sought those exceptions directly on their patients' behalf.  I

12    certainly can take judicial notice of the potential power of a

13    doctor's note.

14         Fourth, to the extent some of Dr. Moore's patients

15    faced severe consequences for remaining unvaccinated, the

16    defendants could have encouraged those patients to pursue

17    political or judicial relief, including, if necessary,

18    emergency judicial relief, such as temporary restraining orders

19    or preliminary injunctions.

20         Again, I can take judicial notice that many lawsuits

21    challenging COVID-19 restrictions were successful, and that the

22    Utah legislature, in particular, enacted various laws

23    restraining local decision makers from imposing onerous

24    restrictions related to COVID-19.

25         Now, Dr. Moore dismisses such legal alternatives as

"long-term suggestions best directed at the broader goal of
stopping the vaccinations at some future time," but not well
suited for preventing immediate harm to his patients.  I
disagree.

First, Dr. Moore overstates the imminence of the harm
he sought to avert.  As I have explained, Dr. Moore's patients
were put to a genuine, if sometimes difficult, choice regarding
vaccination.  None of them faced compelled vaccination at all,
let alone compelled vaccination within a matter of hours or
even days.

Second, Dr. Moore ignores the significant amount of
time that the illegal means he allegedly chose to assist his
patients took to plan and implement.  Again, he was not able to
provide any false vaccinations for months after he decided to
pursue that course of action.  Even if Dr. Moore is correct
that the harm he sought to prevent required a "short-term"
solution, the course that he chose can hardly be characterized
as such.

Finally, Dr. Moore underestimates the ability of the
legal alternatives he disparages to provide "short-term"
solutions, including through legal remedies like temporary
restraining orders and preliminary injunctions.

Because I conclude the defendants fail to satisfy the
necessity defense's first requirement, I need not, and do not,
decide whether they also fail to satisfy the second and third

1    requirements.

2        Given that Dr. Moore's patients had a genuine if

3    sometimes difficult choice whether to receive the COVID-19

4    vaccine, however, I am skeptical that the defendants could show

5    that his patients faced imminent harm from being vaccinated or

6    that his illegal actions were necessary, and thus directly and

7    causally related, to his patients' ability to avoid that harm.

8        More generally, I am inclined to agree with the

9    government that to support a necessity defense, the "harm" to

10   be averted must be something more serious than the harm faced

11   by Dr. Moore's patients.

12       Even assuming that the COVID-19 vaccines posed a risk

13   of death or serious bodily injury, and I will assume that to be

14   true for purposes of resolving this motion, the harm that

15   Dr. Moore's patients faced was not forced vaccination, again.

16   Instead, it was being put to a choice regarding vaccination and

17   the consequences for refusing vaccination, which were at worst

18   loss of employment or inability to attend school in person,

19   were not so severe as to render that choice illusory.

20       Further, if avoiding being put to such a choice or if

21   avoiding the consequences of refusing to receive the vaccine

22   was itself enough to support the necessity defense, then it

23   seems to me that the defense would also extend to at least some

24   of the hypotheticals I raised earlier today.

25       Certainly if employment and educational consequences

1    justify Dr. Moore's actions, I can see no reason why, for

2    example, a defendant would not likewise be justified in forging

3    health insurance documents to help a 27-year-old student remain

4    at university, to forging a passport or green card to help an

5    illegal alien from losing his job, to committing perjury to

6    retain a job, and so forth.  In all of those cases, the illegal

7    action would be taken to avoid similar harms.

8         I am accordingly quite skeptical that the necessity

9    defense is available to a defendant who breaks the law to avoid

10   or ameliorate harms such as these.

11        But Dr. Moore's understanding of the necessity

12   defense seems to sweep even further.  Indeed, in rejecting the

13   Government's argument that the harm to be averted must be death

14   or serious bodily injury, he appears to contend that a

15   defendant may invoke the defense whenever he sincerely believes

16   that committing a crime will, on balance, do more good than

17   harm.

18        But that cannot be the law.  The Tenth Circuit has

19   cautioned that the defense must be applied "strictly and

20   parsimoniously."  That's a quotation from *United States v.*

21   *Al-Rekabi*, 454 F.3d 1113 at page 1122 from the Tenth Circuit in

22   2006.  And other circuits have stated that "[t]he law could not

23   function were people allowed to rely on their subjective

24   beliefs and value judgments in determining which harms

25   justified the taking of criminal action."  And that's a quote

1    from *United States v. Schoon*, 971 F.2d 193 at page 197 from the

2    Ninth Circuit in 1991.  Or as the Tenth Circuit put it in

3    *Turner*, you know, an expansive understanding of this defense

4    would lead to chaos and be tantamount to sanctioning anarchy.

5            All right.  I will make just two more points.

6            First, I am skeptical of the argument that Dr. Moore

7    was obligated by his Hippocratic Oath to commit the actions

8    alleged in the Indictment.  No one sought to compel Dr. Moore

9    to administer vaccines to his patients against his will.  To

10   the contrary, Dr. Moore voluntarily sought out and entered into

11   a contract to administer vaccines.  Assuming that vaccination

12   was harmful and that Dr. Moore's Hippocratic Oath obligated him

13   to avoid harming his patients, he could have avoided doing so

14   simply by declining to participate in the vaccination program.

15   Had he done so, he would have been under no obligation to

16   administer the vaccines.

17           Second, I am not convinced by Dr. Moore's argument

18   that the government will open the door to a necessity defense

19   by relying on his statements to establish his guilt.  Now, I

20   will not at this time attempt to determine whether the

21   government's use of Dr. Moore's statements would warrant the

22   introduction of other portions of the same statements under the

23   rule of completeness as reflected in Federal Rule of Evidence

24   106, but it is certainly possible that it might.

25           Now, it may well be the case that if the government

1    introduces statements by Dr. Moore that there's other portions

2    of the same statements that would need to be considered under

3    that rule.  That rule would not, however, warrant the

4    introduction of additional witnesses or other statements.  And

5    if other portions of Dr. Moore's alleged acknowledgments of

6    guilt do come in under the rule of completeness, I would be

7    willing to consider at that time a limiting instruction to

8    ensure that the evidence is considered for proper purposes.

9             All right.  In summary, then:

10            Docket No. 148, the Government's Motion in Limine, is

11   granted.

12            Docket No. 166, Dr. Moore's Motion to Dismiss the

13   Indictment, is denied.

14            It is so ordered.

15            All right.  That's the ruling on the two motions.

16            Are there any questions from counsel for either side?

17        **MR. BRONSTER:**  Not from the defense, Your Honor.

18        **MR. BOUTON:**  No, Your Honor.  Thank you.

19        **THE COURT:**  All right.  Given my ruling on the

20   motions, it probably makes sense to discuss trial logistics.

21            First, do the parties anticipate that a trial will be

22   necessary to resolve this case?

23            I realize that the answer may not be the same for

24   each defendant, so I'd like to give each of you a chance --

25   each party here the chance to answer that question separately.

 1    And, again, I'm not holding you to this, I'm just trying to

 2    figure out logically what needs to happen now.

 3           So I guess from Mr. Moore's perspective,

 4    Mr. Bronster, Mr. Drake -- excuse me, from Dr. Moore's

 5    perspective, do you have a sense, do you think a trial is going

 6    to be needed?

 7           **MR. BRONSTER:**  I think it likely will be, Your Honor.

 8           **THE COURT:**  Okay.  Thank you.

 9           What about for Plastic Surgery, Mr. Barnhill?  For

10    your client do you think --

11           **MR. BARNHILL:**  Yes, we do, Your Honor.

12           **THE COURT:**  Okay.  What about, Mr. Langford, for

13    Ms. Burgoyne?  Do you think a trial is going to be necessary to

14    resolve the case?

15           **MR. LANGFORD:**  At this point, yes, Judge.

16           **THE COURT:**  Okay.  And Mr. Brass, what about

17    Ms. Andersen?

18           **MR. BRASS:**  I concur with everyone else.

19           **THE COURT:**  Okay.  So it sounds like you all are

20    fairly -- you think a trial is likely.

21           Does the United States disagree with that?

22           **MR. BOUTON:**  No, Your Honor, especially since all the

23    defendants are insisting on it.

24           **THE COURT:**  Right.  Well, I mean it takes two to

25    tango.  I mean both sides have to kind of decide they want to

1    go forward to trial.  And if they want to avoid it, both sides

2    have to cooperate, too.  So that's fine, I just wanted to get

3    that out there.

4              Second, leaving aside standard pretrial practice,

5    such as final disclosures and objections, more targeted motions

6    in limine, preparing jury instructions and so forth, does

7    anything else need to happen or be resolved before trial?

8              **MR. DRAKE:**  Judge, David Drake.  I discussed this

9    with Mr. Bouton yesterday, but I'm facing two, maybe three

10   cancer surgeries.  It will take place during either the part of

11   December into January --

12             **THE COURT:**  Which is not a good time, given the trial

13   calendar, right, is that what you're getting at?

14             **MR. DRAKE:**  Well -- I didn't hear exactly what you

15   said.

16             **THE COURT:**  Well, I mean that's a tough timing, given

17   when the trial is scheduled, is that what you're getting at?

18             **MR. DRAKE:**  Yeah.  And I believe you might be in --

19   the U.S Attorneys Office said they may be stipulating or in

20   agreement with some kind of a short continuance.

21             Is that right, Mr. Bouton?

22             **MR. BOUTON:**  Your Honor, yesterday we did have a

23   discussion with Dr. Moore's counsel.  And it was hypothesized

24   that, were you to rule the way you did rule today, they

25   indicated that they might need more time for medical and other

1    reasons to adequately prepare for trial.

2         The United States did represent that, under those

3    conditions, given the fact that they had indicated that the

4    necessity defense was basically the heart of their case, and if

5    it were precluded -- I don't know, they didn't say start from

6    scratch, but they would basically have to reevaluate their

7    defense and case.  And given the health concerns, they would

8    need a continuance.

9         I indicated that we would not oppose a brief

10   continuance of sufficient length, in the Court's discretion, to

11   ensure that they have adequate time to prepare for trial.  We

12   don't want to force them to trial without adequate time.

13        **THE COURT:**  Okay.  I appreciate your bringing that to

14   my attention.

15        Okay.  Well, let me bracket that for a minute.

16        Leaving aside the timing of the trial, in terms of

17   like substantive legal matters, is there anything else that

18   needs to happen before we can get to trial?

19        **MR. BRONSTER:**  No, Your Honor, but the rulings that

20   you've made do create a need for us to request certain

21   additional specific items of discovery.  I'd like to hope that

22   that's not going to be a lengthy process.  I don't have any

23   reason to think it will be, but it is necessary.

24        **THE COURT:**  But there will be a need for additional

25   discovery?

1          **MR. BRONSTER:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  All right.  Anything other than

3     that that you can think of substantively, anyone?

4          **MR. BRONSTER:**  Not from the United States,

5     Your Honor.

6          **THE COURT:**  All right.  I was going to get to the

7     trial date next, but that's January 14th.  It sounds like there

8     may be a need for a continuance.  That's good to know.

9          Let me ask you this.  The trial is currently

10    scheduled for two weeks.

11         Is that enough time for the trial, including both

12    jury selection and jury deliberations?  Do we need more time?

13    Do we need that full amount of time?  I guess I need to know

14    that.

15         **MR. BRONSTER:**  I would speculate, Your Honor, that

16    more time may be necessary.  I anticipate a somewhat

17    substantial list of witnesses, consisting, for example, of

18    patients who were involved in receiving the vaccine cards, also

19    certain governmental witnesses who I may need to subpoena.  So

20    I think that the defense case potentially could take seven to

21    ten days.

22         **THE COURT:**  Do you have thoughts about the length of

23    the trial, Mr. Bouton, on the Government's side?

24         **MR. BOUTON:**  From our perspective, we would

25    anticipate that the two weeks would be sufficient.  This is the

1    first I'm hearing of a seven- to ten-day defense, guys, and I'm

2    curious as to how many patients would be coming in or what they

3    could relevantly testify to.  Unless he's talking about how

4    they felt about the card, how they valued it, I don't know what

5    they would be talking about, frankly.  But that is what it is

6    and it's not for the United States to --

7             THE COURT:  How much time do you think you need?

8             MR. BOUTON:  A week, roughly.  Maybe six days.

9             THE COURT:  Okay.  That's helpful.  Thanks.

10            And then in terms of the other defendants, how much

11   time do you anticipate you might need?  Would you need

12   additional time beyond what the Government and Dr. Moore would

13   need, any of you?

14            MR. LANGFORD:  I don't believe so, Judge.

15            MR. BRASS:  I think the time that is being discussed

16   would be adequate for us to present our defenses.

17            MR. BARNHILL:  Same here.

18            THE COURT:  Right.  And you'd at least have an

19   incidental amount of time to cross-examine and so forth since

20   there's multiple defendants.  But you don't think, for example,

21   you might have separate witnesses that you'd need to bring in,

22   other than the ones that would be presented by the Government

23   or Dr. Moore?

24            MR. BRASS:  Potentially, but that -- again, I don't

25   think that will add any time.

1        **THE COURT:**  Okay.

2        **MR. LANGFORD:**  I'm in agreement as well, Your Honor.

3        **MR. BARNHILL:**  Same here.

4        **THE COURT:**  Okay.  All right.  Well, it sounds like

5  something like three weeks might be safer.  Does anyone -- I

6  mean does that -- if the Government needs a week and maybe

7  change and you need a week and maybe change, does that sound

8  about right, three weeks?

9        **MR. BRONSTER:**  It does, Your Honor.

10        **MR. BOUTON:**  Yes, Your Honor.

11        **THE COURT:**  All right.  Well, I guess with the

12  possibility of a continuance, we need to talk about that.

13        How much time do you think you'd need to recover so

14  that you'd be -- I mean you'd need to do two things.  You'd

15  need to both recover and also have enough time to prepare while

16  you're healthy.

17        **MR. DRAKE:**  Yeah, Judge, if I may, it's a basal cell

18  carcinoma, requires two surgeries.  The one is the Mohs surgery

19  to carve out the cancer, and the second one is a reconstructive

20  surgery.  I just had a gravel pit dug here this last year and

21  it took me about three weeks to fully recover from it because

22  it affected the muscles and the nerves in that area.  So I've

23  got one up here and I've got one down here and one over here

24  and then one on my left ear.  And they had to be seen to.  I

25  mean they don't spread, they don't metastasize, but they do a

 1    lot of damage left in place.

 2              **THE COURT:**  Sure.

 3              **MR. DRAKE:**  So I would say my recoup time on these --

 4    I'd say about three weeks, four weeks at the max, with all of

 5    them.

 6              **THE COURT:**  Okay.  Well, let's talk about what the

 7    timeline might look like.  For better or worse, and I know it's

 8    not itself a ground for a continuance, but the U.S. Attorneys

 9    Office has my calendar pretty tightly booked in the first

10    quarter of next year.

11              Do you have thoughts, Mr. Bouton?  Are you involved

12    in the Ukashat matter?

13              **MR. BOUTON:**  Yes, Your Honor.

14              **THE COURT:**  That sounds like that's right about the

15    timeframe that we'd be landing on if we were talking about the

16    amount of recovery that Mr. Drake was discussing.

17              **MR. BOUTON:**  We are scheduled for trial in the

18    Ukashat case on February 28th through March 11th.

19              Currently on the Sinju case, April 18th.  I did speak

20    to -- which I have with Ms. Angelos, who represents Sandra

21    Flores, she did speak to me and give me her availability in

22    case the situation arose and a continuance was considered.  And

23    she was available May through June, but Ms. Jepson and I have a

24    trial in Molling June 3rd through June 6th.  I think May is

25    open for us.

1      **THE COURT:**  Let me look.  I think I might have that

2  same trial in June.  I know I have one in early June.  Is it --

3      **MR. BOUTON:**  It is before you, Your Honor, yes.

4      **THE COURT:**  I have all the trials right now, and have

5  for some time now, it seems.  And I know that this Lopez case

6  is supposedly trying to fight with Sinju about the same

7  timeframe, too.

8      All right.  What do you have in mind?  When would be

9  a good timeframe here, just to preserve continuity of counsel,

10  for everybody?

11      I have time in May.  I don't know if -- that's longer

12  than I think we were talking about.  Fitting in the three-week

13  trial before then would be very difficult for me.  I mean I --

14  that's not a ground for a continuance and, if we have to, we

15  could transfer it to a different judge, but --

16      **MR. BOUTON:**  Your Honor, the United States would

17  probably recommend early May, under the circumstances.  I do

18  have a case where -- oh, Ms. Angelos is on vacation May 4th to

19  14th.  So I don't know.

20      **THE COURT:**  Okay.  What I'm going to ask counsel to

21  do, is I'm going ask all of you to put your heads together and

22  try and give me a number of three-week windows where counsel is

23  all available.  And I will try and match those up with when I

24  have time available, when I don't have other criminal trials,

25  and try and find the earliest possible one and see if it's

1    acceptable to you all.

2          And as I said, if it really is the case that, you

3    know, we need a speedier trial and I'm able to accommodate, it

4    is possible to transfer the case to a different judge, you

5    know, for purposes of Speedy Trial Act compliance.

6          **MR. BRONSTER:**  I should say for the record, Your

7    Honor, at least as to Defendant Moore, given that we're one of

8    the parties requesting, it goes without saying that we are

9    prepared to stipulate to whatever waiver of speedy trial right

10   is necessary to accommodate the scheduling that we're

11   discussing.

12         **THE COURT:**  Right.  And again, I'll do everything I

13   can to -- it makes -- it's harder to find a space for a

14   three-week trial than for like a three-day trial.  And

15   especially given this many parties where there's multiple

16   counsel and I'm sure all of you have different engagements and

17   trials on your schedules, too.

18         So it will be a little bit of a challenge, but it

19   sounds like -- what I want you all to do, working together,

20   just over the next several months, just find several three-week

21   blocks where everyone's available, and we'll see if we can make

22   one of them work.

23         Is that acceptable?

24         **MR. BOUTON:**  Yes, Your Honor.  And what kind of time

25   range are you thinking?  Are we looking at the summer, I

1    mean --

2            **THE COURT:**  If we have to.  I mean I always want to

3    get cases resolved as promptly as we can.  I mean I don't think

4    I have anything -- I do not think I have anything right now

5    that couldn't move after the Molling trial, if we were to go

6    that late.

7            Finding a three-week block -- it sounds like

8    Ms. Angelos is gone in May.  May seemed to me like the best

9    possibility for a three-week block before then, just given the

10   other criminal matters.  But, yeah, if it needs to be the

11   summer, if that's what it takes, it could be the summer.

12           I mean is there any reason why that couldn't be so?

13   It would give you time to amply recover, I would hope.

14           **MR. DRAKE:**  Judge is May out, then?  Because I'm

15   available in May, but --

16           **THE COURT:**  Yeah, I am, too.  But it sounds like

17   Ms. Angelos, who represents one of the defendants, has a

18   multi-week trial that -- Mr. Bouton, didn't you say Ms. Angelos

19   is busy in May, or at least part of it?

20           **MR. BOUTON:**  Yes, Your Honor, she has a vacation

21   May 4th to May 14th.

22           And the United States is currently available early

23   July but we might need to discuss.

24           **MR. DRAKE:**  I can tell you I'm available in August,

25   if that's okay, but --

1    **THE COURT:**  Yeah, I could probably be available

2  either of those months.  Let me look at May for a minute.  I

3  guess once we get past May 14th, we don't really have three

4  weeks before Molling, do we?

5    Well, why don't you look at the possibilities.  I

6  could accommodate dates in May.  The only conflict I would

7  potentially have is the Molling trial, which you're aware of.

8  And then I think I could accommodate something in June.  I

9  could accommodate something in July.

10    If necessary, I could accommodate something in

11  August.  I would probably prefer to do it in June or July than

12  August.  That's starting to get awfully far out.  And also my

13  experience is that counsel a lot of times aren't around in

14  August.  That seems to be a common vacation time.  But I mean

15  we could try and come up with a date right now or do you want

16  to have more time to consult with your clients and one another

17  about your schedules?

18    **MR. BOUTON:**  Your Honor, if the defendants are

19  prepared and aware, I think we can try to talk about a date.

20    (Discussion held off the record.)

21    **THE COURT:**  All right.  Do we have some suggestions?

22    **MR. DRAKE:**  Judge, we're committed to the 7th, if

23  you're okay with that, of July.

24    **THE COURT:**  7th of July, let me just double check.

25  Based on what I looked at a minute ago, that's probably fine.

```
 1              I mean we will hit the 24th.  Do we need to add in an

 2    extra day and maybe put it into the 28th?

 3              MR. DRAKE:   That's one thing that we just talked

 4    about.  Yeah, if we went to the 29th, that would be fine.  Is

 5    it okay with you to go to the 29th?

 6              MR. BARNHILL:   Yes.

 7              THE COURT:   Do you need more than 14 days, do you

 8    think?

 9              MR. DRAKE:   Judge, I have a question.  When there's a

10    holiday intervening, we have a jury trial, do you just excuse

11    them like it's a weekend?

12              THE COURT:   Yeah, I do.  So we would not hold court

13    on the 24th.  So we would have 14 days, potentially, through

14    the 25th.  If you felt we need to, you know, we could try and

15    at least hold the 28th as well as -- in replacement of the

16    24th.

17              MR. BOUTON:   That would be fine, Your Honor, with the

18    United States.

19              MR. DRAKE:   I don't have a problem with that, Judge.

20              THE COURT:   Okay.  So the United States and Dr. Moore

21    are comfortable with starting on July 27th -- excuse me,

22    July 7th, and continuing through July 28th, on the

23    understanding that the 24th would be a holiday.

24              MR. DRAKE:   Right, July 7th, with the 24th being a

25    holiday.
```

```
1              MR. BOUTON:  Yes, Your Honor.

2              THE COURT:  Okay.  What about the other defendants?

3         Mr. Brass, would that work for you?

4              MR. BRASS:  Yes, sir.

5              THE COURT:  Mr. Langford, would that work for you?

6              MR. LANGFORD:  Judge, that works for me.

7              THE COURT:  Mr. Barnhill?

8              MR. BARNHILL:  Yes, sir.

9              THE COURT:  And I gather, Mr. Bouton, you've been in

10        touch with Ms. Angelos and know her schedule.  Will that work?

11             MR. BOUTON:  I don't think she gave us her schedule

12        that far.  Oh, she did.  She doesn't have anything until

13        July 28th.  And given the nature of her client's diversion

14        agreement, I don't think -- she would be earlier on in the

15        trial when she took the stand.  I don't expect her to be there

16        the whole time, and she would have coverage from the Federal

17        Public Defenders Office if she needed --

18             THE COURT:  And we might not even be holding trial on

19        the 28th, you know.  Hopefully we have enough days it's

20        possible we might finish early.

21             All right.  Why don't we put it on the calendar then

22        for July 7th through July 28th.  I guess would one of the

23        parties -- I guess I don't know if Dr. Moore or the United

24        States or if someone could prepare a motion to continue for my

25        consideration.
```

 1              **MR. DRAKE:**  I'll do that, Judge.

 2              **THE COURT:**  Okay.  Thank you.  I think there's -- I

 3     think the continuity of counsel issue here I think weighs

 4     heavily to trying to find a trial date when you're done with

 5     your surgery, when all the counsel are available.  But thank

 6     you.  I'll watch for your motion.

 7              **MR. DRAKE:**  Judge, I may have a question.  What I

 8     plan on doing is making this a stipulated motion.  But can I

 9     say in there I'm going to be -- all right with you to say in

10     there that stipulated and approved by the Court in open court

11     on this date and --

12              **THE COURT:**  That's fine.  That's fine.

13              **MR. DRAKE:**  All right.

14              **THE COURT:**  All right.  And then also let's try and

15     get a couple more things on the calendar relating to this,

16     especially where it's that far off.

17              I'd like to first of all get a final pretrial

18     conference on the calendar.  I'd like to do that -- I think

19     this case has enough moving pieces that maybe we could do that

20     two weeks before or the week two weeks before.  So I'm thinking

21     maybe the 23rd of June or maybe even the 20th of June.

22              Would either of those dates work for people for the

23     20th of June or the 23rd of June for pretrial conference?

24              **MR. BOUTON:**  The 20th is better for the United

25     States, Your Honor.

```
1           THE COURT:  Does anyone have a conflict on the 20th
2    of June for a pretrial conference?
3           MR. BRONSTER:  No, Judge.
4           MR. DRAKE:  Judge, as I stated to the prosecution, I
5    plan on being in Japan in June, but I could have --
6           THE COURT:  Is he able to cover the pretrial
7    conference?
8           MR. DRAKE:  Yeah, Jeff could take over.
9           MR. BRONSTER:  I'll take care of that.
10          THE COURT:  Okay.  All right.  Well, that's rainy
11   season in Japan.  I hope it works out for you.
12          MR. DRAKE:  Judge, I will tell you this.  I went
13   there last June.  It's the best place I've ever been.  I love
14   it and I'm telling everybody in the courtroom next time you do
15   a vacation, go to Japan.
16          THE COURT:  All right.  So the 20th for the -- for
17   Mr. Brass, 20th for pretrial conference okay?
18          MR. BRASS:  Yes, sir, it is.
19          THE COURT:  Mr. Langford?
20          MR. LANGFORD:  Yes, Judge, it is.
21          THE COURT:  Okay.  Mr. Barnhill?
22          MR. BARNHILL:  Yes, Your Honor.
23          THE COURT:  All right.  So the 20th of June.  Let's
24   schedule that for 10:00 a.m., but hold the day.  If it looks
25   like we don't have a huge number of things to discuss, I may
```

1  have you come in just at 1:30 instead.  But if it's a big day,

2  I want to start at 10:00.  So just hold that day for the

3  pretrial conference.

4          And then I think I would like to also -- I'm going to

5  issue a trial order -- oh, in a case like this, probably a

6  couple months before that pretrial conference.

7          And I guess before I do that, I'm inclined to set a

8  plea cutoff deadline, just in case anyone has -- you know, in

9  case people have a change of view about things, you know.

10          And what I would like to do is I'd like to set a plea

11  cutoff deadline and then have a status report where the parties

12  file a joint status report, you know, after that deadline to

13  tell me either you've resolved the case as to some or all the

14  defendants or you haven't and it's going to go to trial.  And

15  then once I get that status report, if it says we're going to

16  trial, I'll issue the trial order.

17          So I think -- I think I'm inclined to say April 18th

18  for a plea cutoff deadline.

19          Does that work?

20          **MR. BOUTON:**  Yes, Your Honor.

21          **MR. BRONSTER:**  It does, Your Honor.

22          **MR. BRASS:**  Works for us.

23          **MR. LANGFORD:**  Yes, Judge.

24          **THE COURT:**  And I'm sure you're all familiar with

25  that.  What I mean by that is, you know, once we pass that

1    deadline -- a defendant can plead guilty to the indictment, but

2    if we're talking about some kind of a special deal, you know,

3    it has to be by April 18th.

4              Okay.  April 18th, plea cutoff deadline.

5              I'm going to ask for -- by the close of business on

6    April 21st, I'm going to ask for -- that's the deadline for

7    submitting a status report.  And the only thing I need in that

8    status report is just to know if any resolutions have been

9    reached with any of the defendants or if it looks like we're

10   going to -- I mean just basically for each defendant whether

11   they're going to trial or not or whether a resolution has been

12   reached.  But it can be a joint document that just tells me

13   what the state of play is.

14             Any questions about that?

15        **MR. DRAKE:**  Judge. I did have a question on the

16   cutoff date.  Is that a cutoff for everything, motions,

17   discovery requests, all of that?

18        **THE COURT:**  Well, I had not set that yet.  When I --

19   I think, if at all possible, you should try and resolve any

20   motions.  When I issue my trial order I will set deadlines for

21   disclosures of evidence and final objections and motions in

22   limine related to the disclosed evidence, but I have in mind

23   things that are more targeted than the sort of motion we had

24   today.

25             If you have anything other than that kind of pretrial

1    practice, like the discovery issue, I think you should try and

2    get it resolved before then.  I'm not going to set a firm

3    deadline, but I don't want to be like scrambling to figure out

4    discovery issues once we issue the trial order.

5         **MR. DRAKE:**  We'll proceed with that.  And I've found

6    the U.S. Attorney's Office have been very helpful with us and

7    we'll proceed with that immediately.

8         **THE COURT:**  Right.  If you have discovery that you

9    think you need, I think you should probably get right on that,

10   even though the trial's well in the future.

11        **MR. DRAKE:**  Okay.

12        **THE COURT:**  But, yeah, I am not setting a deadline

13   for resolving discovery, but I would anticipate that it would

14   be resolved before that status conference date.  You all -- I

15   asked whether there were any other issues to be resolved, so

16   I -- at this point, I do not anticipate that any more motions,

17   other than just standard pretrial practice, would be

18   forthcoming.

19        Am I wrong about that?

20        So I don't think I need to set a motion cutoff date

21   because I think it's passed and I don't anticipate more

22   motions.

23        Am I wrong about that?

24        **MR. BRONSTER:**  Just to cover myself, Your Honor, your

25   decision today could at least potentially trigger us wanting to

```
 1    file other motions.  I'm not saying that it will and I'm not
 2    anticipating it, but I'd like to have at least a couple of
 3    weeks to be able to inform the Court it if we do decide that.
 4           THE COURT:  Let's set a motions cutoff date, then,
 5    just as a matter of safety.
 6           MR. BRONSTER:  Sure.
 7           THE COURT:  Yeah.
 8           Yes, Mr. Bouton?
 9           MR. BOUTON:  Your Honor, I think there is a
10    possibility of some of the defendants considering severance.  I
11    think if that issue is going to be raised, it ought to be
12    raised soon.
13           THE COURT:  Well, and I think that would be subject
14    to the motion cutoff date.  That's the kind of motion I would
15    want to get resolved well in advance.  And we have time.  So
16    what would be a reasonable date?  I want all of this wrapped up
17    by the time I issue my trial order, which would be shortly
18    after that April 21st status report.
19           So on that understanding, what would be a reasonable
20    motions cutoff date?  Does anyone have a thought about that?
21           MR. BRONSTER:  Beginning of February, Your Honor?
22           THE COURT:  That would work for me.  Does anyone
23    think that there's a reason you would need --
24           MR. BRONSTER:  Your Honor, is the middle of February
25    satisfactory?
```

1      **THE COURT:**  I think so.  That's about as late as I'm

2   willing to go.  And again, as I said, I'm not -- my

3   understanding is no one has anything specific in mind right now

4   for a motion they'd be looking at, but you just want to reserve

5   the possibility of thinking about it?  And I can imagine that

6   it's possible that one or more of the defendants might seek to

7   sever as well.  That wouldn't surprise me in a case like this.

8      So let's say Valentines Day.  Let's say February 14th

9   is the motions cutoff deadline.  That's a Friday.  So, again,

10   the deadlines are 2/14 is the motions cutoff deadline.

11      4/18 is the plea cutoff.

12      4/21 is the deadline for the status report, which

13   is -- the purpose of that is only just to tell me if anyone's

14   settled or -- and if so, who is going to trial, just so I know

15   just what the trial's going to look like, if we're going to

16   have one, and how many defendants will be at the trial.

17      And then the pretrial conference I said was

18   June 20th.  And then the trial -- I want you to be available

19   for the whole day, but we'll tentatively slot it in for

20   10:00 a.m.

21      Then the trial will go from the 7th until the 28th of

22   July.

23      So to be clear, that motions cutoff deadline would

24   cover things like motions to sever, if any of you -- if that's

25   something that anyone would be inclined to pursue.  That's the

1    date you would need to get that motion to file by.

2         All right.  Are there any questions with anything

3    we've discussed?

4         **MR. BOUTON:**  No, Your Honor.

5         **THE COURT:**  Let's just go in order.

6         Mr. Bronster, Mr. Drake, any questions about anything

7    we've discussed?

8         **MR. DRAKE:**  I did have a question, Judge.  Your

9    opinion was very detailed.

10        Do you plan on having it published?

11        **THE COURT:**  I do not.  You can order the transcript

12   if you want to review it.

13        **MR. DRAKE:**  Okay.

14        **THE COURT:**  Sorry.  I just -- I wish I had the luxury

15   to write down every ruling I have to make, but I just have too

16   many of them.  But I do try and be thorough even when I do do

17   the rulings orally.

18        All right.  Any other questions about anything we've

19   discussed?

20        Mr. Brass, anything from you or your client?

21        **MR. BRASS:**  No, sir.  Thank you.

22        **THE COURT:**  Mr. Langford, anything from you or your

23   client?

24        **MR. LANGFORD:**  No, Judge.  Thank you.

25        **THE COURT:**  Mr. Barnhill?

1          **MR. BARNHILL:**  No, Your Honor.

2          **THE COURT:**  All right.  Anything else we need to

3     address at this time?

4          **MR. BOUTON:**  Not from the United States.

5          **MR. BRONSTER:**  Not for Dr. Moore.

6          **THE COURT:**  Okay.  All right.  Hearing nothing, thank

7     you all, and court is adjourned.

8               (Concluded at 5:15 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

127

CERTIFICATE OF COURT REPORTER


1          This is to certify that the proceedings in the

foregoing matter were reported by me in stenotype and

thereafter transcribed into written form;

      That said proceedings were taken at the time and

place herein named;

      I further certify that I am not of kin or otherwise

associated with any of the parties of said cause of action and

that I am not interested in the event thereof.

      In witness whereof I have subscribed my name this

18th day of October 2024.


Teena Green, RPR, CSR, CRR, CBC