IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____ )
United States of America,       )
                                )
        Plaintiff,              )
                                )   Case No: 2:23-cr-00010-HCN
vs.                             )
                                )
Plastic Surgery Institute       )
of Utah, et al.,                )
                                )
        Defendants.             )
_____ )

**STATUS CONFERENCE VIA ZOOM BEFORE THE
HONORABLE HOWARD C. NIELSON, JR.**

Date: June 4, 2025

Time:  1:00 p.m. to 2:40 p.m.

Reported by Teena Green, RPR, CRR, CBC

    Orrin G. Hatch United States Courthouse
    351 South West Temple, 7.430
    Salt Lake City, Utah   84101
    (801) 910-4092
    teena_green@utd.uscourts.gov

1                              **APPEARANCES**

2    FOR THE PLAINTIFF:

3    TODD CHRISTOPHER BOUTON
     SACHIKO JEPSON
4    JACOB J. STRAIN
     US ATTORNEY'S OFFICE
5    111 South Main Street, Suite 1800
     Salt Lake City, UT   84111-2176
6    (801) 524-5682
     todd.bouton@usdoj.gov
7    sachiko.jepson@usdoj.gov
     jacob.strain@usdoj.gov
8
     FOR DEFENDANT PLASTIC SURGERY INSTITUTE OF UTAH:
9
     BRIAN R. BARNHILL
10   OSBORNE & BARNHILL
     11576 South State Bldg., Suite 204
11   Draper, UT   84020
     (801) 571-2555
12   brian@oblawpc.com

13   FOR DEFENDANT MICHAEL KIRK MOORE, JR.:

14   KATHRYN NEAL NESTER
     NESTER LEWIS PLLC
15   40 South 600 East
     Salt Lake City, UT 84102
16   (801) 535-4375
     kathy@nesterlewis.com
17
     DAVID O. DRAKE
18   DAVID DRAKE PC
     6905 South 1300 East, Suite 248
19   Midvale, UT   84047
     (801) 205-9049
20   sirdrake2033@gmail.com

21   FOR DEFENDANT KRISTIN JACKSON ANDERSEN:

22   EDWARD K. BRASS
     BRASS & CORDOVA
23   560 South 300 East, Suite 105
     Salt Lake City, UT   84111
24   (801) 322-5678
     ed@edbrasslaw.com

25

1    June 4, 2025                                    1:00 p.m.

2                       **P R O C E E D I N G S**

3          **THE COURT:**  All right.  Good afternoon.  We're here

4    for a status conference in *United States v. Plastic Surgery*

5    *Institute of Utah, et al.*  That's Case No. 2:23-cr-10.  The

6    purpose of this hearing is to address Dr. Michael Kirk Moore's

7    and Kristin Jackson Andersen's motion to continue the trial.

8          Let's start with appearances of counsel for the

9    record, though.

10         First, counsel for the United States.

11         **MR. BOUTON:**  Good afternoon, Your Honor.  Todd

12   Bouton, Jacob Strain, and Sachiko Jepson for the United States

13   of America.

14         **THE COURT:**  Are all three of you here?

15         **MR. BOUTON:**  Yes.

16         **THE COURT:**  All right.  Welcome, Mr. Bouton,

17   Mr. Strain, and Ms. Jepson.

18         All right.  Counsel for Plastic Surgery Institute.

19         **MR. BARNHILL:**  Good afternoon.  Brian Barnhill for

20   Plastic Surgery Institute.

21         **THE COURT:**  Welcome, Mr. Barnhill.

22         Counsel for Dr. Moore.

23         **MS. NESTER:**  Good afternoon, Your Honor.  Kathy

24   Nester and David Drake here on behalf of Dr. Moore.  And

25   Dr. Moore is also present.

1          **THE COURT:**  All right.  Welcome, Ms. Nester.

2  Welcome, Mr. Drake.  And, welcome, Dr. Moore.

3          **MR. DRAKE:**  Thank you, Judge.

4          **THE COURT:**  Okay.  And then counsel for Ms. Andersen.

5          **MR. BRASS:**  Good afternoon, Your Honor.  Ed Brass

6  appearing for Ms. Andersen.

7          **THE COURT:**  Welcome, Mr. Brass.  It's good to see you

8  being able to be here.

9          **MR. BRASS:**  Thank you.  I actually really appreciate

10  that right now.  Thanks.

11          **THE COURT:**  Very good.

12          Do we have any counsel for any of the other

13  defendants?

14          **MS. ANGELOS:**  Your Honor, Kris Angelos for Sandra

15  Flores.

16          **THE COURT:**  All right.  Welcome, Ms. Angelos.

17          Any other lawyers on the call, other than -- I have a

18  law clerk and some court personnel, but are there any other

19  representative of counsel that need to enter an appearance?

20          All right.  Hearing none.  Okay.

21          **MR. BOUTON:**  Your Honor, I'm sorry to interrupt.  I

22  would just draw to your attention that we do have Agent Ashley

23  Collins from HHS on the call.

24          **THE COURT:**  Okay.  Thank you.

25          Well, it would not be true to form in this case if we

1    didn't have a little bit of drama, so I guess I should not be

2    surprised.  On November 26th, 2024, after I granted Dr. Moore's

3    motion to revoke the detention order that had been issued by

4    the magistrate judge, I granted Dr. Moore's motion to continue

5    the trial from January 2025 until this July, primarily because

6    counsel for Dr. Moore, David Drake, had some medical issues

7    scheduled and we wanted to facilitate his recovery, which would

8    have likely conflicted with the January 2025 trial date.

9            I issued -- then we proceeded on the understanding

10    that we'd go to trial in July.  And I issued the trial order

11    for that trial just over a month ago, on May 2nd, 2025.

12            We now have a motion from Dr. Moore to continue the

13    trial.  In support of his motion, counsel for Dr. Moore

14    represents that on May 21st, 2025, the prosecution disclosed

15    for the first time to defense counsel over 200 pages of

16    government contracts between the federal government and the

17    manufacturers of the vaccines.

18            Counsel for Dr. Moore argues that these documents are

19    relevant to Dr. Moore's defense because they shed light on

20    whether the vaccines shipped to Dr. Moore's office were federal

21    government property at the time of their disposal.

22            And counsel for Dr. Moore represents that additional

23    time is necessary to retain an expert to analyze the government

24    contracts and to determine who should be subpoenaed to

25    testify about these contracts and to serve trial or document

1  subpoenas on these out-of-state government officials.

2       Plastic Surgery Institute joins the request for a

3  continuance.  Ms. Andersen also moves to continue the trial.

4  In addition to incorporating by reference the arguments made in

5  Dr. Moore's motion, counsel for Ms. Andersen represents that

6  additional preparation time would be welcome because of the

7  medical issues he's been dealing with since March 2025, which

8  rendered him physically unable to work on a full-time basis

9  from that date until the present.

10      Okay.  That's my understanding of the motions before

11  me.  I note as well that Dr. Moore filed a reply in support of

12  the motion yesterday, and then I believe it was this morning

13  the government filed a sur-reply.

14      Let's see.  I'd like to hear from you all on these

15  motions, but I guess I'd like to start by asking the government

16  some questions about these documents that seem to have, you

17  know, caused -- or at least are the stated reason for the

18  request for continuance.

19      Now, based on the government's response, my

20  understanding is that the government intends to use the vaccine

21  contracts to establish the price of the vaccines, not whether

22  the government owned the vaccines when Dr. Moore allegedly

23  disposed of them.

24      Am I right about that, Mr. Bouton, or whoever wants

25  to speak for the United States?

1      **MR. BOUTON:**  Yes, Your Honor.  I don't know if you

2  had time to review the sur-reply that was filed.

3      **THE COURT:**  I did.  Briefly, but I did.

4      **MR. BOUTON:**  So, yes, that was the purpose.  We had

5  determined in trial preparation that our former CDC witness

6  could not testify to the exact pricing of the vaccines, and so

7  we scrambled to find a witness who could do so.  It took some

8  time and we were able to find one that was identified on

9  May 15th, I think four days before we had to exchange witness

10  lists.

11      We spoke to Dr. Disbrow, he's a Ph.D, on the next

12  day, the 16th, the Friday before that deadline for the first

13  time and confirmed that he could testify to this.  But he

14  indicated that he would need to use these contract documents to

15  do so to support his testimony and to be sure he had the right

16  numbers.

17      We received them for the first time on May 19th.  And

18  we indicated in our exhibit list that they would be forthcoming

19  under seal the next day after we had worked the issue out with

20  ASPR, who produced them.  We turned them over on May 20th.  It

21  was less than 24 hours that we had them in our possession

22  before they went to the defendant.

23      **THE COURT:**  All right.  Well, I'm not really

24  interested in argument just yet, I'm really just interested in

25  the answers to my question.  Okay, and you've answered that, so

1    it's price.

2         So I guess my next question is, if these contracts

3    are only to establish price, what evidence or testimony will

4    the government offer to prove beyond a reasonable doubt that

5    the vaccines were federal government property when Dr. Moore

6    allegedly disposed of them?

7         **MR. BOUTON:**  Most of that evidence, Your Honor, would

8    come through the CDC witness who was involved with the program

9    and Operation Warp Speed who can testify that the government

10   funded and obtained the vaccines and distributed them

11   exclusively through the CDC.

12        Evidence would also include the CDC COVID-19

13   vaccination program provider agreements, including the one

14   Dr. Moore and Ms. Burgoyne signed that indicate these were

15   being distributed pursuant to a collaborative agreement with

16   the Utah Department of Health and Human Services.

17        We would also have evidence from Mr. Lakin from the

18   Department of Health and Human Services.  His first MOI was

19   produced last July, I believe, when we replied to the motion to

20   dismiss, and he talked about how the vaccines were ordered

21   through the CDC system and distributed directly to the

22   providers.  The cards themselves were emblazoned with the HHS

23   and CDC logos.

24        **THE COURT:**  No, I understand.  And all of these

25   things, apart from the contract, it sounds like pursuant to --

1    maybe there's a question, pursuant to Rule 16, you identified

2    these witnesses and provided the relevant documents to the

3    defendants and as you kind of knew about them you intended to

4    use them.  Is that right?

5        **MR. BOUTON:**  Yes, Your Honor.  The only thing new is

6    these pricing documents that we do just want to use to show the

7    pricing, assuming the defense will not agree that they're worth

8    at least a dollar.  If they want us to prove the exact amount,

9    we will.

10       **THE COURT:**  Okay.  Now, I think before, and you

11   repeated it today, you indicated that the reason you did not go

12   forward with Mr. Duggar is that he lacked personal and accurate

13   knowledge so you replaced him.  But I guess at that point, you

14   were not planning to use any contracts to verify or support his

15   testimony.  Correct?

16       **MR. BOUTON:**  Yes, Your Honor.  We did not believe

17   that we would need this kind of documentation.  We thought he

18   was capable to testify to the exact pricing.  We interviewed

19   him and his numbers appeared off, and he admitted that he

20   wasn't certain what the exact pricing was.  And so we had to

21   find someone who knew.

22       **THE COURT:**  All right.  And I guess my question -- so

23   you replaced him with Gary Disbrow?

24       **MR. BOUTON:**  I'm sorry, Your Honor, just for that

25   issue.

1       **THE COURT:**  Oh, so Mr. Duggar is testifying on other

2  issues, but just not about --

3       **MR. BOUTON:**  Yeah, a lot.

4       **THE COURT:**  Yeah, right.  So this Mr. -- I guess you

5  called him "Doctor," if we're going to call Ph.D.s doctors,

6  whatever.  Some of my Ph.D. friends say it stands for fake

7  doctor, Ph, you know, but regardless -- and, well, I won't

8  continue on that.

9       But I guess for -- you know, you testified

10  that Dr. -- or Mr. -- Gary Disbrow wanted to use these

11  documents.  But does he have personal knowledge of the pricing?

12       **MR. BOUTON:**  My understanding is he was involved in

13  the program and knew that they purchased them.  I think he had

14  to rely on the documents to know the exact pricing.  But he was

15  someone who was familiar with them and was involved in the

16  contract, I don't know if it's enforcement or the program, so

17  he had access to the documents.  I believe he may have approved

18  some of them.  But he had some involvement with them.  He just

19  needed them to I guess refresh his recollection as to the exact

20  amount.

21       **THE COURT:**  I guess --

22       **MR. BOUTON:**  -- to rely on them is what he said.

23       **THE COURT:**  I guess my question is that.  I mean is

24  this a matter of where you would need them to refresh his

25  recollection or is it a matter where you'd be using him as the

1   foundation to get the contracts in and then relying on the

2   contracts for the price?  I'm just trying -- it might make a

3   difference, and that's why I'm trying to understand exactly

4   what's going on here.

5       **MR. BOUTON:**  Our intention, Your Honor, was just to

6   have him testify as to the pricing of the vaccines, what the

7   United States paid for them.  He wanted to use the documents.

8   We would be comfortable not using them, if that is an issue.

9       **THE COURT:**  I mean would you be comfortable -- I mean

10  does he have enough knowledge that you could ask him and, if he

11  didn't recall, you could just refresh his recollection with

12  them without introducing them into evidence?  Do you think it's

13  that sort of thing, or do you think he actually would need -- I

14  guess the question is if he knew or knows, you could refresh

15  recollection; if he doesn't know and you actually need the

16  contracts to come in and he's just kind of providing foundation

17  for them.  Those are potentially two quite different scenarios.

18      Do you understand what I'm getting at, Mr. Bouton?

19      **MR. BOUTON:**  Yes, I think so, Your Honor.  And that's

20  a difficult question.  In my brief interactions with him, it

21  was strongly suggested that he would want to rely on them.

22  Could I show them to him?  Has he gone through and already done

23  the review.  Could I show them to him and refresh his

24  recollection so he could give us the exact number if it was

25  necessary to provide an exact number?  Yes.  I definitely think

1    it was his preference to use them.  And so I'm not entirely

2    comfortable saying he would go forward without them.

3           **THE COURT:**  Okay.  No, I understand.  I guess, I mean

4    in trying to understand the concerns voiced by Dr. Moore and by

5    the co-defendants, or some of the co-defendants, I guess -- I

6    mean I think part of the concern is there is -- I mean, in

7    these heavily redacted documents, there is language that talks

8    about title transfers, and things like that.  There's

9    language -- I didn't -- there's clear language about that in

10    the Janssen contract.  There's language about that in the

11    Pfizer contract, though one of the conditions that has to be

12    met is redacted.

13         The Moderna contract has language that deals with

14    title of some things, so it's not clear the Moderna language

15    covers the vaccines or not.  And I guess the concern -- again,

16    I don't want to put words in the defendants' mouth.

17         I guess, you know, one concern would be if you are

18    intending to use these contracts to establish ownership or

19    transfer of title from the pharmacies to the government, number

20    one, they're not complete on that issue; and number two, it's

21    kind of a new thing that, you know, is kind of out of the blue.

22         If it's just the issue that you've talked about

23    before pricing, I guess one of the things I was trying to get

24    at is, you know, if you replaced Mr. Duggar on this issue

25    because he didn't have personal knowledge, presumably you were

1    looking for someone who did have personal knowledge, so why do

2    you need the documents?

3            And then I guess if it's just the pricing

4    information, you know, why do you need all of 200 pages?  I

5    mean the pricing information is a fraction of that.

6            **MR. BOUTON:**  I would agree, Your Honor, that we

7    don't.  We think very few pages in those documents are

8    relevant.  We just wanted the information as to pricing and

9    they gave us more than I thought we really needed.  But we

10   disclosed everything we received because we felt we had to.

11           **THE COURT:**  Sure.  Sure.

12           **MR. BOUTON:**  I do think there are only a few pages

13   that are relevant to the pricing issue, Your Honor.

14           **THE COURT:**  All right.  I understand.  Okay.  I guess

15   I'd like to -- those were the questions I had to try and just

16   understand what was going on here.  I mean, as far as you're

17   concerned, your need to use the documents is just driven by

18   your witness's desire to rely on them?

19           **MR. BOUTON:**  Yeah.

20           **THE COURT:**  If he felt like he had personal knowledge

21   just to testify to the pricing and he didn't need them, you

22   would be comfortable relying on his testimony?

23           **MR. BOUTON:**  Yes.

24           **THE COURT:**  Okay.  And presumably, you know, if he

25   were able just to use them just to refresh recollection without

1  them being entered into evidence, you'd be comfortable with

2  that?

3          **MR. BOUTON:**  Yes, we would, Your Honor.

4          **THE COURT:**  And if defense consented, because -- and

5  I mean there's issues with rule of completeness and stuff, you

6  would be willing to, you know, rely on just the portions of the

7  document that just --

8          **MR. BOUTON:**  Yes, Your Honor, dealt with pricing.

9          **THE COURT:**  All right.  I guess with that, I'd like

10 to give counsel an opportunity to be heard further on the

11 motions.

12         Ms. Nester, I guess you filed your motion first,

13 before Mr. Brass, so I'll let you speak first, or your

14 colleague, if you want.

15         **MS. NESTER:**  Thank you, Your Honor.

16         **THE COURT:**  I've read your motion and your reply

17 brief.  You don't need to belabor everything you said, but --

18         **MS. NESTER:**  Sure.  So, first, I certainly accept

19 Mr. Bouton's representations that he disclosed the documents

20 right away.  These are officers of the court, I know them to be

21 ethical people.  I don't question that they're not being

22 truthful about that.

23         The problem is that the document doesn't just serve

24 the purpose of establishing pricing, which just -- I know if

25 Your Honor even had a chance to glance at them, there are no

1    individual prices listed.  So I guess they're going to do math

2    and try to figure out how many vaccines they bought and the

3    total they paid these pharmaceutical companies, and come up

4    with some formula to figure out what the value per vaccine was.

5         I mean there could be an argument that that was a

6    service contract, not purchasing price of the product, the way

7    I read it.  But I mean, again, I'm just going to fess up that I

8    am not a contract lawyer.  I am certainly not a government

9    contract lawyer.  I barely passed contracts in law school.

10        I have looked at it to the best of my ability.  It

11   appears to me to have common UCC -- what I vaguely recall in

12   the back of my brain about the UCC from law school, that it has

13   the freight-on-board type language in there.  I guess you saw

14   it as well because you just referred to it.  And that may play

15   an important role to the defense.

16        So I appreciate that they only want one thing out of

17   that document, but I think there's issues in that document that

18   are helpful to the defense in terms of exactly who had a

19   possessory interest in these products at the time they were

20   delivered to Dr. Moore's door, which is going to be a key

21   element of the case, and pricing is going to be a key element

22   of the case.  We're certainly not going to stipulate to a key

23   element of the crime needed to convict our client.

24        I do question how this individual, either Duggar or

25   Disbrow, are going to talk about things that they've heard the

1    government did through hearsay.  I certainly will object to

2    that.  I know you can see that on the horizon.  But I assume

3    they'll figure out a way around that, or they'll try.

4            But my concern is this.  I thank them for disclosing

5    this.  It absolutely was their duty to disclose it.  I talked

6    about these documents with Mr. Strain two years ago when I was

7    first on the case.  We talked about the need to have to look at

8    these contracts.

9            So we've all known that -- you know, that this is a

10   complicated issue about who possessed and owned this property.

11   That's what this whole case is going to come down to.  And I

12   just need time to go get a contract lawyer who's smarter than

13   me that works at a fancy firm that makes more than me to read

14   these things, tell me what they say in terms of the UCC

15   terminology, because I don't know that, help me understand.

16           And I may want to litigate some of these redactions.

17   Because here's my problem.  You know, I'm not going to

18   stipulate to the authenticity of these documents.  And they've

19   redacted every signatory to the document, so I don't even know

20   how to call or interview people to question whether these are

21   the original versions, whether this is the final, final, final

22   version, if there have been amended versions.  I can't even

23   follow up on that because they've redacted who the signatories

24   are.

25           So all I'm saying is, Your Honor, you know, we were

1   pushing to trial, my client wants this over with as much as

2   anybody does.  But it is more important to try this case fairly

3   than quickly.  And at this point, we've had a major

4   introduction of issues that require expert investigation.  And

5   I simply don't have time before July, especially not under the

6   terms of your court order.

7           **THE COURT:**  All right.

8           **MS. NESTER:**  That's it.

9           **THE COURT:**  Okay.  Thank you, Ms. Nester.

10          All right.  Mr. Brass, would you like to be heard on

11  the motions at all?  Again, I've read your motions, so you

12  don't have to --

13          **MR. BRASS:**  No.  I have nothing to add, Your Honor.

14  Thank you, thank you for the opportunity.

15          **THE COURT:**  Okay.  Let me do ask you this, though.  I

16  mean, are you -- I mean, obviously, especially if we get into

17  the issues -- apart from the issues that Ms. Nester has raised

18  with these contracts, do you feel like you're going to be up to

19  trial in July, first of all?

20          **MR. BRASS:**  I believe that based on how I feel today.

21  I don't feel great today, to be honest with you.  This is an

22  interesting condition I've never had in my life, but I improve

23  every single day, so I anticipate by July I'd be just fine.

24          **THE COURT:**  Right.  And leaving aside this -- you

25  know, what Ms. Nester characterized as a new issue, do you

1    feel, apart from that, that you don't have enough time to

2    prepare?

3              **MR. BRASS:**  No, I think I do.

4              **THE COURT:**  Okay.  All right.  Thank you.

5              Okay.  And would counsel for -- I guess it's

6    Mr. Barnhill for Plastic Surgery.

7              Would you like to be heard on it?

8              **MR. BARNHILL:**  I'd just join Ms. Nester's same

9    arguments.  I looked at the contracts as well.  I tried to make

10    sense of the documents.  And to her point, whether they're

11    amended or whether they're final, who the signers were, I

12    couldn't decipher from the documents themselves who I would

13    need to speak with.

14              And I join in the fact that there are a lot of issues

15    that are raised within the contracts that I feel like I need to

16    have a better understanding of what the arrangement was on the

17    ownership, and was it -- were they conveyed to Utah for their

18    distribution or -- since it's so redacted, there was no flow to

19    reading through the documents to even try to decipher what was

20    trying to be conveyed in the documents.

21              So I'd just join in her arguments.  I think these are

22    important issues that we need time to address and talk to some

23    of the witnesses that could provide foundation, provide

24    personal knowledge.

25              **THE COURT:**  All right.  And Ms. Angelos, I assume

1    your client, Ms. Flores, doesn't really have a dog in this

2    fight, but do you have anything to say?

3            **MS. ANGELOS:**  No, Your Honor.  That's correct, we do

4    not have a dog in this fight.

5            **THE COURT:**  All right.  Okay.  And I guess I'll

6    give -- Mr. Bouton, I'll give you a chance to respond.

7            As I said before, I mainly was interested in your

8    answers to the questions, but now I don't know if you want to

9    speak more broadly to kind of the arguments that are being

10   made.  I welcome hearing what you have to say.

11           **MR. BOUTON:**  Thank you, Your Honor.

12           For Sandra Flores, I do think there is an issue that

13   wasn't addressed in the briefs, that she has a diversion

14   agreement, which I believe was set to expire at the end of next

15   month.  So a continuance could affect -- I'm unclear as to the

16   enforceability, what happens after 18 months, when she's

17   complied, to what extent she is still bound by her obligations

18   to cooperate that underlie the agreement.  So a continuance

19   beyond where the case is currently set could have implications

20   for her testimony.  So I do think there is a concern about

21   Ms. Flores, even though Ms. Angelos may not have thought about

22   that.

23           I don't know if she wants to respond to that, before

24   I move on.

25           **THE COURT:**  Do you have anything off the top,

1    Ms. Angelos, or is that something you'd need to think about?

2    **MS. ANGELOS:**  Your Honor, as I read the diversion

3    agreement, it will be done in 18 months, which will be at the

4    end of July.  I don't anticipate that it is going to affect

5    Ms. Flores's testimony or her testifying.  And I anticipate if

6    the diversion agreement is complete and she is off and the case

7    is dismissed, that the Government will still have perjury or

8    obstruction charges if she doesn't testify truthfully.  So I

9    don't necessarily think it affects it, but I understand the

10   government has concerns.

11   **THE COURT:**  Okay.  Understood.

12   All right.  Why don't you continue, Mr. Bouton.

13   **MR. BOUTON:**  Thank you, Your Honor.

14   Ms. Nester has suggested that the contracts don't

15   show the numbers clearly, but I think they do.  If you look at

16   the final NFP pricing for Janssen on page 1, it says "Price per

17   regimen of 750."

18   On Pfizer, on page 6, it lists the kinds of vaccines

19   and their per-unit amounts, 24, 35, 24, 10, 24, 10, whatever

20   they are.

21   And on the Moderna document, on pages -- I think

22   starting at page 3, it lists a unit price, which is the

23   per-vaccination price.  That is backed out of the larger

24   amount, but it is pretty clearly and cleanly identified.

25   And these are the documents that Mr. Disbrow

1    indicated he used to confirm the pricing.  So I do think the

2    pricing can be clearly identified without using all of the

3    pages.  I was frankly surprised to get 53 pages.  I thought

4    they were only going to give me -- fewer, because they were --

5    they had concerns about the confidentiality of the agreements,

6    and they still do.  I believe the Court is probably aware that

7    we filed a motion to seal and propose an alternative of them

8    testifying that it's over a dollar or just to the amount

9    because ASPR -- what is it, the Administration or Agency for

10   Strategic Preparedness -- was concerned about publicly

11   identifying the exact amounts even in trial, which we explained

12   to them may be necessary.  So I do think you can use just a few

13   pages of these documents to get the pricing information.

14          Now, as to whether this is fair, right, or the Speedy

15   Trial Act would authorize a continuance, I think the answer is

16   no.  Because there would have -- the defense would have to show

17   that they had exercised due diligence in pursuing this issue.

18          And the issue that they say they want to use these

19   extraneous parts of the contracts for is the issue of whether

20   the property at issue, the vaccines and the vaccination record

21   cards belong to the United States.

22          Well, that's not a new issue.  That's something the

23   defense admits they raised two years ago that they had concerns

24   about.  It's an issue they specifically vetted and litigated

25   starting last July in their motion to dismiss, where one of

1    their main arguments on page 1 was, "Counts 2 and 3 must be

2    dismissed because the property that the defendant is accused of

3    converting," meaning the vaccines and cards, "did not belong to

4    the federal government at the time."  They argued they instead

5    belonged to the State of Utah.

6         So they had been exploring this theory and

7    researching it and litigating it and arguing it.  It came up at

8    the hearing on October 18th.  And when the Court initially

9    indicated it would continue the trial to July 7th, seven or

10   eight months ago, Mr. Bronster, who was representing Dr. Moore,

11   along with Mr. Drake at the time, indicated he would need more

12   time to conduct discovery and to interview witnesses.  And the

13   Court indicated, "You should get on it if you need discovery

14   and you anticipate it."  Your Honor anticipated it would be

15   done by April 21st before the status conference, and it doesn't

16   look like they've done it.

17        If they had really thought there was something to

18   this defense, which they had already raised and have known

19   about for over two years, they would have sought the discovery.

20   I don't believe it's an excuse to say, "Well, we think because

21   it's confidential now, a FOIA request would have been

22   ineffective."  Well, it doesn't look like one was made.  And if

23   one had been denied and they really were pursuing this because

24   they believed it was a viable defense, they would have come to

25   the Court, to Your Honor, and tried to compel the disclosure.

1          The fact that these documents have some other

2    language about an issue we haven't raised doesn't resurrect or

3    excuse the failure to pursue this for months and months, if not

4    years.  So I don't believe -- the United States does not

5    believe that the defendants have exercised due diligence or can

6    show due diligence in pursuing this theory.

7          The United States is not suggesting they haven't been

8    diligent in preparing for trial, litigating this case.  They

9    thoroughly vetted the necessity defense.  They're getting

10   ready.  They've had time.  They're very competent and

11   experienced.  It looks like they just chose not to look into

12   this and now this is an excuse for one more trial continuance,

13   which would be, at a minimum, a fifth.

14         I mean there were two other times when the trial was

15   continued and just set for a status conference and not set.  So

16   arguably, this would be the seventh trial continuance, based on

17   the theory that they've had time to explore, would be our

18   position, Your Honor.

19         **THE COURT:**  Understood.  How are you going to get

20   this in at trial, just out of curiosity?

21         **MR. BOUTON:**  To get what in, Your Honor?

22         **THE COURT:**  The documents in.  It sounds like the

23   defense is not going to stipulate anything in terms of

24   (inaudible).

25         **MR. BOUTON:**  The intent that we believe that

1    Mr. Disbrow can authenticate them based on his position at the

2    agency and familiarity with them that show that they're real,

3    that these are actual pricing documents, agreements between the

4    United States and the manufacturers.

5         **THE COURT:**  Okay.  So --

6         **MR. BOUTON:**  And they accurately reflect the pricing.

7    He would say that.

8         **THE COURT:**  Yeah, so he can authenticate them in that

9    respect.  Understood.  Okay.

10         **MR. BOUTON:**  That would be our intention, Your Honor.

11         **THE COURT:**  All right.  Okay.  Thank you, Mr. Bouton.

12         Ms. Nester, do you want to respond to any of that, or

13    reply, I guess?

14         **MS. NESTER:**  Super briefly to something Mr. Bouton

15    said.

16         So we did not know that the military was who did the

17    deal with the pharmaceutical companies until we got these

18    contracts.  So my client did submit a FOIA seeking the original

19    documents for the origin of the purchase of the vaccines and

20    was told it would take 18 months.  But it wouldn't have worked

21    because we did not know -- I don't think the United States

22    generally knows that the military was the one who did this

23    contract.

24         So we would not have even had the knowledge to submit

25    it to the right agency.  We were trying to get it through the

1    Department of Health and Human Services, which is wrong.  So I

2    mean that's a closely-held fact that none of us knew.  And I'd

3    bet, you know, Mr. Bouton and Mr. Strain and Ms. Jepson may not

4    have known that either until they saw these contracts, because

5    that's not publicly known.

6            So I just want to make sure you don't think that we

7    were failing to -- I mean there's no way we could have gotten

8    this, even on our very best day of advocacy.  And I think they

9    would have been denied to us anyway.  They've been redacted in

10   the form they've been given to us.  So I just want to make sure

11   the Court's aware of that.

12           And I think that while it's true we've had this

13   they're since the beginning, we haven't had these documents

14   until now.  So that's the position we're in.

15           So that's all I have.

16           **THE COURT:**  And just to be clear, by (inaudible) is

17   this -- Mr. Bouton has mentioned the name of the agency or

18   the --

19           **MS. NESTER:**  It's the Department of Defense that

20   entered into the contract with the pharmaceutical companies, it

21   was the military.

22           **THE COURT:**  Where are you getting that from?

23           **MS. NESTER:**  At the very top of the contract, at the

24   top of it.

25           **THE COURT:**  Which one, the Pfizer one?  There's

1    three.

2        **MS. NESTER:**  I think it's on all of them, if I

3    remember correctly.  I don't have them right in front of me,

4    but, yeah, these are military contracts.  Which is one of the

5    reasons they want this confidential, because I don't think they

6    want people to know that, for whatever reason, I don't know.

7    And I don't think military documents are even covered by FOIA,

8    as far as I understand it.  I don't think I can send a FOIA

9    request and ask for our nuclear plans against Russia.

10        **THE COURT:**  So there's an attempt to redact, for

11    sure.  But I guess I'm trying to --

12        I'm trying to see what it is in the contracts that

13    you're looking at.  I'm not saying you're wrong.  I'm just

14    trying to see what it is you're looking at.

15        **MS. NESTER:**  So I think that even the Government's

16    motion conceded it, because that's one of the things they did

17    not want to come out in trial.  I mean maybe it was on an

18    e-mail that I got or on the motion, but the Government's

19    specifically trying to protect that from disclosure, so I think

20    they would concede it.

21        **MR. BARNHILL:**  Your Honor, I can point you to page 5

22    of the Janssen contract, it's the first one I pulled up.

23    Page 5 identifies the agreement is entered into between the

24    United States of America, represented by the Department of

25    Defense, contracting (inaudible) New Jersey.  Advanced

1    Technology International is a consortium management firm of

2    the --

3              **THE COURT:**  Yeah, I see that.  Yeah.  Okay.  Thank

4    you.

5              Okay.  Sorry, I interrupted you, though, Ms. Nester.

6              **MS. NESTER:**  That's it.  That's all I think I want to

7    respond to.

8              **MR. DRAKE:**  Judge, I had a question, if I may be

9    heard.  If not, I know Kathy's been designated as the

10   representative for Dr. Moore.

11             **THE COURT:**  It's a status conference.  If you have

12   something to ask, you can do it.

13             **MR. DRAKE:**  Judge, at the time these documents were

14   presented to the witnesses for their recollection -- or, excuse

15   me, to refresh a recollection or for authentication (inaudible)

16   be in a redacted form because at some time the problem we've

17   all had with looking at these documents is they're so heavily

18   redacted.  There are a number of ways judicially that we could

19   get around redaction, such as non-disclosures, sealing.  But

20   I'd like to see the documents in full.  Because under *Brady* and

21   rules of procedure, anything that's mitigating to the defendant

22   should be disclosed.  And we can't tell what's mitigating to

23   the defendant.  But I'm sure there are because the documents in

24   question involve ownership.

25             And so my first question is, I (inaudible) but my

1  first question is, how would these be presented to the witness?

2  And, secondly, we, as defendants' attorneys, need to be able to

3  see the portions that are redacted.  And, you know, so if

4  there's some way judicially that we could do that, in camera,

5  whatever, we could come up with something.

6          **MS. NESTER:**  And if you notice, we're not objecting

7  to the Government's -- sorry, my last trial was in state so I

8  keep wanting to say state.  And when I'm in the state, I say

9  government.  I can't stop myself.  But we're not going to

10 object to their request to seal it from public view as needed

11 for our country's security.  We're not going to be unreasonable

12 about that.

13         **THE COURT:**  Yeah.  I know it is unusual to have

14 documents at trial -- well, it's unusual to have documents at

15 trial that are redacted at all, but it's especially unusual to

16 have ones that are redacted in a form that -- I mean Mr. Bouton

17 represents that he doesn't even have the non-redacted -- and

18 counsel doesn't even have access to -- I mean even in the case

19 of classified information, there's special procedures and so

20 forth to govern that.  And we don't generally allow things to

21 go forward to trial without -- with redactions, even for

22 national security stuff that's classified.

23         Do you want to speak to that, Mr. Bouton?

24         **MR. BOUTON:**  Yes.  I mean looking at page 5 of this

25 document, it does indicate the agreement is entered in between

1    the United States of America and they're represented by the

2    Department of Defense.  My understanding, consistent with the

3    interview of -- the most recent interview of Chris Duggar, is

4    that this was part of Operation Warp Speed where general -- I

5    don't know if it was Milley -- the general was in charge of

6    running it and funding the development of the vaccines and then

7    the purchase and controlling the distribution of them.

8           So it's not surprising to me that there would be

9    reference to the DOD or the Department of Defense in here.  But

10   I think the language that's cited by the defendants indicates

11   it is an agreement between the United States, they're just

12   acting through a particular agency to do the deal.

13          That said, it's not our intent to use this to prove

14   it belongs to the United States of America, although I think it

15   would help do that.  It really was just to have competent

16   testimony as to the pricing that is apparently in dispute.

17          **THE COURT:**  Yeah.  Yeah.  Well, I'm not -- I don't --

18   I mean, I don't know.  You raise an interesting issue,

19   Ms. Nester.  I mean I don't want to -- I guess there's a

20   small -- I guess there's a possibility I'm mistaken on this,

21   but I'm pretty sure DOD is not exempt from FOIA.  I think there

22   are specific exemptions for FOIA for things like national

23   security and military information that are probably more likely

24   to be invoked by the Department of Defense and many other

25   agencies.  But, you know, I mean my -- I almost -- I spent time

1    at DOJ at times when these issues matter, and I'm pretty sure

2    I've seen FOIA issues come up through DOD.  But, again, it's

3    been a long time so I wouldn't want to swear to that.  But I

4    don't think there's a categorical exception for DOD, I think

5    they're subject to FOIA same as other agencies, though FOIA

6    does have a number of exemptions that, you know, can cover

7    sensitive military sorts of things.

8            But am I wrong about that, Mr. Bouton, or do you

9    know?

10           **MR. BOUTON:**  I do not know, Your Honor.  I haven't

11   tried to issue a FOIA request to the DOD.

12           **THE COURT:**  Yeah.  Yeah.  Okay.  Well, I -- go ahead.

13           **MR. DRAKE:**  I'm sorry.  There's one other thing.  And

14   I didn't mean to interrupt.  I'm sorry.

15           There's one other thing.  In looking over these

16   documents, and as Mr. Barnhill said and Ms. Nester, we think

17   that these documents also contain evidence that we're seeing

18   now.  We're seeing this for the first time, but there's enough

19   of a hint there that we see that these documents may show

20   mitigating circumstances for our client, in that the origin of

21   the vaccine and the government dispossessed themselves of the

22   vaccine and these contracts and this sort of thing.  So I think

23   these contracts that were just given to us by the Government

24   are going to be helpful for us.  And on that basis, I'd like to

25   assert -- reassert on our motion for continuance, because if

1  they do in fact do that, then I think we're entitled to go

2  through that and use them for ourselves.

3       **THE COURT:**  So I'm trying to understand.  You said on

4  that basis you want to reassert your motion to continue?

5       **MR. DRAKE:**  I'm sorry.  What I meant to say, Judge,

6  is that I think the documents may be -- the documents produced

7  may be useful to defense strategies.

8       **THE COURT:**  Okay.

9       **MR. DRAKE:**  But we're unable to ascertain that

10 totally because of the redaction.  But -- in other words,

11 Judge, I can see how you're going in your statements and

12 questions, and I didn't want to have these documents excluded

13 if they are going to contain something that's mitigating.

14      **THE COURT:**  Yeah.  Well, it seems to me -- and I

15 don't want to get too far ahead of myself, but it seems to me

16 the way to think of this may depend on what exactly the

17 Government's planning to do with them.  You know, I would be

18 very concerned if the Government was planning to use them to

19 try and show ownership, you know, based on, you know, the

20 timing of the disclosure.

21      I am far less concerned to the extent the Government

22 is just trying to establish pricing and it's just a question of

23 whether you think you could maybe dig something out of them

24 that would be helpful to you.

25      Because it's one thing, you know, for you to be --

1  have ample notice and time to meet the Government's

2  case-in-chief, you know, in terms of developing your own

3  arguments.  You know, I think that the Government's Arguments

4  do have some traction with regard to -- you know, you've

5  mentioned that these contracts must have existed for -- you

6  know, from the start of the case.  And, you know, you haven't,

7  as far as I can tell, made any serious attempts to get them.

8        So I guess those are two different things, in my

9  view.  But I guess -- I mean I think how these are used at

10  trial matters a great deal.  And that's why I've been kind of

11  trying to explore that.  And I mean I would be most

12  comfortable, I guess, if these were just being used to refresh

13  recollection and not coming in at all, unless the defense

14  somehow wanted to introduce them.

15        But you're not sure, Mr. Bouton, about that, it

16  sounds like.

17        **MR. BOUTON:**  I would have to phone a friend with

18  Mr. Strain and ask him his recollection, because he was on the

19  call with Mr. Disbrow, or the Teams meeting, to see what he

20  thinks.

21        **THE COURT:**  Yeah, I mean the thing is, I mean --

22        **MR. BOUTON:**  If you'd like him to chime in,

23  Your Honor, he may have a better --

24        **THE COURT:**  Yeah, we will in just a moment.  I mean I

25  guess the other possibility would just be redacting them

1    heavily even further and just -- not redacting, but just like

2    introducing the pages, the relevant pages.  I guess, you know,

3    the defense could object to that, and I'm not going to -- I'm

4    not going to rule in advance on the issue.  I think the defense

5    may have objections, under the rule of completeness or I don't

6    know what, to them coming in at all.

7             But, you know, I'm not sure how easy it's going to be

8    for you to get these in if you're trying to actually get them

9    introduced, but I don't want to prejudge that issue.  I haven't

10   really thought through all the permutations, though.

11            **MR. BOUTON:**  Understood, Your Honor.  And I would add

12   that they did not object to those exhibits by their deadline --

13            **MS. NESTER:**  We didn't have them.

14            **MR. BOUTON:**  -- to reserve authenticity.  Although

15   that was not, in my view, allowed by the pretrial order.

16            **MS. NESTER:**  We didn't have them yet.

17            **MR. BOUTON:**  Yes, you had them on the 20th --

18            **MS. NESTER:**  But not at the time you did your list, I

19   don't think.

20            **MR. BOUTON:**  We produced the list on the 19th and the

21   documents on the 20th, and the objections to our exhibits were

22   due last week.

23            **MS. NESTER:**  We objected on the grounds of

24   authenticity.

25            **MR. BOUTON:**  Yes, but really the trial order did not

1    allow you to reserve those objections, other than 402 and 403.

2    But I guess that's a different issue.

3            **THE COURT:**  Whoa, whoa, whoa.  I mean that's

4    something we can discuss.  I mean I -- you don't have to make

5    objections based on 402 and 403, you can make those at trial.

6    But the purpose of the trial order is to flesh out other issues

7    besides those.

8            **MR. BOUTON:**  Yes, Your Honor.  That was my

9    understanding.  But my understanding was only 402 and 403 were

10   accepted, so authenticity objections ought to have been made

11   already.

12           **THE COURT:**  It sounds like she did, is what she's

13   saying.

14           **MS. NESTER:**  Yeah, I did.

15           **THE COURT:**  I can't rule on that.  But I mean I think

16   you're right, Mr. Bouton, but I think Ms. Nester is saying --

17   she's not disagreeing with you, she's just saying but she did

18   make that objection.

19           **MR. BOUTON:**  Just to all of them by reserving it.

20           **MS. NESTER:**  Except for like three of them.  I mean

21   we are not going to make you call the bank representatives to

22   get bank records in and we're not going to make you call the

23   department of -- the Utah corporations, whatever it's called,

24   to get the --

25           **THE COURT:**  Okay.  Well, I understand what you're

1   saying now, Mr. Bouton.  You're saying it wasn't like a

2   document-specific objection, it was a general objection.  I

3   haven't looked at how the objections were presented, so I'm

4   just not going to opine on that.  But I think I understand what

5   you're getting at.

6          All right.  Okay.  Well, that's -- okay.

7          Mr. Strain, did you have something you wanted to say?

8          **MR. STRAIN:**  I don't really have a ton to contribute.

9   My vague memory of our interview with Mr. Disbrow weeks ago is

10  that he was involved in the negotiations, that he was in the

11  room when these prices were determined, and that he can testify

12  competently about them.  But Mr. Bouton's right, those

13  contracts were -- I mean he relies on them.  To the exact

14  extent, I'm not sure.  We'd have to do more follow-up.

15         **THE COURT:**  Okay.  All right.  That's helpful.  I

16  mean, I guess -- I guess -- I mean, as I said, I think there's

17  two distinct issues here.  One is, you know, to the extent, you

18  know, one relates to the defense (inaudible) kind of explore --

19  you know, to the extent it might help the arguments they want

20  to make.  The other is, you know, whether they could properly

21  come in or be referenced just for the purposes of, you know,

22  establishing pricing.  And I think those are related but

23  slightly different issues.

24         I mean I guess the government, Mr. Bouton, is

25  comfortable going forward on the understanding that you may

1    have a fight to get these documents in?  And --

2            **MR. BOUTON:**  Yes, Your Honor.  As long as my

3    colleagues are nodding their heads in agreement, I would say

4    yes, they appear to be on board with that.

5            **THE COURT:**  Right.  And I mean it's the defenses' --

6    I mean, again, I mean would you even want them out, though, is

7    the question I have for the defense?  Maybe you don't know the

8    answer to that right now.

9            **MS. NESTER:**  I don't know.  I need an expert to help

10   me figure that out.

11           **THE COURT:**  Okay.  Any other thoughts about -- any

12   other thoughts about the motion to continue?

13           **MR. BOUTON:**  Your Honor, I guess I would ask if --

14   well, no.  No.

15           **MS. NESTER:**  Your Honor, I would also just point

16   out -- I don't know if you've had a chance to look at it yet,

17   but I think the Government has noticed six witnesses.  They

18   think they're going to finish their trial in four days.  I

19   think originally we had talked about blocking this case out for

20   three weeks.  I don't think any of us think that anymore.  I

21   think at most this case would take two weeks and probably less.

22   So we're not talking about a huge -- we're not talking about a

23   huge inconvenience of pushing this case off for a couple more

24   months.

25           All of the witnesses -- of the six witnesses they've

1    noticed, one of them's not -- maybe it's seven, I can't

2    remember.  One of them's not necessary anymore because we're

3    stipulating to the authenticity of the corporate records, three

4    of them are just people that are local that live here, and then

5    they have their two experts.  So I mean the expert wasn't even

6    retained until a few weeks ago.  So I just don't think it's

7    going to be a huge ordeal for us to push this trial and maybe

8    set it -- when we reset it, only set it for two weeks.

9          I know we have -- probably the jury stuff has gone

10    out.  I don't know how soon you send that out.  So that's the

11    only thing I think that would be probably a pain to reschedule,

12    but the rest of it's not.

13          **THE COURT:**  Right.  I mean there's administrative

14    issues and that's -- you know, those alone, of course, are not

15    a basis for a continuance.  But I understand the points you're

16    making.  Though I guess one thing I wanted to be clear about

17    the timing is, when I set a trial or when I'm asking for

18    time -- I think we went over this in October when we talked

19    about this trial schedule -- I'm not just looking at -- I'm not

20    just adding the time for the Government's case-in-chief plus

21    the time for the Defense's case-in-chief, I'm trying to build

22    in time for jury selection and jury deliberations.  In some

23    cases, that may not be a significant factor.  I think jury

24    selection in this case could easily take a couple of days.

25          **MS. NESTER:**  I think you're right.

1    **THE COURT:**  And I don't know that jury selection --

2    that we can assume that it won't take a couple days or more

3    either.  I think that has to be built in.  And that's one

4    reason I'm kind of reluctant to reduce the scheduled trial time

5    much.

6        **MS. NESTER:**  Okay.

7        **THE COURT:**  I would much rather have the jury be able

8    to come in early and go home earlier than I told them that they

9    might have to stay than to have what I've had happen before

10   where they end up having to stay a few days past what I told

11   them because they're still deliberating or something.  So

12   that's part of what's going on there.

13       I think this case -- I mean if this were a simple

14   like, you know, felon in possession of a firearm case, you

15   know, we probably could assume that the jury selection and jury

16   deliberations -- we don't have to build in multiple days for

17   those things, but I'm not sure that's true here.

18       **MS. NESTER:**  You're probably right.

19       **THE COURT:**  Yeah.

20       **MR. BOUTON:**  I would just clarify, Your Honor, if I

21   may, that we do have nine witnesses.  And the only one who

22   would be brief is Mr. Disbrow.

23       **THE COURT:**  Right.  Well, he might be brief, it

24   sounds like --

25       **MR. BOUTON:**  At least our intentions were to put him

1    on briefly.

2           **THE COURT:**  Your direct examination will be brief, is

3    what you're saying?

4           **MR. BOUTON:**  Yes.

5           **THE COURT:**  Yeah, yeah, I understand.  But you still

6    think you need how long for your case-in-chief, Mr. Bouton?

7           **MR. BOUTON:**  We think we could get done in a week, if

8    jury selection took one day.  We think five or six days for our

9    case-in-chief.

10          **THE COURT:**  And that's building in time for jury

11   selection?

12          **MR. BOUTON:**  That was building in one day for jury

13   selection.  So that's two days.  Five to seven.

14          **THE COURT:**  I'm really skeptical about that,

15   honestly.  I mean it seems like this is going to be a -- it

16   wouldn't surprise me if jury selection took a little longer in

17   this case than it sometimes does.  I mean I just don't know in

18   advance.  But the case does seem to implicate issues on which

19   people have fairly strong views, you know, and that's something

20   we're going to want to look at to try and make sure we can get

21   a fair jury that's fair to the Government, that's fair to the

22   Defense.

23          And it's the kind of case where also not only are

24   there a fair number of strong views, but they run in different

25   directions, you know.  So I think both of you are going to --

1    I'd be surprised if the jury pool didn't present a fair number

2    of individuals that both sides -- you know, that -- I don't

3    think each side is going to be completely happy with views of

4    all of the jury pool.  Let's just put it that way.

5            **MR. BOUTON:**  Fair enough, Your Honor.

6            **THE COURT:**  I don't know that, but it's just an

7    assumption and a guess.  All right.  I need a -- okay.  I

8    guess -- let me just see something.

9            Well, I appreciate your arguments.  I need about five

10   minutes, if you could just stand by.  Don't cut your

11   connections.  You can turn off your microphones and your video,

12   but stay on Zoom so we don't have to try and corral everybody

13   again.

14           (A recess was taken.)

15           **THE COURT:**  All right.  I'll welcome everybody back

16   now.

17           Okay.  Thank you for your patience.  I appreciate all

18   of your arguments today and your answers to my questions.

19   They've been very helpful.

20           I've carefully read the briefing, the motions, the

21   response, the reply, the sur-reply.  I've also carefully

22   considered the points counsel have made today.

23           I'm going to deny the motions to continue.

24           First of all, I don't think there is a Rule 16

25   violation here, given that the Government represents -- and I

1    don't have any reason to question its representation -- that

2    the trial team did not have these contracts in their possession

3    until just, you know, about 24 hours before they were provided

4    to the defense.

5        And as, of course, everyone knows, 16(a) -- and I

6    don't know if I'm going to get all the numbers right, I think

7    it's (a)(1)(E) for documents and objects, requires production

8    "[u]pon a defendant's request, the government must permit

9    the defendant to inspect and to copy or photograph . . .

10   documents . . . if the [document] is within the government's

11   possession, custody, or control and . . . the item is material

12   to preparing the defense . . . [or] the government intends to

13   use the [document] in its case-in-chief at trial."  Well, also

14   or if it belongs to the defendant.

15       Here, you know, I think that there's not a violation,

16   given that it was not in the Government's -- and by that I

17   understand it to mean the prosecution's -- custody or control.

18       Also, I note that the Government's intended use of

19   the document does not introduce or inject a new issue into the

20   case.  The Defense has long known that the Government intended

21   to introduce testimony regarding the price the government paid

22   for the vaccine.  The Government represents that the only use

23   it intends to make of the documents is to support testimony

24   regarding the price of the vaccine.

25       I do want to be clear that I'm open to limitations on

1  the document that would enforce -- you know, make sure it's

2  used only for that purpose; for example, things such as

3  admitting only portions of the documents.  I also am not going

4  to rule in advance as to potential objections to the documents

5  coming in at all.

6        All right.  Now, because the Government is not using

7  it to establish ownership and because there's not a Rule 16

8  violation, against that backdrop, I cannot find that

9  Dr. Moore's counsel reasonably needs additional time to prepare

10  for trial, taking into account the exercise of due diligence

11  based on the production of these documents.

12        Counsel for Dr. Moore represents that as far back as

13  2023, defense counsel discussed with the prosecutors in this

14  case the need to trace the ownership of the vaccines all the

15  way back to the manufacturers.

16        Further, the existence of contracts between the

17  vaccine manufacturers and the government is no secret.  Indeed,

18  it should have been obvious to defense counsel that such

19  contracts must have existed.

20        Nor is the -- you know, and counsel today mentioned

21  the involvement of DOD.  But, again, the fact that the

22  operation -- you know, the vaccines were developed as part of

23  Operation Warp Speed is also a matter of public record and long

24  has been.

25        It follows, I believe, that the defense has had years

1    to investigate the contractual relationship between the vaccine

2    manufacturers as well as when, whether and how the government

3    took title to the vaccines from the manufacturers, if it did.

4    I guess, "when, whether and how" is what I said, I guess that

5    covers if it did.

6            At our hearing in October, defense counsel indicated

7    the need for additional discovery.  And I told them to get

8    right on it and that I anticipated that it would be done by the

9    spring.

10           Now, to be sure, Dr. Moore's motion includes the

11   conclusory assertion that "the defendants were not able to

12   obtain the [][contract] documents" the Government recently

13   disclosed "either through FOIAs or subpoenas" "[b]ecause of the

14   confidential nature of the [] documents."  But counsel for

15   Dr. Moore does not describe the efforts the defendants actually

16   made to obtain the documents.

17           You know, there was a reference today to a FOIA

18   request, but apart from that -- but it's not clear to what

19   extent the defense followed up on that, other than to say it

20   would have taken 18 months.  And it's not clear by that whether

21   Ms. Nester meant that they abandoned the request or whether

22   it's still pending or what.  But apart from that, it's not -- I

23   don't have any representations or indication that the defense

24   made any efforts to obtain the documents, despite having years

25   to explore the issue of whether the vaccines were government

1    property when Dr. Moore allegedly disposed of them.

2           As far as I can tell, there's no indication in the

3    record that the defense ever even asked the prosecution, you

4    know, for the documents, or that the prosecution would not have

5    attempted to provide them if the defense had made such a

6    request.

7           Certainly, FOIA is subject to various exemptions but,

8    you know, the court does have subpoena power.  There's -- you

9    know, if there were -- you know, if the defense was

10   encountering road blocks and they thought these contracts were

11   genuinely important to their defense, it's not clear to me why

12   that could not have been brought to the attention of the court.

13          Because Dr. Moore had ample time to explore whether

14   the vaccines were federal government property when Dr. Moore

15   allegedly disposed of them, I cannot find that counsel for

16   Dr. Moore has exercised due diligence in investigating this

17   issue.

18          Further, having reviewed the documents on which

19   Dr. Moore bases his motion for a continuance, and to be sure,

20   they're redacted and not complete, but I do not see anything in

21   the documents that seems at all likely to support an argument

22   that the government did not obtain title to the vaccines at the

23   time they were delivered to Dr. Moore, or even anything that

24   suggests that additional exploration of this issue is

25   warranted.

1          Rather, to the extent the documents address the

2    issue, they appear relatively straightforward.  As would be

3    expected, the contracts state that the government took title --

4    well, the Janssen contract states that the government took

5    title when the vaccines were delivered to vendor-managed

6    inventory, or to a site designated by the government and the

7    government accepted delivery in writing -- that's the Janssen

8    contract at 47 -- or when the government provided pre-approval

9    documents to the manufacturer confirming availability of

10   vaccine doses.  That's Pfizer at 50.

11         It thus appears to be candidly that the defense has

12   no reasonable good faith basis for thinking that further

13   explanation in the contracts on this issue would be helpful.

14   Rather, it seems that they seek to engage in a fishing

15   expedition on the off-chance that something might turn up,

16   especially given that the defense has had ample opportunity to

17   explore the issue.

18         I thus conclude that denying the request for

19   additional time to analyze and consult an expert regarding

20   these documents would not be a miscarriage of justice.

21         In addition, although I appreciate that Dr. Moore is

22   willing to waive his right to a speedy trial, I must consider

23   "the public's interest in a speedy trial."  I'm quoting there

24   from *United States v. Williams*, 511 F.3d 1044 at page 1058 from

25   the Tenth Circuit in 2007.

1          Given the significant resources that the Government

2    has expended in complying with the operative trial order, and

3    indeed with the previous trial order for January, for the

4    January 2025 trial date, I conclude that the public's interest

5    in a speedy trial outweighs the ends-of-justice factors that

6    the defendants have identified under the Speedy Trial Act.

7          I so find.

8          Further, I believe that the parties understood, in

9    November 2024 when I set the current trial date, that we were

10   setting a firm trial date that would be continued only for

11   truly unforeseen circumstances.  But Dr. Moore has long been

12   aware that the Government must show ownership of the vaccines

13   to convict the defendants under Counts 2 and 3.  Indeed, its

14   motion to dismiss questioned the Government's ability to make

15   that showing, albeit on somewhat different grounds.

16         It follows, I conclude, that Dr. Moore's continuance

17   motion is not based on truly unforeseen circumstances.

18         And again on that point, I note that, you know, even

19   at the time I denied the motion to dismiss and we set this

20   trial date -- though there was some subsequent movement back

21   and forth in connection with the detention -- but, you know, we

22   originally set this trial date in the October hearing.  You

23   know, there was an understanding that additional discovery

24   might be necessary, and I was very clear that, you know, that

25   needed to get done.

1          All right.  Now, I do have some concerns about

2     counsel for Mr. Andersen, his health condition.  But he does

3     represent that, you know, he believes he will be able to

4     proceed by the July trial date and that, apart from this issue

5     that I have addressed, he does not anticipate any other

6     problems being ready for trial.  So for that reason as well, I

7     don't think that's a basis for a continuance, additional

8     time -- you know, reasonable time necessary for effective

9     preparation.

10          For all of these reasons, I cannot find that a

11     failure to grant a continuance would work a miscarriage of

12     justice or deny counsel the reasonable time necessary for

13     effective preparation, taking into account the exercise of due

14     diligence.  And I thus cannot find that the ends of justice

15     served by granting the requested continuance outweigh the best

16     interest of the public in a speedy trial.

17          For that reason, trial will begin, as scheduled, on

18     July 7th, 2025.  Again, to be clear, my ruling is premised on

19     the understanding that the Government will attempt to use the

20     document only to show the pricing and not to attempt to show

21     that the government took title to the vaccines.  And I am open

22     to various possibilities for enforcing that or ensuring that

23     that is the use to which the document is limited.  You know,

24     whether that's reducing the number of pages that are actually

25     admitted into evidence to those that are related to pricing and

1    not those involving title, or to perhaps, you know, using it

2    simply to refresh recollection, if that works, without having

3    it given to the jury at all.

4            I'm also -- as I said before, I am not ruling in

5    advance that the document is even admissible.  I'm not -- you

6    know, the defense may have arguments that it can't be properly

7    authenticated, they may have arguments that it can't fairly be

8    admitted under the rule of completeness.  I don't know what's

9    been preserved or what arguments might be made, but I'm not

10   intending to rule on those at this time.

11           But on that understanding, the motion to continue is

12   denied.

13           All right.  Are there any other matters that -- well,

14   first of all, any questions about that?

15           **MR. DRAKE:**  Judge, if I may --

16           **MS. NESTER:**  Can you let me go first, David?

17           **THE COURT:**  Let's go Ms. Nester first and then

18   Mr. Drake.

19           **MS. NESTER:**  Your Honor, one thing I would ask now is

20   that -- we got the documents after our expert deadline had

21   expired.  I believe I'm going to need a rebuttal expert to

22   explain these documents in a way that is understandable to the

23   jury.  And I think we're entitled to do that.  But because of

24   its late disclosure, I already am past a deadline.

25           I'm asking to be relieved from that deadline and

1    allow me to designate late a rebuttal expert.  And if you have

2    to go get a fact witness to question these documents in any

3    way, that I be allowed to do late disclosure of those witnesses

4    as well.

5        **THE COURT:**  That seems -- I mean I'm not going to

6    grant that based only on what you just said, but it seems like

7    there might be something to what you're saying.  I'll consider

8    a motion that kind of elaborates on the points you're making.

9        **MS. NESTER:**  Okay.  I'll file one.  Thank you.

10       **THE COURT:**  But again, to be clear, I don't think

11   just what you said is enough.  But I do think -- it may be the

12   seed of a reasonable argument, but I'd want to give you the

13   chance to elaborate that a little bit.

14       **MS. NESTER:**  All right.  Thank you.

15       **MR. DRAKE:**  And, Judge, what I would ask is if we

16   could have the redaction removed and then we could be put

17   under -- that we show it to no one, we don't even share it with

18   our clients, sign a non-disclosure agreement or whatever would

19   be comfortable for the Court, so that we can see the whole of

20   the documents.  Because I have an issue with pricing and

21   ownership, and I think the two are inextricably related.  So if

22   we could do something with the redaction, I'd really appreciate

23   that.

24       **THE COURT:**  I'd like to hear the Government's view on

25   that.  I mean, what do -- again, it's not often that we allow

1    evidence in to trial that even the lawyers are not allowed to

2    see.

3         **MR. BOUTON:**  Yes, Your Honor, it is unusual.  But

4    there was much pushback from ASPR in providing this to us.  We

5    got more than I thought we would get.  I thought we would just

6    get pricing pages.  And they have concerns based on

7    confidentiality agreements with the manufacturers, as I

8    understand, and other issues about this information being made

9    public.

10        We did try to -- we made them aware that there was a

11   protective order, right, that we have discovery obligations in

12   the case, and that defense counsel would be bound by the

13   protective order to use it only for the case and not to

14   publicly disclose it.  They still had extreme reservations and

15   provided us the documents only in this form.

16        **THE COURT:**  Okay.  Well, I mean does the protective

17   order that's in place allow attorneys' eyes only designations?

18        **MR. BOUTON:**  I think we would need more specific

19   language and an order from the Court to allay their concerns

20   that these be shared with them, and that it be attorneys' eyes

21   only for counsel.  They were not entirely comfortable, just

22   based on the protective order that's in place, which is why

23   they gave us the redacted versions.

24        **THE COURT:**  Yeah.

25        **MR. DRAKE:**  Judge, I'm willing to sign whatever.  I

1  have no intent whatsoever to disclose this to anyone, and I'd

2  be bound by anything that the government wants to have me sign,

3  and I'm sure Ms. Nester would.

4          **MS. NESTER:**  Well, maybe not anything.

5          **MR. DRAKE:**  Well, I mean within the context of what

6  we're saying.

7          But, Judge, one problem, they have this witness on

8  the stand and the signature's redacted, so he can't even tell

9  if he signed it or not.  I mean that's the problem.

10          But I think, as I said before, it would be a great

11  benefit if we could have an unredacted version.  And I'd be

12  willing to sign whatever protective order is necessary not to

13  share it with anyone except maybe co-counsel.

14          **THE COURT:**  Well, why -- I think that's -- I'm

15  reluctant to allow a document to come in that counsel has not

16  seen.

17          But Mr. Bouton, do you want to speak to that?

18          **MR. BOUTON:**  Maybe.

19          **THE COURT:**  Well, you raised your hand, which is why

20  I was --

21          **MR. BOUTON:**  Yeah, I was considering whether I

22  could respond to it.  I mean there is a concern with this of

23  just allowing more fishing expedition with the documents.  Our

24  position is the redacted portions have never been in our

25  control or possession, I haven't seen them.  We don't know what

1    they are so this would be, in a sense, expanding the discovery.

2    But I understand the Court's concerns about the rule of

3    completeness.

4            **THE COURT:**  I even -- can I even allow a document to

5    be sealed or redacted in trial without making findings that

6    it's properly redacted?  I mean --

7            **MR. BOUTON:**  Probably not, Your Honor.

8            **THE COURT:**  Okay.  That might be a problem for you,

9    then, if we can't figure out how to get an unredacted version

10   that at least I can see and at least the attorneys can see.

11           **MR. BOUTON:**  We're definitely willing to go back to

12   ASPR and address the Court's concerns.  And if the Court is

13   ordering us or ordering them to produce the unredacted version

14   pursuant to an attorneys' eyes only protective order, I'm sure

15   we would comply.  But it might take something like that.

16           **THE COURT:**  Yeah.  Yeah.  Well, it seems like it

17   might be warranted, given where we are right now.

18           What's your basis -- I mean other than that you don't

19   have it, but I mean that's -- that's a tricky argument at this

20   point.

21           **MS. NESTER:**  Your Honor, can I jump in?

22           **THE COURT:**  Yeah.

23           **MS. NESTER:**  I've done litigation before -- and I

24   think both Mr. Bouton and Mr. Strain may have as well -- but

25   I've done top-secret litigation before where we had to use SCIF

1   and follow the CIPA and all that stuff, or CIPA, or whatever

2   it's called.  And even those cases require that unredacted

3   top-secret national security documents be given to the

4   attorneys to read in their unredacted form.  And a lot of times

5   the government has to make a call:  Is it more important to you

6   to prosecute this person or is it more important to you to keep

7   this document sealed?  And that's your call.  And they've had

8   to drop cases because they would not unseal terrorist-related

9   documents, and they just had to drop it.  And I mean that's

10  happened and that's not --

11          **THE COURT:**  Thank you, Ms. Nester.  I alluded to that

12  earlier and I'm well aware of all that.

13          **MS. NESTER:**  Yeah.

14          **THE COURT:**  Yeah.  I just -- I don't know that --

15  yeah, I think I -- I do think we need a protective order.  And

16  I think for starters it should be attorneys' eyes only.  But I

17  do think if you're actually going to use this at trial, I think

18  we have to be in a position to evaluate what it says and

19  whether the redactions are proper, and so forth.  So I do think

20  we need a protective order and I do think we need the

21  unredacted documents.  So, yeah, I do think that is an order I

22  would be willing to make.  But I'd also like counsel, to the

23  extent the current protective order doesn't have like

24  attorneys' eyes only provisions -- I thought it did, but I

25  might -- it's been a while since I've had to look at that.

1          But maybe the parties could propose a

2    specific agreement or a specific modification to the current

3    agreement, and by that I mean the protective order.  So like

4    propose an attorneys' eyes only protective order or an

5    amendment to the current one, if it's needed, to just allow for

6    that kind of designation.  And then I guess I would allow the,

7    you know, counsel to propose for me an order just requiring the

8    production of an unredacted version of the documents, subject

9    to an attorneys' eyes only declaration.  And then I'll decide,

10   you know, if there's -- we'll go from there.

11         But, yeah, I mean I do think, to the extent the

12   Government intends to introduce this at trial, that that -- you

13   know, it's -- I think that's probably requisite for both me and

14   defense counsel to be able to at least see what the entire

15   document says.

16         Whether or not Ms. -- you know, the defense is able

17   to use it in any way, I don't know.  As I said, I think it's

18   something of a fishing expedition.  At least in the unredacted

19   version I don't see anything that looks like a fruitful line of

20   inquiry, but there's a lot of redactions.

21         **MR. BOUTON:**  Understood, Your Honor.  And I do think

22   if we were to tailor a protective order that specifically

23   addressed these documents it would allay some of the concerns

24   that ASPR raised.

25         **THE COURT:**  But I mean Ms. Nester is right, I mean

1    even if it's like top-secret, alphabet-soup-code-word kind of

2    stuff, you know, you can't just not have -- you can't have it

3    introduced at trial in a redacted form without the judge or the

4    defense ever having a chance to see it.

5              **MR. BOUTON:**  Understood, Your Honor.

6              **THE COURT:**  Yeah.  Anything else?

7              **MR. BOUTON:**  Not from the United States, Your Honor.

8              **THE COURT:**  Okay.  And I don't even know if this is

9    an appropriate question, Mr. Bouton, and I -- and you don't

10   have to answer, but I just --

11             **MR. BOUTON:**  Now I'm worried, Your Honor.

12             **THE COURT:**  I hope you got a -- I hope you've done

13   your political due diligence on this case, because we're

14   putting a lot of effort into this and I -- you know, I hope

15   (inaudible) is really okay with this going forward.

16             **MR. DRAKE:**  That's a good point, Judge.

17             **MR. BOUTON:**  I have reason to believe that they are,

18   Your Honor.

19             **THE COURT:**  Okay.  Well, I'm not going to push you on

20   that, I just -- you know, if we're going to put all this effort

21   into the case, you know, I want to make sure that, you know,

22   we're not on a fool's errand, as it were.

23             But, again, you said you've got -- I'm not going to

24   require more than what you just said.  I just wanted to flag

25   that issue, just to make sure.  I'm sure you're aware of the

1    need for that.

2            **MR. DRAKE:**  Judge, we were planning on having RFK

3    come in and testify.  I'm just kidding.

4            **THE COURT:**  I didn't see that on your exhibit list.

5            **MR. BOUTON:**  He was not on the witness list.

6            **MR. DRAKE:**  He'll be a rebuttal witness, Judge.

7            **THE COURT:**  All right.  Very well.  Again, as I said,

8    I don't really even want to like press you or ask about that, I

9    just wanted to make sure that -- I'm sure that's something

10   you're sensitive to and aware of, so --

11           **MR. BOUTON:**  Yes, Your Honor, I understand we're

12   devoting significant government and private and judicial

13   resources on this case.

14           **THE COURT:**  Right.  Right.  Understood.  Very good.

15   I appreciate that.

16           Any other matters we should address at this time?

17           **MR. DRAKE:**  Judge, is now an inappropriate time or an

18   appropriate time to tell the court reporter we're requesting a

19   transcript of today or do I do that with her directly?

20           **THE COURT:**  You can do it directly.

21           **MR. BOUTON:**  Nothing from the United States,

22   Your Honor.

23           **MS. NESTER:**  Your Honor, do you know when you're

24   going to get us that first round of questionnaires that got

25   sent out?

1    **THE COURT:**  Real soon.  I was waiting until after

2    today, actually.

3    **MS. NESTER:**  Okay.  Thank you, Your Honor.

4    **THE COURT:**  Yeah, it doesn't seem like there is a

5    huge amount of dispute among the parties.  It seemed like there

6    was maybe one or two that struck me as relatively minor issues.

7    But it seemed like you'd reached -- you know, that there were

8    some additional proposed questions, but there wasn't much

9    controversy.

10    Am I wrong about that?

11    **MS. NESTER:**  No.  I think we kind of just each had

12    questions we were worried about.  But we also have the pending

13    motions in limine, which the sooner we can -- are you

14    anticipating us arguing that at the pretrial?  Because the

15    sooner we know that, the better for our defense.

16    **THE COURT:**  Yeah, I was anticipating addressing those

17    at pretrial.

18    **MS. NESTER:**  Okay.  Perfect.  Thank you.

19    **THE COURT:**  Okay.  Anything else?

20    **MR. BRASS:**  Not for me.

21    **THE COURT:**  Okay.  All right.  Well, thank you.  In

22    that case -- I guess I didn't ask everyone specifically, but

23    I'm not seeing any hands or anything, so I'm assuming

24    everyone's done.

25    Thank you, again.  And court is adjourned.(2:40 p.m.)

CERTIFICATE OF COURT REPORTER

        This is to certify that the proceedings in the foreging matter were reported by me in stenotype and thereafter transcribed into written form;

        That said proceedings were taken at the time and place herein named;

        I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the event thereof.

        In witness whereof I have subscribed my name this 4th day of June 2025.

Teena Green, RPR, CSR, CRR, CBC